Nos. 19-15566, 19-15662

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION

SHAWNE ALSTON; MARTIN JENKINS; JOHNATHAN MOORE; KEVIN PERRY; WILLIAM TYNDALL; ALEX LAURICELLA; SHARRIF FLOYD; KYLE THERET; DUANE BENNETT; CHRIS STONE; JOHN BOHANNON; ASHLEY HOLLIDAY; CHRIS DAVENPORT; NICHOLAS KINDLER; KENDALL GREGORY-MCGHEE; INDIA CHANEY; MICHEL'LE THOMAS; DON BANKS, "DJ"; KENDALL TIMMONS; DAX DELLENBACH; NIGEL HAYES; ANFORNEE STEWART; KENYATA JOHNSON; BARRY BRUNETTI; DALENTA JAMERAL STEPHENS, "D.J."; JUSTINE HARTMAN; AFURE JEMERIGBE; ALEC JAMES,
*Plaintiffs-Appellees-Cross-Appellants*,

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE NCAA; PACIFIC 12 CONFERENCE; CONFERENCE USA; THE BIG TEN CONFERENCE, INC.; MID-AMERICAN CONFERENCE; SOUTHEASTERN CONFERENCE; ATLANTIC COAST CONFERENCE; MOUNTAIN WEST CONFERENCE; THE BIG TWELVE CONFERENCE, INC.; SUN BELT CONFERENCE; WESTERN ATHLETIC CONFERENCE; AMERICAN ATHLETIC CONFERENCE,
*Defendants-Appellants-Cross-Appellees*.

Appeals from the United States District Court for the Northern
District of California, No. 4:14-md-2541 (Wilken, J.)

## DEFENDANTS' JOINT OPENING BRIEF

SETH P. WAXMAN
LEON B. GREENFIELD
DANIEL S. VOLCHOK
DAVID M. LEHN
KEVIN M. LAMB
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 663-6000

August 16, 2019              *Counsel for the NCAA*

ADDITIONAL COUNSEL LISTED ON INSIDE COVER

BART H. WILLIAMS
SCOTT P. COOPER
KYLE A. CASAZZA
JENNIFER L. JONES
SHAWN S. LEDINGHAM, JR.
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
(310) 557-2900

*Counsel for Pac-12 Conference*

LEANE K. CAPPS
CAITLIN J. MORGAN
POLSINELLI PC
2950 North Harwood Street, Suite 2100
Dallas, TX 75201
(214) 397-0030

AMY D. FITTS
POLSINELLI PC
900 West 48th Place, Suite 900
Kansas City, MO 64112
(816) 218-1255

*Counsel for the Big 12 Conference, Inc. and Conference USA*

MARK A. CUNNINGHAM
JONES WALKER LLP
201 St. Charles Avenue, 50th Floor
New Orleans, LA 70170
(504) 582-8536

*Counsel for Sun Belt Conference*

BETH A. WILKINSON
BRANT W. BISHOP
WILKINSON WALSH + ESKOVITZ LLP
2001 M Street N.W., 10th Floor
Washington, D.C. 20036
(202) 847-4000

SEAN ESKOVITZ
WILKINSON WALSH + ESKOVITZ LLP
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
(424) 316-4000

*Counsel for the NCAA*

JEFFREY A. MISHKIN
KAREN HOFFMAN LENT
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
4 Times Square
New York, N.Y. 10036
(212) 735-3000

*Counsel for the NCAA and Western Athletic Conference*

ROBERT W. FULLER, III
PEARLYNN G. HOUCK
LAWRENCE C. MOORE, III
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, N.C. 28246
(704) 377-2536

MARK J. SEIFERT
SEIFERT LAW FIRM
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 999-0901

*Counsel for Southeastern Conference*

**ADDITIONAL COUNSEL LISTED ON FOLLOWING PAGE**

ANDREW J. PINCUS
CHARLES A. ROTHFELD
RICHARD J. FAVRETTO
Mayer Brown LLP
1999 K Street N.W.
Washington, D.C. 20006
(202) 263-3000

BRITT M. MILLER
ANDREW S. ROSENMAN
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600

*Counsel for The Big Ten Conference, Inc.*

MERYL MACKLIN
BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
(415) 268-1981

RICHARD YOUNG
BRENT E. RYCHENER
BRYAN CAVE LEIGHTON PAISNER LLP
90 South Cascade Avenue, Suite 1300
Colorado Springs, CO 80903
(719) 473-3800

*Counsel for Mountain West Conference*

BENJAMIN C. BLOCK
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
(202) 662-5205

*Counsel for the American Athletic Conference*

R. TODD HUNT
BENJAMIN G. CHOJNACKI
WALTER HAVERFIELD LLP
The Tower at Erieview
1301 East 9th Street, Suite 3500
Cleveland, OH 44114
(216) 928-2935

*Counsel for Mid-American Conference*

D. ERIK ALBRIGHT
GREGORY G. HOLLAND
FOX ROTHSCHILD LLP
300 North Greene Street, Suite 1400
Greensboro, N.C. 27401
(336) 378-5200

JONATHAN P. HEYL
FOX ROTHSCHILD LLP
101 North Tryon Street, Suite 1300
Charlotte, N.C. 28246
(704) 384-2625

CHARLES L. COLEMAN, III
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111
(415) 743-6900

*Counsel for Atlantic Coast Conference*

## CORPORATE DISCLOSURE STATEMENT

The National Collegiate Athletic Association is an unincorporated, non-profit membership association composed of over 1,200 member schools and conferences.  It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

The American Athletic Conference is a D.C. not-for-profit corporation headquartered in Providence, Rhode Island.  It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

The Atlantic Coast Conference is a North Carolina not-for-profit unincorporated association headquartered in Greensboro, North Carolina.  It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

The Big Ten Conference, Inc. is a Delaware not-for-profit corporation with its principal place of business in Rosemont, Illinois.  It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

The Big 12 Conference, Inc. is a Delaware not-for-profit corporation with its principal place of business in Irving, Texas.  It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

Conference USA is an Illinois not-for-profit corporation with its principal place of business in Irving, Texas. It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

The Mid-American Athletic Conference, Inc. is an Ohio not-for-profit corporation headquartered in Cleveland, Ohio. It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

The Mountain West Conference is a Colorado not-for-profit corporation headquartered in Colorado Springs, Colorado. It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

The Pac-12 Conference (Pac-12) is a California not-for-profit unincorporated association headquartered in San Francisco, California. It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

The Southeastern Conference is an Alabama unincorporated non-profit association headquartered in Birmingham, Alabama. It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

The Sun Belt Conference is a Louisiana non-profit corporation headquartered in New Orleans, Louisiana. It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

The Western Athletic Conference is a Colorado not-for-profit corporation headquartered in Englewood, Colorado. It has no corporate parent, and no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES .................................................................... vii

INTRODUCTION ......................................................................................1

JURISDICTION.........................................................................................5

ISSUES PRESENTED.................................................................................6

STATEMENT ...........................................................................................6

    A.    The NCAA And The "Revered Tradition Of Amateurism
        In College Sports" ......................................................................6

        1.    The NCAA administers intercollegiate athletics as
            an integral component of higher education................................6

        2.    Amateurism in college sports.....................................................8

    B.    *O'Bannon* ...............................................................................12

    C.    Proceedings Below .................................................................15

        1.    Pretrial .................................................................................15

        2.    Trial, judgment, and permanent injunction................................18

SUMMARY OF ARGUMENT ...................................................................21

STANDARD OF REVIEW ........................................................................25

ARGUMENT ..........................................................................................26

I.    *O'BANNON* FORECLOSES PLAINTIFFS' CLAIMS................................................26

    A.    Stare Decisis .........................................................................26

    B.    Res Judicata .........................................................................33

II. THE CHALLENGED RULES ARE LAWFUL UNDER A PROPER RULE-OF-REASON ANALYSIS ......................................................38

    A. In Applying The Rule Of Reason, Courts Must Afford The NCAA "Ample Latitude" To Superintend College Sports......................................................39

    B. Although The District Court Correctly Concluded That The Challenged Rules Have Procompetitive Benefits, Its Step-2 Analysis Was Deeply Flawed ..................................41

        1. The district court flouted *O'Bannon*'s instruction that at step 2, the court could "only consider the benefits of the NCAA's existing rule"......................42

        2. The challenged rules are procompetitive because they preserve amateurism in college sports, thereby providing consumers with a unique and attractive product......................................44

        3. The district court unjustifiably rejected defendants' conception of amateurism ......................48

    C. The District Court's Less-Restrictive Alternative Is Unsupported And Improper ......................................56

        1. The district court wrongly concluded that the real distinction between college and professional sports is that only professional athletes can receive unlimited pay......................................58

        2. The evidence does not show that the district court's alternative would be virtually as effective as the challenged rules at differentiating college and professional sports......................................59

        3. The evidence does not show that the district court's alternative would not impose significantly increased costs......................................64

        4. The district court's alternative involves improper price setting ......................................65

III.   THE INJUNCTION IMPROPERLY ARROGATES CONTROL OVER
       COLLEGE SPORTS TO THE DISTRICT COURT ...................................................66

CONCLUSION ....................................................................................................69

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

Page(s)

*American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230
(3d Cir. 1975)..................................................................32

*American Needle, Inc. v. NFL*, 560 U.S. 183 (2010)................................40

*Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) (en banc)..............................28

*Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1 (1979) ..........................................39

*Chicago Professional Sports Ltd. Partnership v. NBA*, 95 F.3d 593
(7th Cir. 1996) .....................................................................65, 68

*Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir.
2013) .......................................................................67

*Costantini v. Trans World Airlines*, 681 F.2d 1199 (9th Cir. 1982)......................36

*Deppe v NCAA*, 893 F.3d 498 (7th Cir. 2018)..........................................44

*Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184 (9th Cir. 1984)......................25

*Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394 (1981)......................33

*Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001)..........................................32, 33

*In re Watts*, 298 F.3d 1077 (9th Cir. 2002)..........................................25

*Justice v. NCAA*, 577 F. Supp. 356 (D. Ariz. 1983) ................................49

*Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401 (2015)..........................29

*Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998) ........................................40

*McClain v. Apodaca*, 793 F.2d 1031 (9th Cir. 1986) ..................................37

*Media Rights Technologies, Inc. v. Microsoft Corp.*, 922 F.3d 1014
(9th Cir. 2019) ...................................................................25

*Miranda v. Selig*, 860 F.3d 1237 (9th Cir. 2017) ...................................30

*Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011)......................................25

*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984)...........................29

*Mpoyo v. Litton Electro-Optical Systems*, 430 F.3d 985 (9th Cir. 2005) ...................................................................................................36

*Nash County Board of Education v. Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981) ..............................................................................36

*NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984).....................................................................................*passim*

*NCAA v. Miller*, 10 F.3d 633 (9th Cir. 1993) ........................................39

*O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015).........................................*passim*

*O'Bannon v. NCAA*, 7 F. Supp. 3d 955 (N.D. Cal. 2014) .......................................55

*Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ..........................................41

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831-832 (1999).....................................34

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438 (2009)....................................................................29

*Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ......................................................................44

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010).......................................................................40

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006) ...............................................................................33

*Schmidt v. Lessard*, 414 U.S. 473 (1974) ...............................................67

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) ......................................29, 30

*Taylor v. Sturgell*, 553 U.S. 880 (2008)....................................28, 33, 34

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) .............................................65

*Turtle Island Restoration Network v. U.S. Department of State*,
    673 F.3d 914 (9th Cir. 2012) ........................................................... 35

*United States v. Clarke*, 573 U.S. 248 (2014) ......................................... 26

*United States v. Ramos-Medina*, 706 F.3d 932 (9th Cir. 2013) .............. 32

*United States v. Tohono O'odham Nation*, 563 U.S. 307 (2011) ..................... 35, 36

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................. 65, 68

## DOCKETED CASES

*In re NCAA Student-Athlete Name & Likeness Licensing Litigation*,
    No. 09-1967 (N.D. Cal.) ................................................................ 34

*NCAA v. O'Bannon*, No. 15-388 (9th Cir.) ............................................. 48

## STATUTES AND RULES

20 U.S.C.
    §1087kk ...................................................................................... 9
    §1087*ll* ...................................................................................... 9
    §1087tt ...................................................................................... 10

28 U.S.C.
    §1291 ......................................................................................... 5
    §1331 ......................................................................................... 5
    §1337 ......................................................................................... 5

Federal Rule of Appellate Procedure
    Rule 4 ......................................................................................... 5
    Rule 23 ................................................................................... 34, 35
    Rule 65 ................................................................................... 67, 68

## OTHER AUTHORITIES

Areeda, Phillip E. & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2019
    update) ................................................................................. 65, 66

Diamond, Jared, *How MLB's Luxury Tax Has Put a Deep Freeze on
    Spending*, Wall St. J. (Jan. 11, 2019), https://tinyurl.com/
    y5g3wtgk ...................................................................................... 58

Easterbrook, Frank, *The Limits of Antitrust*, 63 Tex. L. Rev. 1 (1984)...................29

Hovenkamp, Herbert, *Antitrust Balancing*, 12 N.Y.U. J.L. & Bus. 369 (2016)..............................................................................................66

*Minor League Basketball Teams Offer Some the Chance to Play, to Keep Their NBA Dreams Alive*, Fox News (July 3, 2013), https://tinyurl.com/y48nlz69...........................................................58

National Collegiate Athletic Association, *What Is The NCAA?*, https://tinyurl.com/y4kpswnl......................................................7

*Restatement (Second) of Judgments* (1982)............................................37

University of Nebraska, *Post-Eligibility Experiences* (Jan. 6, 2017), https://tinyurl.com/y36pgnzu....................................................54

U.S. Golf Association, *Rules of Amateur Status*, https://tinyurl.com/y3kk2q4e.....................................................51

U.S. Soccer Federation, *2019-2020 Policy Manual*, https://tinyurl.com/y5zd3783.....................................................51

**INTRODUCTION**

Students at colleges and universities across the country have long enjoyed the benefits of participating in intercollegiate athletics as part of their education. And for over 100 years, the National Collegiate Athletic Association (NCAA) and its member schools and conferences have played a central role in making those benefits available, by overseeing the nation's leading college-sports league—a league that for decades has made possible an enormously popular sports product. A defining feature of that league is (and has long been) that the players are unpaid (i.e., amateur) student-athletes rather than paid professionals.

Less than four years ago, this Court decided a class action brought by college football and basketball players challenging whether NCAA rules implementing the requirement that student-athletes be amateurs violated federal antitrust law. That decision, *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), reaffirmed a principle the Supreme Court recognized thirty years earlier, in *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984): "In order to preserve the character and quality of [college sports], athletes must not be paid," *id.* at 102, *quoted in O'Bannon*, 802 F.3d at 1062. Applying that principle, *O'Bannon* concluded that federal antitrust law requires the NCAA to permit student-athletes to receive athletic scholarships up to their "cost of attendance" (COA), a federally defined term covering tuition, books, fees, room and board, and

other legitimate and reasonable expenses typically incurred by students (athletes and non-athletes) to attend school, but no more. 802 F.3d at 1079.

That line was appropriate, *O'Bannon* explained, because covering legitimate educational expenses, including both academic expenses—for which COA is an objective and reasonable proxy—and athletic expenses, is consistent with amateurism, whereas cash payments unconnected to such expenses (which plaintiffs sought and the district court permitted in that case) are not. By preventing such payments, *O'Bannon* concluded, the NCAA's amateurism rules maintain college sports as a product distinct from minor league and other professional sports, and thus provide what antitrust law recognizes as the procompetitive benefit of widening consumer choice. This Court accordingly reversed the part of the district court's injunction requiring the NCAA to allow deferred payments to student-athletes of up to $5,000 per year above COA, holding that such payments would not be virtually as effective as the challenged NCAA rules in preserving amateurism.

This case is *O'Bannon* all over again. Nearly identical classes again invoke antitrust law to challenge materially identical NCAA rules. And the same district court that presided in *O'Bannon* has again required the NCAA to allow student-athletes to be paid for participating in intercollegiate athletics, notwithstanding *O'Bannon*'s holding that doing so was clear error. Indeed, the court authorized

schools to give all student-athletes "academic … awards and incentives" of up to $5,600 in cash per year (an amount strikingly similar to the $5,000 deferred payments struck down in *O'Bannon*). The court also ordered the NCAA to allow, without limit, what the court called "education-related benefits"—regardless of whether those benefits correspond to student-athletes' legitimate (or even actual) expenses. The benefits, moreover, expressly include "paid post-eligibility internships," which (since they must be allowed without limit) would permit student-athletes to be paid tens or hundreds of thousands of dollars in cash. The decision below thus goes much further than what this Court rejected in *O'Bannon*.

The district court's judgment should be reversed for several independent reasons. To begin with, *O'Bannon* forecloses plaintiffs' claims under principles of stare decisis and res judicata. None of the district court's rationales for its contrary conclusion—such as the recent minor relaxation of a few NCAA rules—justified another costly antitrust trial seeking to undo the same rules *O'Bannon* upheld. Absent adherence to the clear line *O'Bannon* drew, defendants will continue to face repetitive litigation over substantially the same rules.

Separately, the district court misapplied established core antitrust principles, in several ways. *First*, at step 2 of the three-step rule-of-reason analysis, the court erroneously considered alternatives to the challenged NCAA rules, flouting *O'Bannon*'s explicit directive that the only proper question at step 2 is whether the

*existing* rules have procompetitive benefits. This legal error relieved plaintiffs of the heavy burden they bear at step 3 of the rule of reason to adduce strong evidence that there is a viable less-restrictive alternative to the challenged rules. In fact, there is no evidence supporting the alternative the court adopted.

*Second* (and relatedly), the court reasoned that allowing large cash payments and *unlimited* "education-related benefits" to student-athletes would not erode the distinction between college and professional sports because, in its view, the real distinction between the two is that only professionals can receive unlimited pay. Nothing in the record supports that view—and it directly contradicts both *O'Bannon* and *Board of Regents*, each of which recognized that the distinction is that professionals are paid to play while student-athletes are not. The district court's decision, if left to stand, would eliminate that distinction.

*Third*, the court used its antitrust analysis to second-guess defendants' judgments and commitment to amateurism. But the court's decision to require the allowance of certain forms of pay simply reflects its disagreement with the NCAA's line-drawing regarding the types and amounts of expenses schools may cover. That is impermissible; antitrust law does not authorize courts to micro-manage the broadly reasonable judgments joint enterprises must make in offering their products. Nor did it permit the court here to fundamentally transform defendants' product from what it has been for decades—an amateur intercollegiate

sports league—into one in which student-athletes receive pay, just not what the court considers *too much* pay.

At bottom, then, this case (like *O'Bannon*) is about whether a federal court may use antitrust law to make detailed revisions to intercollegiate eligibility rules, or whether the administration of intercollegiate athletics should be left to the NCAA and its members. The Supreme Court answered that question in *Board of Regents*, stating that "[t]he NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports" and "needs ample latitude to play that role." 468 U.S. at 120; *accord O'Bannon*, 802 F.3d at 1062, 1074. The decision here—including the permanent injunction the district court issued, which would require defendants to seek the court's approval of *any* future regulation of "education-related benefits"—is utterly inconsistent with that admonition. They leave the NCAA *no* "latitude" in determining how best to preserve amateurism in college sports, and therefore threaten to upend that venerable enterprise. The judgment below should be reversed.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§1331 and 1337. The court entered judgment on March 12, 2019. ER1. Defendants noticed a timely appeal ten days later. *See* ER309; Fed. R. App. P. 4(a). This Court has jurisdiction under 28 U.S.C. §1291.

**ISSUES PRESENTED**

1.  Whether *O'Bannon v. NCAA* forecloses this lawsuit as a matter of stare decisis or res judicata.

2.  If not, whether NCAA rules limiting amounts that student-athletes may receive without losing their athletic eligibility are valid under the Sherman Act.

3.  If not, whether the district court's permanent injunction impermissibly arrogates control over college sports to the court.

**STATEMENT**

**A.  The NCAA And The "Revered Tradition Of Amateurism In College Sports"**

    *1.  The NCAA administers intercollegiate athletics as an integral component of higher education*

Founded in 1905, the NCAA is a national association that "superintend[s] college athletics." *O'Bannon*, 802 F.3d at 1079. Its "basic purpose" is to "maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports." ER274 (§1.3.1).

To carry out this purpose, the NCAA has promulgated a body of rules that address, among other things, the terms of competition, eligibility requirements (academic and otherwise), athletic scholarships, limits on expenses and awards, and recruitment. *See generally* ER272-273. These rules are extensive, reflecting the monumental enterprise that intercollegiate athletics constitutes: nearly half a

- 6 -

million student-athletes playing two dozen sports on over 19,000 teams at more

than 1,100 schools nationwide. *What Is The NCAA?*, https://tinyurl.com/y4kpswnl

(all cited websites visited August 16, 2019).

For purposes of their participation in NCAA athletics, schools are divided

into Divisions I, II, and III, with Division I schools featuring the largest athletic

programs, providing student-athletes the most financial aid, and generally offering

the highest level of competition. ER8; *O'Bannon*, 802 F.3d at 1053. Within

Division I, football programs are divided into the Football Bowl Subdivision (FBS)

and the Football Championship Subdivision (FCS), with FBS schools generally

offering the higher level of competition. ER8; *O'Bannon*, 802 F.3d at 1053.

Member schools have also organized themselves into 100 different conferences,

including 32 in Division I. ER8; *What Is The NCAA?*, *supra*.

Although almost all NCAA teams are subsidized by their schools (often via

student fees), a small percentage of teams generate more revenue than expenses.

*See* ER263-264; ER154-155. Nonetheless, schools' "primary mission" is not

earning profits but "educating [their] students." ER153-154; *accord* ER211-212.

And intercollegiate athletics are "an important part of the educational experience."

ER213; *see also* ER274 (§1.3.1). Sports programs enhance student-athletes'

education and personal development by requiring or providing opportunities for

leadership, teamwork, camaraderie, time management, discipline, and coping with

success and failure. ER153-155, 183-184; ER213; ER225-227; ER259-260.

Athletics also enables some individuals to attend college who would otherwise be

financially unable to do so. ER155; ER173-176. Finally, athletic programs build a

sense of community among students and faculty, encourage loyalty and support

from alumni, and help create a public profile that attracts new students. ER209-

210, 214; ER155-156.

### 2. *Amateurism in college sports*

a. Throughout its history, the NCAA has "'play[ed] a critical role in the

maintenance of a revered tradition of amateurism in college sports.'" *O'Bannon*,

802 F.3d at 1062 (quoting *Board of Regents*, 468 U.S. at 120). In fact, "one of [the

NCAA's] earliest reforms of intercollegiate sports was a requirement that the

participants be amateurs." *Id.* at 1053. Today, NCAA rules maintain "a clear line

of demarcation between intercollegiate athletics and professional sports," ER274

(§1.3.1), including by requiring that "[s]tudent-athletes … be amateurs," ER276

(§2.9). Defendants' longstanding commitment to amateurism is essential to the

educational role college sports plays for student-athletes, and likewise essential to

the appeal of college sports to fans, alumni, sponsors, and broadcasters. *See infra*

pp.45-46.

The core of amateurism, the Supreme Court has explained, is that "athletes

must not be paid" to play. *Board of Regents*, 468 U.S. at 102. Indeed, *O'Bannon*

observed that "not paying student-athletes is *precisely what makes them amateurs*." 802 F.3d at 1076. Accordingly, NCAA rules state that student-athletes lose their NCAA eligibility if they use their "athletics skill … for pay in any form" in their sport. ER280 (§12.1.2).

      b.     NCAA rules explicate this no-pay principle in myriad ways. Of particular relevance here, the rules provide that, although "pay" is prohibited, schools may cover student-athletes' legitimate academic and athletic expenses. The principal measure of legitimate academic expenses is COA, which is used to determine the amount of federal financial assistance students may receive to attend their schools. 20 U.S.C. §1087kk. COA includes:

> (1) tuition and fees normally assessed a student carrying the same academic workload as determined by the institution, and including costs for rental or purchase of any equipment, materials, or supplies required of all students in the same course of study;
>
> (2) an allowance for books, supplies, transportation, and miscellaneous personal expenses, including a reasonable allowance for the documented rental or purchase of a personal computer, … as determined by the institution; [and]
>
> (3) an allowance (as determined by the institution) for room and board costs incurred by the student[.]

*Id.* §1087*ll*. Although federal law thus specifies the categories of costs included in COA, schools "determine the appropriate and reasonable amounts" for their students. ER324. In doing so, "[e]ach school 'can have different standard costs for different categories of students,'" ER317 (quoting ER323), but under NCAA

rules, "institution[s] must calculate the cost of attendance for student-athletes in accordance with the cost-of-attendance policies and procedures that are used for students in general," ER285 (§15.02.2.1).

NCAA rules allow student-athletes to receive financial aid up to the full amount of the cost of attendance at their schools. ER284, 287 (§§15.01.6, 15.1). This can be provided through athletic scholarships (also known as "grants-in-aid"), other financial aid, or both. ER286-287 (§§15.02.6, 15.1).

NCAA rules also allow schools to cover student-athletes' legitimate academic expenses that exceed the categorically defined COA. For example, COA may not cover atypical financial needs that some students inevitably have, such as high travel expenses caused by attending college unusually far from home. NCAA rules (and federal law) permit schools to address such needs in two ways. First, federal law allows "financial aid administrator[s]" to "make adjustments on a case-by-case basis to the cost of attendance … to allow for treatment of an individual … with special circumstances." 20 U.S.C. §1087tt. And NCAA rules similarly provide that schools may "adjust[]" COA "on an individual basis" if such adjustments are made for non-student-athletes. ER285 (§15.02.2.1). Second, schools may use two funds—the "Student Assistance Fund" (SAF) and the "Academic Enhancement Fund" (AEF)—to meet individual "financial needs that arise in conjunction with participation in intercollegiate athletics [or] enrollment in

an academic curriculum," as well as to enhance "academic-support programs for Division I student-athletes."  ER268-269; *see also* ER284-285, 294-295 (§§15.01.6.1, 16.11.1.8).  The needs that schools may cover using these funds include tutoring, supplies, clothing, unexpected travel expenses due to family emergencies, and health and safety expenses.  ER268.

NCAA rules likewise permit schools to cover legitimate expenses incurred due to participation in intercollegiate athletics (and hence not included in COA).  These include medical expenses arising from injuries incurred during athletic participation, room and board for preseason practices, uniforms and equipment, travel for competitions, meals before and after those events, and a per diem (currently $30) to cover "unitemized incidental expenses" while traveling for "NCAA championship events."  ER290-293 (§§16.4, 16.5.2.2, 16.5.2.4.2, 16.5.2.4.3, 16.8.1.1).  In addition, schools "may provide the cost of actual and necessary expenses … for [a student-athlete's] significant other and children" to attend a post-season event.  ER292 (§16.6.1.1).

Finally, the NCAA permits student-athletes to receive specified non-cash awards to recognize exceptional individual or team academic or athletic achievement.  For instance, the rules provide that student-athletes may receive:  an award valued at $175 or less for being a team's most-improved or most-valuable player; an award valued at $375 or less for reaching a postseason NCAA

- 11 -

championship contest; an award valued at $550 or less for participating in an all-star or postseason bowl game; and a trophy valued at $1,500 or less for being a conference's "athlete of the year" or "scholar-athlete of the year." ER296-297 (Figs. 16-1, 16-2, and 16-3); *see also* 288-289 (§16.1).

The limits on permissible awards (which have been adjusted over time to account for inflation and other changed circumstances) reflect the NCAA's judgment about what amounts are reasonable and modest, and hence unlikely to become vehicles for disguised pay-for-play, or otherwise be abused. *See* ER170-171; ER158-164; ER229-230. To further reduce the risk of abuse, NCAA rules also provide that any "[a]wards received for intercollegiate athletics participation may not be sold, exchanged or assigned for another item of value." ER289 (§16.1.4).

### B. *O'Bannon*

*O'Bannon v. NCAA* was a class action brought by current and former FBS football and Division I men's basketball players who claimed the NCAA was violating the Sherman Act by restricting student-athletes' ability to receive compensation for the use of their names, images, and likenesses (NILs). *O'Bannon*, 802 F.3d at 1055-1056. Because no NCAA rule specifically barred payments for NIL use, the *O'Bannon* plaintiffs challenged what this Court referred to as the overall "compensation rules," *id.* at 1053. After a bench trial, the district

court held that those rules were "an unlawful restraint of trade." *Id.* The court issued a two-part injunction, barring the NCAA from capping athletic scholarships below COA (which NCAA rules did when *O'Bannon* was filed) and requiring the NCAA to permit schools to give student-athletes, in addition, "up to $5,000 per year in deferred compensation" through a trust fund. *Id.*

This Court affirmed in part and reversed in part. As relevant here, the Court upheld the district court's finding that the NCAA's compensation rules are procompetitive because they help "preserv[e] the popularity of the NCAA's product by promoting its current understanding of amateurism." 802 F.3d at 1073. In so holding, this Court noted that the district court—although ultimately finding that amateurism has procompetitive benefits—had "suggested that … the NCAA's definition of amateurism is inconsistent" and that amateurism is not "the *primary* driver of consumer demand for college sports." *Id.* at 1058-1059. The Court affirmed the district court's finding that amateurism has procompetitive benefits, while stating that the court "probably underestimated the NCAA's commitment to amateurism." *Id.* at 1073; *see also id.* at 1072 ("[W]e might have credited the depth of the NCAA's devotion to amateurism differently.").

This Court next explained that NCAA compensation rules cannot be invalidated based on the availability of a less-restrictive alternative unless the plaintiff proves they are "*patently and inexplicably* stricter than is necessary to

accomplish all of [their] procompetitive objectives." 802 F.3d at 1075. Applying this principle, the Court affirmed the part of the injunction barring the NCAA from capping athletic scholarships below COA. (The NCAA had previously allowed *non*-athletic scholarships up to COA and, while *O'Bannon* was pending, amended its rules to allow athletic scholarships up to COA.) The Court reasoned that because, "by the NCAA's own standards, student-athletes remain amateurs as long as any money paid to them goes to cover legitimate educational expenses," a scholarship cap below COA was not needed to promote amateurism. *Id.* at 1074-1075 & n.18. But, the Court held, the district court had "clearly erred" in requiring the NCAA to allow payments to each student-athlete of up to $5,000 per year above COA. *Id.* at 1074, 1076. Such payments, the Court explained, were not "*equally* effective in promoting amateurism and preserving consumer demand" as the NCAA's current rules. *Id.* In holding otherwise, the Court continued, the district court had "ignored that not paying student-athletes is *precisely what makes them amateurs*." *Id.* at 1076. Offering even "small payments" above COA that are unrelated to legitimate expenses, the Court concluded, would be "a quantum leap." *Id.* at 1078. And if "that line [were] crossed," there would be "no basis for returning to a rule of amateurism and no defined stopping point; we have little doubt that plaintiffs will continue to challenge the arbitrary limit imposed by the district court." *Id.* at 1078-1079.

Summing up its holding, the Court stated that antitrust law "requires that the NCAA permit its schools to provide up to the cost of attendance to their student athletes. It does not require more." 802 F.3d at 1079.

### C. Proceedings Below

#### 1. Pretrial

While *O'Bannon* was pending, plaintiffs filed several antitrust class actions against the NCAA and eleven Division I conferences, challenging the NCAA's compensation rules. The Judicial Panel on Multidistrict Litigation transferred the cases to the same judge in the Northern District of California who presided over *O'Bannon*, where the cases were, with one exception, consolidated. ER14 & n.5; Dkts. 1-2, 60, 86, 184, 197. The district court then certified three injunctive classes of student-athletes who received or will receive an offer of a full athletic scholarship between the filing of the first complaint and the resolution of this appeal: one for FBS football players and one each for Division I men's and women's basketball players. Dkt. 305 at 5.[1]

After this Court decided *O'Bannon*, defendants here moved for judgment on the pleadings, arguing that *O'Bannon* foreclosed plaintiffs' claims by holding that antitrust law "requires nothing more of the NCAA than that it permit its member

---

[1]    Plaintiffs sought damages as well as injunctive relief, but the parties have settled the damages claims. Dkt. 60 ¶9; Dkt. 746.

schools to provide student-athletes with their full education-related cost of attendance." Dkt. 373 at 4; *see also id.* at 4-7. The district court acknowledged that it was "hard … to distinguish" the rules challenged here from those at issue in *O'Bannon*, noting that although *O'Bannon* was "ostensibly pegged" to NILs, the issue in both that case and this one is "really … should [schools] be able to offer more money." ER326. The court nonetheless denied defendants' motion because *O'Bannon*, it asserted, "simply forecloses one type of relief Plaintiffs previously sought: cash compensation untethered to educational expenses." ER150. According to the court, while *O'Bannon* precluded such compensation, it did not resolve whether NCAA caps on "other 'benefits' and 'in-kind' compensation" are valid. *Id.*

The parties next filed cross-motions for summary judgment, which the court resolved almost entirely in plaintiffs' favor. It again rejected defendants' argument that stare decisis foreclosed plaintiffs' claims. ER125-126. It also rejected defendants' argument that plaintiffs' claims were barred by res judicata, reasoning that some plaintiffs were neither members of nor in privity with the *O'Bannon* classes, and that "[s]ome of the additional benefits limited by the rules" challenged here were not "addressed" in *O'Bannon* or have "expanded since that time." ER119, 123.

- 16 -

The court then addressed the rule of reason. As *O'Bannon* explained, that rule provides a three-step framework for assessing an allegedly anticompetitive restraint:

> [1] The plaintiff bears the initial burden of showing that the restraint produces significant anticompetitive effects within a relevant market. [2] If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects. [3] The plaintiff must then show that any legitimate objectives can be achieved in a substantially less restrictive manner.

802 F.3d at 1070 (brackets in original).

At step 1, the district court granted summary judgment for plaintiffs, adopting both "the market definition from *O'Bannon*"—"the market for a college education combined with athletics or alternatively the market for the student-athletes' athletic services"—and *O'Bannon*'s finding that the challenged NCAA rules have anticompetitive effects in that market. ER127-128. In doing so, the court asserted that defendants' position was that "*O'Bannon* is binding on this point." ER128. In fact, defendants had argued that *O'Bannon* was binding (and dispositive) as to plaintiffs' entire claim. Dkt. 373. The court instead treated *O'Bannon* as binding only at step 1. ER128-143.

At step 2, the court concluded (as relevant here) that defendants had raised a triable issue on whether the challenged rules have the procompetitive benefit of promoting consumer demand for NCAA athletics. ER130-131. Although *O'Bannon* held that there the NCAA had proven this same procompetitive benefit,

- 17 -

*see* 802 F.3d at 1072-1074, the district court disregarded *O'Bannon* because, the court asserted, "the specific rules at issue are not the same." ER130.

Finally, at step 3, the court addressed plaintiffs' proposed less-restrictive alternatives (LRAs). The court rejected defendants' argument that those LRAs were foreclosed both because they were merely "new arguments in support of the same challenge already adjudicated in *O'Bannon*," and because they were contrary to *O'Bannon*'s holding that antitrust law "does not require" the NCAA to allow compensation above COA (as each proposed LRA would do). ER141. In the court's view, the proposals differed from those considered in *O'Bannon*. ER141-143.

The court thus set the case for trial on whether the challenged rules have procompetitive benefits and, if so, whether a viable LRA exists. ER143-145.

## 2.    *Trial, judgment, and permanent injunction*

After a bench trial, the district court granted judgment for plaintiffs and issued a permanent injunction. ER1, 2-5.

In its rule-of-reason analysis, the court acknowledged (at step 2) that the challenged rules are procompetitive because they "maintain[] a distinction between college sports and professional sports," and such a distinction promotes "consumer demand" for college sports. ER49, 90. But the court proceeded to reject defendants' conception of and commitment to amateurism, asserting among other

things that defendants do not have a coherent definition of the term. *See generally* ER24-33, 84-86. The court also declared that the true distinction between collegiate and professional sports is "that student-athletes do not receive unlimited cash payments, especially those unrelated to education, like those seen in professional sports leagues." ER90. The court therefore deemed the challenged rules "necessary to achieve this procompetitive effect" only "to the extent that they prevent unlimited cash payments unrelated to education." *Id.*

At step 3, the court rejected all three of plaintiffs' proposed LRAs: the two pursued at trial (*see* Dkt. 987-1 at 41-44) and a third raised after trial (Dkt. 1099-3 at 42-43). The court found that each would "allow their schools to offer student-athletes unlimited cash payments," and thus would not be "virtually as effective" as the challenged rules at maintaining the distinction between college and professional sports that the court had just announced. ER59-61, 63. The court found, however, that an alternative of its own (which the court called a "modified" version of plaintiffs' third proposal) would be virtually as effective as the NCAA's rules at maintaining that distinction and would not substantially increase costs. ER61. Under this new alternative—first disclosed when the court entered judgment—the NCAA could still cap athletic scholarships and prohibit "compensation and benefits that are unrelated to education." ER107-108. But with one exception, the NCAA could not prohibit schools from providing student-

- 19 -

athletes "uncapped[] education-related compensation and benefits," including unlimited "paid post-eligibility internships." ER61, 63. The exception is that the NCAA could "cap" cash and cash-equivalent "academic … awards and incentives" at not less than the NCAA's combined "caps on [all] athletic performance awards" (which are non-cash awards the aggregate value of which the court suggested is now $5,600). ER65, 101. The court's alternative does not restrict these uncapped compensation and benefits to the reasonable (or even actual) expenses that student-athletes incur.

The court issued a detailed permanent injunction barring the NCAA from limiting compensation save as permitted under the court's LRA. ER2-4. Specifically, the injunction provides that:

> The compensation and benefits related to education … that the NCAA may not … limit … are the following: computers, science equipment, musical instruments and other tangible items not included in the cost of attendance calculation but nonetheless related to the pursuit of academic studies; post-eligibility scholarships to complete under-graduate or graduate degrees at any school; scholarships to attend vocational school; tutoring; expenses related to studying abroad …; and paid post-eligibility internships.

ER2-3; *see also* ER61. The injunction further states that this list "may be amended" only "on motion of any party," ER3—in other words, only with the court's pre-approval. The injunction permits the NCAA to "adopt … a definition of … 'related to education'" and to ask the court to "incorporate that definition" into the injunction. *Id.* It also permits the NCAA to adopt rules that "regulate[]

- 20 -

how conferences or schools provide education-related compensation and benefits."
*Id.*

## SUMMARY OF ARGUMENT

I.     *O'Bannon* precludes this litigation under both stare decisis and res judicata.

A.     This Court held in *O'Bannon* that the NCAA may limit athletics-based payments to the amount of student-athletes' "legitimate educational expenses," and held more specifically that antitrust law requires the NCAA to permit schools to provide student-athletes with athletic scholarships up to COA, but "does not require more."  802 F.3d at 1075, 1079.  The antitrust claims here seek "more" than what *O'Bannon* said the NCAA must allow—well "more," in fact—and thus are foreclosed as a matter of stare decisis.

B.     Res judicata prevents parties and their privies from repeatedly bringing claims that were or could have been brought in a prior action.  Here, injunctive classes of FBS football players and Division I basketball players claim that the NCAA's rules violate the Sherman Act by preventing schools from paying student-athletes to play.  That is the same claim that injunctive classes of FBS football players and Division I basketball players brought in *O'Bannon* regarding virtually the same NCAA rules.  It is therefore barred by res judicata.

If *O'Bannon* does not preclude this action, future plaintiffs will be able to bring essentially the same claim again and again, such that there would never be

finality. In *O'Bannon*, this Court mentioned that very danger in explaining why the district court had clearly erred. 802 F.3d at 1079. That scenario is just what stare decisis and res judicata exist to prevent.

II.   The district court's rule-of-reason analysis is thoroughly flawed.

    A.    The rule of reason does not allow federal courts to strike down broadly reasonable restraints. Courts may invalidate procompetitive restraints only if the plaintiff proves that the restraints are significantly more restrictive than necessary to achieve their procompetitive ends. Avoiding excessive judicial meddling is particularly important with sports leagues like the NCAA, because some restraints are necessary for leagues to produce their product at all. That is why *Board of Regents* admonished courts to give the NCAA "ample latitude" to superintend college sports, 468 U.S. at 120, and why *O'Bannon* stated that plaintiffs challenging NCAA compensation rules must make a "strong evidentiary showing" that a viable less-restrictive alternative exists, 802 F.3d at 1074. The district court's analysis is not faithful to these principles.

    B.    The district court correctly found that the challenged rules have the procompetitive benefit of widening consumer choice by distinguishing college athletics from professional sports. That should have ended the step-2 inquiry and led the court to step 3, where plaintiffs bear a heavy burden to show a viable less-restrictive alternative. Instead, the court questioned at length defendants'

- 22 -

commitment to and conception of amateurism (repeating a mistake it made in *O'Bannon*) and declared that the *true* dividing line between college and professional sports is not what the Supreme Court, this Court, and others have recognized for decades—that NCAA student-athletes are not paid to play—but rather that they are not paid *unlimited* amounts unrelated to education. The court offered no support for this novel assertion, which is demonstrably false. Yet the court embraced it in order to conclude that certain NCAA rules (those limiting "education-related benefits") are not "necessary" to preserve consumer demand. That was a manifestly erroneous application of the step-2 inquiry. As *O'Bannon* explained, "[d]uring the second step the district court could only consider the benefits of the NCAA's existing rule …. [I]t could not consider the potential benefits of an alternative rule (such as capping large payments)." 802 F.3d at 1073 n.17.

    C.    The district court's step-3 analysis is equally infirm. After rejecting all of plaintiffs' proposed LRAs because each could lead to "unlimited" payments to student-athletes, the court then embraced its own alternative even though it suffers from the same flaw. Under that alternative, each school can give every student-athlete not only thousands of dollars in cash for academic awards and incentives, but also unlimited "education-related" benefits, including "paid post-eligibility internships," ER2-3, that would allow schools to give student-athletes

- 23 -

tens or hundreds of thousands of dollars more in cash. Schools can also give each student-athlete highly valuable "education-related benefits" that have no connection either to the academic program a student-athlete is pursuing or to the student-athlete's reasonable (or even actual) expenses. Far from being "virtually as effective" as the challenged rules in preserving the distinction between college athletics and professional sports that *Board of Regents* and *O'Bannon* both recognized—student-athletes are not paid to play—the decision below would eradicate that distinction.

The court also cited little beyond its own say-so regarding whether its alternative would impose "significantly increased costs"; it certainly did not make the requisite "strong evidentiary showing" that such costs would not be imposed. *O'Bannon*, 802 F.3d at 1074. In fact, such costs likely would be incurred, through required new rulemaking and litigation engendered by the court's intrusive injunction.

Finally, the court's LRA involves pure price administration, which is not the role of an antitrust court. The court simply adjusted the "price cap," i.e., the NCAA rule prohibiting pay, by adding monetary academic awards and incentives—up to $5,600 annually, almost the exact amount the court tried to impose in *O'Bannon* but that this Court rejected.

III.    The district court's injunction improperly puts the court in the role of ongoing administrator of college sports, deeming an enumerated list of items "educational benefits" that the NCAA must allow, without limit, and permitting changes to that list only with the court's approval.  That is not remotely the "ample latitude" the Supreme Court has said the NCAA must have, *Board of Regents*, 468 U.S. at 120, and it conflicts with *O'Bannon*'s prohibition on judicial "micromanag[ing]" of "organizational rules," 802 F.3d at 1075.[2]

## STANDARD OF REVIEW

This Court "review[s] the district court's findings of fact after [a] bench trial for clear error and review[s] the district court's conclusions of law de novo." *O'Bannon*, 802 F.3d at 1061.  "Whether [a] practice[] … violate[s] the Sherman Act is a question of law," *Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184, 1186 (9th Cir. 1984), as is the application of stare decisis, *In re Watts*, 298 F.3d 1077, 1079 (9th Cir. 2002), or res judicata, *Media Rights Technologies, Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1020 (9th Cir. 2019).

In reviewing a permanent injunction, this Court "review[s] legal conclusions underlying the [injunction] de novo, factual findings for clear error, and the scope of injunctive relief for an abuse of discretion."  *Momot v. Mastro*, 652 F.3d 982,

---

[2]    In *O'Bannon*, this Court disagreed with the NCAA that its amateurism rules are valid as a matter of law under *Board of Regents*.  *See* 802 F.3d at 1061-1064. Defendants preserve this argument for further review.

- 25 -

986 (9th Cir. 2011).  An error of law constitutes an abuse of discretion.  *United States v. Clarke*, 573 U.S. 248, 257 (2014).

## ARGUMENT

## I.    *O'BANNON* FORECLOSES PLAINTIFFS' CLAIMS

*O'Bannon* "summar[ized]" its "decision" as follows:  "The Rule of Reason requires that the NCAA permit its schools to provide up to the cost of attendance to their student athletes.  It does not require more."  802 F.3d at 1079.  That conclusion flowed from this Court's reasoned recognition that, consistent with amateurism principles, the NCAA may allow schools to cover student-athletes' legitimate expenses while precluding additional payments.  By that same reasoning, *O'Bannon* controls here as a matter of stare decisis because the challenged rules allow schools to cover those expenses, i.e., allow student-athletes to receive "up to the cost of attendance."  *Id.*

Plaintiffs' claims are also precluded by res judicata, because they could have been asserted in *O'Bannon* (and effectively were).  Although the district court identified supposed differences between the two cases, some of those do not exist, and those that do are insufficient to defeat preclusion.

### A.    Stare Decisis

1.    Presented with a full trial record, this Court in *O'Bannon* addressed the same issue presented here:  To what extent does antitrust law restrict the

NCAA's ability to limit student-athletes' compensation? Recognizing that amateurism is consistent with covering students-athletes' legitimate educational expenses, *O'Bannon* concluded that antitrust law "requires that the NCAA permit its schools to provide up to the cost of attendance to their student athletes. It does not require more." 802 F.3d at 1079. Applying that holding, this Court affirmed the district court's decision insofar as it "requir[ed] the NCAA to permit schools to provide compensation up to" COA, but reversed insofar as it "require[d] the NCAA to allow its member schools to pay student-athletes up to $5,000 per year" above COA. *Id.* at 1075-1076, 1079.

*O'Bannon*'s conclusion followed from two features that this Court recognized about the NCAA's administration of intercollegiate sports: (1) NCAA rules preserving "the amateur nature of collegiate sports" are procompetitive because they differentiate college sports from professional sports and "increase[] their appeal to consumers," 802 F.3d at 1072-1073; and (2) "not paying student-athletes is *precisely what makes them amateurs*," *id.* at 1076.

These principles and the holding they produced make clear that this lawsuit is foreclosed. Plaintiffs seek (and the district court ordered) compensation that *O'Bannon* held is "not require[d]"—compensation, in fact, far in excess of the trust-fund payments this Court rejected. *See* 802 F.3d at 1079. Stare decisis thus

- 27 -

required the district court to dismiss this case on the pleadings. *See Taylor v. Sturgell*, 553 U.S. 880, 903 (2008).

2. The district court's reasons for rejecting defendants' stare-decisis argument lack merit.

a. The court read *O'Bannon* as foreclosing only a requirement that the NCAA allow "cash compensation untethered to educational expenses." ER150; *accord* ER142-143. Even if that reading were correct, it would not distinguish *O'Bannon*, because the injunction here imposes such a requirement: It requires the NCAA to permit "benefits"—including unlimited cash payments for "post-eligibility internships," ER3, and thousands of dollars in cash annually as "academic … awards and incentives," *id.*—that need only be nominally "related to" education, without regard to student-athletes' legitimate expenses, ER2. In any event, there is no plausible reason why *O'Bannon*'s holding should be limited to "cash compensation untethered to educational expenses," ER150. This Court used that phrase because that was the nature of the remedy it was reviewing. *See* 802 F.3d at 1076. As explained, moreover, the Court's *holding* (which is of course "law of the circuit," *Barapind v. Enomoto*, 400 F.3d 744, 751 (9th Cir. 2005) (en banc) (per curiam)) was broader than that phrase.

The district court's remedy also muddies the clear, administrable line *O'Bannon* drew. The Supreme Court has "repeatedly emphasized the importance

- 28 -

of clear rules in antitrust law," *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438, 452 (2009), because clear rules minimize the "notoriously high litigation costs and unpredictable results" that often mark antitrust litigation, *Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401, 2411 (2015). Such costs and unpredictability, the Court has also explained, "deter or penalize perfectly legitimate conduct." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 763 (1984); *see also, e.g.*, Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 29 (1984). That is precisely what has happened here: As discussed below, *see* pp.31-32, the district court penalize[d]" the NCAA for "legitimate conduct," namely, its recent decisions to adjust slightly a few of its compensation rules, *Monsanto*, 465 U.S. at 763.

b.    The district court also opined that "[i]n the area of antitrust law," stare decisis must yield to "an interest 'in recognizing and adapting to changed circumstances and … accumulated experience.'" ER126. That too is wrong.

The case the court cited for this point, *State Oil Co. v. Khan*, 522 U.S. 3 (1997), addressed how a court that is authorized to *overrule* an antitrust precedent should decide whether to do so, *see id.* at 20-21 ("[T]his Court has reconsidered its decisions construing the Sherman Act when the theoretical underpinnings of those decisions are called into serious question."). Such considerations have no bearing on a court that is *not* authorized to overrule a precedent. These courts must simply

- 29 -

apply the precedent that binds them. *State Oil* itself made that point, observing
that the lower court there "was correct" to apply the relevant Supreme Court
precedent "despite [its] disagreement with" that precedent and the precedent's
"increasingly wobbly, moth-eaten foundations." *Id.* at 20. This Court has likewise
recognized that there is no antitrust exception to the binding force of circuit
precedent, including on future panels of the Court. *See Miranda v. Selig*, 860 F.3d
1237, 1239-1240 (9th Cir. 2017) ("[W]e are bound by Supreme Court and Ninth
Circuit precedent upholding the business of baseball's exemption from federal
antitrust laws."), *cert. denied*, 138 S. Ct. 507 (2017).

   c.    The district court made two related assertions regarding the
challenged NCAA rules. Neither avoids *O'Bannon*'s preclusive force.

   i.    According to the court, *O'Bannon* challenged only NCAA
"restrictions on sharing NIL revenue." ER114. That is not correct: There have
never been NCAA rules specifically addressing NIL revenue. That is why this
Court in *O'Bannon* broadly described "the restraint at issue" as "the NCAA's
limits on student-athlete compensation." 802 F.3d at 1072; *see also supra* p.16
(citing ER326). Precisely the same restraint is challenged here. *See* ER122.

   To be sure, the *O'Bannon* plaintiffs focused on a particular implication of
the NCAA's no-pay rule, namely, that the plaintiffs could not receive payments for
uses of their NILs. That, however, was immaterial to *O'Bannon*'s holding and

analysis.  The Court's invalidation of NCAA limits below COA rested not on anything specific to NILs but on the Court's view that such limits had "no relation whatsoever to the procompetitive purposes of the NCAA."  802 F.3d at 1075.  Likewise, the Court's invalidation of a requirement that the NCAA allow payments above COA rested not on anything specific to NILs but on its view that requiring the NCAA to allow such payments would force the NCAA to "surrender[] its amateurism principles entirely."  *Id.* at 1079.  *O'Bannon*'s precedential force thus cannot be dismissed on the ground that it was a case only about NILs.

      ii.     The district court also thought that post-*O'Bannon* changes in the NCAA's compensation restrictions defeated defendants' stare-decisis argument.  ER123-124; *see also* ER76-77.  In particular, the NCAA now permits:

- unlimited snacks on top of certain previously allowed meals and snacks;

- reimbursement of limited travel expenses of a small group of family members to attend the College Football Playoff or the basketball Final Four;

- retention by foreign student-athletes (not just U.S. student-athletes, as previously) of Olympic medal payments; and

- borrowing against future earnings to pay premiums for loss-of-value insurance (in addition to previously allowed coverage of such premiums through the Student Assistance Fund and previously allowed borrowing against future earnings for other forms of disability insurance).

*Compare* ER282-283, 291-292; ER307 *with* ER300-301, 304, 305. These limited adjustments cannot produce new antitrust liability because they all *loosened* compensation restrictions that existed at the time of *O'Bannon*, i.e., they created no restraint not before this Court in *O'Bannon*.[3]

d.      Finally, the district court thought it relevant that plaintiffs "propose different alternatives from those considered in *O'Bannon*." ER135. But proposed LRAs are *arguments* a plaintiff makes in trying to show that a challenged restraint is unreasonable. New arguments cannot avoid the precedential effect of a prior decision; they must be brought to a court that has the power to overrule that decision. Were it otherwise, businesses could face a new costly and time-consuming lawsuit about an already-adjudicated practice every time a lawyer "conjure[d] up" another (possibly) less-restrictive way to achieve an already-adjudicated restraint's procompetitive benefits. *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3d Cir. 1975). That is not the law. *See, e.g.*, *United States v. Ramos-Medina*, 706 F.3d 932, 938-939 (9th Cir. 2013).

In short, *O'Bannon* "constitutes binding authority" that the district court was not free to "cast aside." *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001).

---

[3]     The district court stated that the rules were also changed after *O'Bannon* to allow student-athletes to receive performance awards on Visa gift cards rather than store-specific cards. ER28 n.13. In fact, there has been no rule change: Visa cards, like gift suites, were permitted at the time of *O'Bannon*. *Compare* ER288 (§16.1.1.2) *with* ER304.

Stare decisis likewise gives this Court "no choice but to apply the earlier-adopted rule." *Id.* at 1171. Under *O'Bannon*, plaintiffs' claims necessarily fail.

### B. Res Judicata

*O'Bannon* separately forecloses this litigation as a matter of res judicata. Under that doctrine, a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981). The district court held that differences in the plaintiffs' identities and the rules challenged warranted denial of res judicata effect. That was wrong.

1. As to the plaintiffs' identities, the class members here who were also class members in *O'Bannon*, *see* ER12 n.4; Dkt. 60 ¶¶24-128, are indisputably bound. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006). The remaining class members here—"male student-athletes who were recruited after *O'Bannon* and female student-athletes," ER119—are also bound, because they were "adequately represented" by the *O'Bannon* class. *Taylor*, 553 U.S. at 884. "[A]dequate representation" means: "(1) [t]he interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 900 (citation omitted). Both elements are present here.

First, the plaintiffs' interests in the two cases are aligned. As noted (and elaborated below), the rules challenged are essentially the same, and apply to plaintiffs here the same way they applied to the *O'Bannon* plaintiffs—and, in fact, to all Division I student-athletes. Indeed, had the plaintiffs' interests in the two cases *not* been aligned, the district court would have had to create separate classes (with separate counsel) for class members here who also belong to the *O'Bannon* class. *See* Fed. R. Civ. P. 23(a)(4), (g)(4); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831-832, 855-856 (1999). And second, the *O'Bannon* plaintiffs clearly understood themselves to be acting in a representative capacity: They were class representatives seeking injunctive relief invalidating rules applicable to all student-athletes, current and future. *See, e.g.*, Third Am. Compl. ¶¶337, 344, 607, *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. 09-1967 (N.D. Cal. July 19, 2013), ECF No. 832.

In rejecting defendants' res-judicata argument, the district court placed great importance on the Supreme Court's statement in *Taylor* that "[i]n the class-action context, the[] limitations [on binding a non-party] are implemented by the procedural safeguards contained in Federal Rule of Civil Procedure 23." 553 U.S. at 900-901. The court read that statement to mean that "the definition of the *O'Bannon* class … limits the persons who are subject to the preclusive effect of the judgment." ER120. But *Taylor*—which did not involve the preclusive effect of a

- 34 -

prior injunctive class action—said only that class certification is sufficient for preclusion, not that the scope of preclusion is dictated by the earlier class definition.  And this case shows why such a formalistic rule makes no sense:  It could easily be abused to allow successive class actions challenging the same policy or practice, simply by constructing each new class to avoid complete overlap with a prior one.  The fact that the district court in *O'Bannon* certified a class comprising only a subset of student-athletes does not defeat preclusion of a later suit by a substantially identical class.

Lastly, the district court stated that "only" *O'Bannon*'s class members "were on notice that they were represented."  ER120.  That is baffling since the court did not require notice to injunctive class members either in *O'Bannon* or here.  In any event, notice is not required for injunctive-relief classes.  *See* Fed. R. Civ. P. 23(c)(2)(A).

2.     As to the identity of the claims, both the Supreme Court and this Court have explained that the key inquiry in applying res judicata is whether the later lawsuit involves the "same transactional nucleus of facts" as the earlier one. *Turtle Island Restoration Network v. U.S. Department of State*, 673 F.3d 914, 918 (9th Cir. 2012); *see also United States v. Tohono O'odham Nation*, 563 U.S. 307, 316 (2011) ("The now-accepted test in preclusion law … depends on factual overlap, barring 'claims arising from the same transaction.'").  In fact, that is "the

most important" criterion for res judicata, *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1202 (9th Cir. 1982), and hence is "often … outcome determinative," *Mpoyo v. Litton Electro-Optical Systems*, 430 F.3d 985, 988 (9th Cir. 2005).

The "factual overlap" (*Tohono*, 563 U.S. at 316) between *O'Bannon* and this litigation is pervasive:  Both cases arise from and revolve around the fact that the NCAA limits the compensation schools can provide student-athletes.  And the legal claim here—that the challenged restraints violate antitrust law—is the same one adjudicated in *O'Bannon*.  In short, "[t]he two suits allege the same wrongful act, the same illegal price-fixing conspiracy, the same operative facts in support of such conspiracy."  *Nash County Board of Education v. Biltmore Co.*, 640 F.2d 484, 488 (4th Cir. 1981).  Such "repetitious suits involving the same cause of action" are exactly what res judicata prohibits.  *Tohono*, 563 U.S. at 315.

The district court stated that whereas this case challenges compensation limits broadly, *O'Bannon* challenged rules regarding NIL rights.  ER75.  But again, no NCAA rules address payments for NIL use.  What prevented the *O'Bannon* plaintiffs from receiving such payments (and hence what those plaintiffs challenged) were the overall NCAA compensation rules.  That is why *O'Bannon* stated that what was at issue were "the NCAA's compensation rules."  802 F.3d at 1053.  Indeed, the Court used the phrase "compensation rules" nearly four dozen times.

- 36 -

The district court sought to avoid this point by characterizing the "overlap" between the rules challenged here and in *O'Bannon* as "general."  ER76.  But the two sets of rules do not merely "overlap"; they are, with insignificant refinements, *see supra* pp.31-32, the same rules.  The district court made clear in its ruling here that, as in *O'Bannon*, it addressed "the current, interconnected set of NCAA rules that limit the compensation [student-athletes] may receive in exchange for their athletic services."  ER6.  Any differences in the particular *relief* the plaintiffs sought in the two actions is irrelevant.  *See McClain v. Apodaca*, 793 F.2d 1031, 1034 (9th Cir. 1986) (res judicata bars later suit even if the "subsequent complaint seeks a different remedy"); *accord Restatement (Second) of Judgments* §24 cmt. c (1982).

The district court thought this argument "misse[d] the point" because the revised rules still "fix" "prices."  ER77.  For res-judicata purposes, however, the question is not whether the rules still "fix" "prices," but whether the current challenge to the NCAA's rules was or could have been brought in *O'Bannon*.  The answer is yes.

*     *     *

The implications of the district court's stare-decisis and res-judicata rulings underscore why those rulings are wrong.  By authorizing successive lawsuits challenging the same compensation limits, the decision below exposes the NCAA

to "death by a thousand cuts," as litigants come to court again and again to pursue what is fundamentally the same legal challenge to the same restraint. This Court warned against that very scenario in *O'Bannon*, stating that if the district court's above-COA remedy were upheld, there would be "little doubt that plaintiffs will continue to challenge the arbitrary limit imposed by the district court" over and over, until the NCAA is finally forced to "surrender[] its amateurism principles entirely." 802 F.3d at 1079. Stare decisis and res judicata exist precisely to prevent such efforts.

## II.  THE CHALLENGED RULES ARE LAWFUL UNDER A PROPER RULE-OF-REASON ANALYSIS

Reversal is independently required because the district court's rule-of-reason analysis was badly flawed. Under the rule of reason, even a restraint with significant anticompetitive effects can be invalidated only if it has no pro-competitive benefits or the plaintiff makes a compelling showing that its pro-competitive benefits could be achieved in a substantially less restrictive way. Neither circumstance was present here. The district court thus needed to commit a host of errors to invalidate the challenged rules and impose its new regime. In particular, the court:  (1) improperly considered alternatives to the existing rules at step 2, thereby shifting plaintiffs' heavy step-3 burden onto defendants; (2) unjustifiably rejected defendants' conception of amateurism, a mistake it committed in *O'Bannon*; (3) invented a new and unsupported distinction between

- 38 -

college and professional sports; and (4) embraced an alternative that—far from being virtually as effective as the challenged rules at differentiating college from professional sports—would turn student-athletes into paid professionals and thereby destroy amateur college sports as it has long existed.

### A. In Applying The Rule Of Reason, Courts Must Afford The NCAA "Ample Latitude" To Superintend College Sports

As this Court explained in *O'Bannon*, antitrust courts may not "micro-manage organizational rules" or "make marginal adjustments to broadly reasonable market restraints." 802 F.3d at 1075. Hence, once a restraint is found to provide a procompetitive benefit, a court may intervene only if the plaintiff shows the restraint to be "*patently and inexplicably* stricter than is necessary to accomplish all of its procompetitive objectives." *Id.*

This judicial restraint is at its apex with athletic leagues and other joint ventures, where "horizontal restraints on competition are essential if the product is to be available at all." *Board of Regents*, 468 U.S. at 101; *see also id.* at 117 ("a certain degree of cooperation is necessary if the type of competition that [the NCAA] and its member institutions seek to market is to be preserved"); *NCAA v. Miller*, 10 F.3d 633, 639 (9th Cir. 1993). *See generally Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures … are … not usually unlawful … where the agreement … is necessary to market the product at all."). As a sister circuit put it, "courts have generally accorded sports organizations a certain degree

of deference and freedom to act." *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 80 (3d Cir. 2010) (citing Supreme Court and this Court's precedent). That is why restraints essential to a joint venture's product are "likely to survive the Rule of Reason." *American Needle, Inc. v. NFL*, 560 U.S. 183, 203 (2010).

*Board of Regents* and *O'Bannon*, moreover, leave no doubt that this additional deference applies to NCAA eligibility rules. Deeming it "reasonable to assume that most of the regulatory controls of the NCAA are … procompetitive"—including "rules defining … the eligibility of participants"—*Board of Regents* explained that the NCAA "needs ample latitude to play" its "critical role in the maintenance of a revered tradition of amateurism in college sports." 468 U.S. at 117, 120; *see also, e.g.*, *Law v. NCAA*, 134 F.3d 1010, 1022 n.14 (10th Cir. 1998). And this Court applied that instruction in *O'Bannon*, holding that the NCAA's need for ample latitude required plaintiffs to "make a strong evidentiary showing" to carry their burden at step 3 of the rule of reason. 802 F.3d at 1074.

As elaborated below, the district court's rule-of-reason analysis is wholly inconsistent with these principles. A proper analysis makes clear that the NCAA's compensation rules have procompetitive benefits that cannot be achieved through plaintiffs' or the court's proffered alternatives.

**B.** **Although The District Court Correctly Concluded That The Challenged Rules Have Procompetitive Benefits, Its Step-2 Analysis Was Deeply Flawed**

The question at step 2 of the rule of reason is whether there is "a procompetitive rationale for the [challenged] restraint." *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018). Here, that question is whether "the NCAA's amateurism rule has procompetitive benefits." *O'Bannon*, 802 F.3d at 1076. The district court found (as *O'Bannon* required) that the answer is yes: The challenged rules maintain the distinction between college and professional sports, thereby providing the procompetitive benefit of widening consumer choice. ER49-51.

That should have ended the step-2 inquiry and led the district court to step 3, where plaintiffs had the heavy burden to identify a less-restrictive alternative that is virtually as effective as the challenged rules in maintaining the distinction between college and professional sports without substantially increased costs, *O'Bannon*, 802 F.3d at 1074. Instead, the court baselessly rejected defendants' conception of amateurism as incoherent and disconnected from consumer demand, and replaced it with a new conception of amateurism—that both professionals and amateurs can be paid but only professionals are paid *unlimited* sums—that is startlingly devoid of support. That was legal error.

- 41 -

> 1. *The district court flouted* O'Bannon's *instruction that at step 2, the court could "only consider the benefits of the NCAA's existing rule"*

*O'Bannon* was pellucid on what courts analyzing NCAA compensation rules are (and are not) to do at step 2. "During the second step," this Court explained, "the district court could only consider the benefits of the NCAA's existing rule[s] … —it could not consider the potential benefits of an alternative rule (such as capping large payments)." 802 F.3d at 1073 n.17. Yet that is exactly what the district court did here: First, the court declared that what *really* distinguishes college and professional sports is that professionals can be paid "unlimited amounts" unrelated to education (a declaration that, as discussed below, *see* pp.58-59, has no evidentiary basis and is contrary to both *Board of Regents* and *O'Bannon*). ER50. And based on that declaration—which effectively defined the court's LRA—the court improperly considered *at step 2* "the potential benefits of an alternative rule," *O'Bannon*, 802 F.3d at 1073 n.17, holding that its novel distinction could be maintained just as well without many of the challenged rules, i.e., that NCAA rules limiting "education-related benefits" are not "necessary" to preserve the court's distinction. ER51, 90. This analysis, in *O'Bannon*'s words, "cannot be right." 802 F.3d at 1073 n.17.

*O'Bannon*'s direction regarding the proper analysis is reflected in the analysis this Court actually conducted. This Court considered "procompetitive

justifications for the compensation rules" as they existed, 802 F.3d at 1072,

holding that the NCAA had satisfied its burden at step 2 because "there is a

concrete procompetitive effect in the NCAA's commitment to amateurism," *id.* at

1073. And to decide whether that benefit could be achieved in a less-restrictive

way, the Court recognized that it had to "turn to the final inquiry," step 3, 802 F.3d

at 1074. The district court here, by contrast, made that decision at step 2 in stating

that the rules "have a procompetitive effect [only] to the extent that they prevent"

particular payments. ER51.

The district court's legal error infected its entire analysis. In particular, the

error led the court to require defendants to show that modifying the existing rules

would *not* undermine their procompetitive effects, rather than requiring plaintiffs

to show at step 3 that such modifications (or other alternatives) would be

"'virtually as effective' in serving the procompetitive purposes of the NCAA's

current rules, and 'without significantly increased cost,'" *O'Bannon*, 802 F.3d at

1074. Because plaintiffs could not (and assuredly did not) carry the burden that

should have been imposed on them at step 3, *see infra* pp.59-65, the court's

departure from *O'Bannon*'s instruction regarding the proper step-2 analysis

requires reversal.

>    2.    *The challenged rules are procompetitive because they preserve amateurism in college sports, thereby providing consumers with a unique and attractive product*

The district court also seriously mis-analyzed the procompetitive benefits of the NCAA's amateurism rules—and did so in a way that led it to conclude incorrectly that there is a viable LRA to the challenged rules.

a.    As the Supreme Court and this Court have explained, "widen[ing] consumer choice" is procompetitive. *Board of Regents*, 468 U.S. at 102, *cited in O'Bannon*, 802 F.3d at 1072; *accord Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157 (9th Cir. 2003). Defendants widen consumer choice by making available to consumers a product—"amateur collegiate sports"—that is distinct from "professional sports to which it might otherwise be comparable, such as … minor league baseball." *Board of Regents*, 468 U.S. at 88, 102. And as *Board of Regents* recognized, "to preserve the character and quality of th[is] 'product,' athletes *must not be paid*, must be required to attend class, and the like." *Id.* at 102 (emphasis added); *see also Deppe v NCAA*, 893 F.3d 498, 502 (7th Cir. 2018). *O'Bannon* likewise recognized that "not paying student-athletes is *precisely what makes them amateurs*." 802 F.3d at 1076. It also recognized that NCAA rules that preserve "the amateur nature of collegiate sports increase[] their appeal to consumers." *Id.* at 1073; *see also id.* at 1074, 1099.

b.    The evidence at trial confirmed that this judicial consensus is sound. Fact witnesses with decades of experience in college sports, higher education, and sports broadcasting testified that amateurism contributes to the popularity of college sports.  These witnesses included Pac-12 Commissioner Larry Scott, who testified that based on his review of multiple consumer-perception surveys and conversations with various constituencies, it was "clear to [him] that the vast majority of consumers think amateurism is a very important component of college sports."  ER199, 201-207.  Similarly, Eugene Smith, Ohio State University's athletics director, testified—based on nearly forty years of experience running college-sports programs—that amateurism is "basic and core" to college sports. ER172, 178-182, 185-186.  He also testified that many fans and donors are "opposed to pay-for-play" and that allowing pay-for-play would "significantly" "affect the demand for college sports" among fans, donors, and sponsors.  ER187-197.  And American Athletic Conference commissioner Mike Aresco testified, based on his experience as an ESPN and CBS executive as well as his later experience as a conference commissioner, that "amateurism … contributes to consumer demand."  ER216-223.  From the broadcaster's perspective, he explained, NCAA sports is "a unique property that … resonated with fans because it wasn't professionalized at all," in contrast to minor leagues, which have "never been popular."  ER215-216.

This lay testimony was corroborated by survey evidence. Bruce Isaacson, a marketing and consumer-behavior expert, testified that in his survey of nearly 1,100 college-sports fans, 31.7% reported that they watch college sports because they "like the fact that college players are amateurs and/or are not paid." ER233-234, 237-238, 240. This was the third-most-common reason respondents selected for watching college sports. ER237-238.

    c.    The district court's responses to the foregoing evidence have no merit. The court did not discredit the lay-witness testimony, instead stating that "[t]his testimony does not establish that the challenged rules have a connection to consumer demand, … because student-athletes would continue to be students in the absence of the challenged rules." ER49. That ignores the substance of the testimony, which focused, as shown, on amateurism, i.e., on the fact that student-athletes are not paid. As explained below, *see* pp.60-62, that would no longer be true under the court's alternative regime.

The court did reject the survey evidence, on two baseless grounds. First, the court stated that the survey's "responses [were] hopelessly ambiguous" because the question gave no indication that "amateur" and "not paid" were intended to be synonymous. ER41-42. That attempt to inject ambiguity into a commonplace term is unavailing. Both the Supreme Court and this Court have made clear that "amateur" has a well-understood meaning: *Board of Regents* stated that to

maintain amateurism in college sports, "athletes must not be paid." 468 U.S. at 102. And even more directly, *O'Bannon* emphasized that "not paying student-athletes is *precisely what makes them amateurs*." 802 F.3d at 1076. *O'Bannon* also explained that there is a "shared conception of … the difference between amateurs and professionals," with "the basic difference" being "if you're paid for performance, you're not an amateur." *Id.* at 1076 n.20. The survey's use of "amateur" and "not paid" therefore did not make the responses "hopelessly ambiguous." ER41-42.

Second, the district court disagreed that the survey shows that "'amateurism' is an 'important' factor in consumers' decision to watch … college sports," because "*only* 31.7% [of respondents] selected the 'amateur and/or not paid' option as a reason why they watch." ER42 (emphasis added). That blitheness is startling. One-third (which translates to millions of people) is a *substantial* percentage. Few businesses would eliminate a feature of their product that one-third of their customers enjoy. Nor is there any basis in law or economic theory to hold that a feature is procompetitive only if it appeals to an even greater percentage.

In short, the NCAA's amateurism rules achieve the procompetitive benefit of "maintain[ing] the integrity of college [sports] as a distinct and attractive product," thereby expanding consumer choice. *Board of Regents*, 468 U.S. at 116. And the rules preserve amateurism by prohibiting eligible student-athletes from

- 47 -

using their athletic skills for "pay," while permitting schools to cover student-athletes' legitimate expenses and to provide limited awards for exceptional achievement. *See supra* pp.9-12. The rules also delineate the permissible expenses and awards to ensure that they do not become a channel for disguised "pay for play." *See supra* p.12. All of this easily satisfies defendants' burden at step 2.

### 3. The district court unjustifiably rejected defendants' conception of amateurism

Just four years ago, this Court held that virtually the same rules have the procompetitive benefit of "preserving the popularity of the NCAA's product by promoting its current understanding of amateurism." *O'Bannon*, 802 F.3d at 1073. It did so, moreover, notwithstanding the *O'Bannon* plaintiffs' strenuous arguments that the NCAA's amateurism model is a sham. *See O'Bannon* Appellees' Br. 3-8, 12-14, 51, 2016 WL 3626736 (9th Cir. Jan. 21, 2015). Indeed, despite those arguments, this Court concluded that the same district court that presided here had "probably underestimated the NCAA's commitment to amateurism." *O'Bannon*, 802 F.3d at 1073.

Defendants' conception of amateurism has not changed in any material respect since *O'Bannon*, and hence the district court should have simply asked whether the challenged rules reasonably relate to the preservation of amateurism—an approach that, as just explained, would have yielded the same answer as in

*O'Bannon*:  They do and are therefore valid.  Instead, the court repeated its approach in *O'Bannon* of questioning the coherence of defendants' conception of amateurism and the connection between that conception and consumer demand. That approach was as mistaken this time as it was then.

a.    The district court criticized defendants for supposedly not "defin[ing] the nature of the amateurism they claim consumers insist upon" (i.e., that student-athletes are not paid to play).  In particular, the court described the "Principle of Amateurism" in the NCAA's constitution as "circular."  ER25.  But NCAA rules *do* define amateurism, and without being circular.  The "Principle of Amateurism" has long been that "participation" in intercollegiate athletics is an "avocation," one "motivated primarily by education and by the physical, mental and social benefits to be derived."  ER276 (§2.9); *see also* ER245; *Justice v. NCAA*, 577 F. Supp. 356, 361 (D. Ariz. 1983) (citing the Principle of Amateurism).  And as they have for decades, NCAA rules apply this affirmative principle by providing that a student-athlete "loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual … [u]ses his or her athletics skill (directly or indirectly) for pay in any form in that sport."  ER280 (§12.1.2).  Other rules then elaborate these overarching principles by addressing the myriad situations in which a student-athlete might receive something of value.  None of this is circular or incoherent.

The foregoing also makes clear that the district court went astray in faulting "[d]efendants and their witnesses [for] often describ[ing] amateurism by reference to what they say it is not: namely, … 'pay for play,'" ER25. Moreover, in criticizing defendants for defining amateurism by "what it is not," ER84, the court was also criticizing the Supreme Court and this Court, because each has done likewise, *see supra* p.44. Indeed, it was largely because "the district court ignored" such a definition—i.e., that "not paying student-athletes is *precisely what makes them amateurs*"—that *O'Bannon* found clear error in the district court's prior effort to introduce pay for play into NCAA sports. 802 F.3d at 1076. Defendants' conception of "amateurism," in other words, is what the Supreme Court and this Court have both recognized to be the ordinary meaning of the term.

b.     The court also criticized defendants for various above-COA allowances in the rules. In the court's view, these allowances are instances of "what a reasonable person could consider to be 'pay for play.'" ER27. Hence, the court said, defendants lack a coherent definition of pay because something is "'pay' if the NCAA has decided to forbid it, and … not … 'pay' if the NCAA has decided to permit it." ER85; *see also* ER33 ("The only common thread underlying all forms and amounts of currently permissible compensation is that the NCAA has decided to allow it."). And, the court further asserted, the fact that NCAA sports "remain[] exceedingly popular" despite the presence of these allowances "belies

Defendants' position that the challenged current restrictions on student-athlete compensation are necessary to preserve consumer demand." ER33, 90.

None of this is defensible. The district court's fundamental error was assuming that any above-COA allowances are "pay for play" or otherwise contrary to the traditional no-pay definition of amateurism. For decades, NCAA rules have allowed schools to cover legitimate expenses (academic and athletic) that student-athletes incur because of their participation in intercollegiate athletics, and also permitted specified limited non-cash awards for exceptional achievement by individuals or teams—regardless of whether they exceed COA, which, as noted, is a federally defined measure of the academic expenses that all students generally incur at their school, *see supra* pp.9-11. These allowances are not only longstanding but also comparable to those of other amateur organizations. *See, e.g.*, U.S. Soccer Federation, *2019-2020 Policy Manual*, Policy 601-1, https://tinyurl.com/y5zd3783; U.S. Golf Association, *Rules of Amateur Status*, Rule 3, https://tinyurl.com/y3kk2q4e. The notion that it is consistent with amateurism to have such allowances for actual, legitimate expenses and modest awards for exceptional achievement is therefore not a recent, ad hoc, or disingenuous rationalization.

To the extent the district court's criticism was that not every allowance under NCAA rules is either a legitimate expense or an award for exceptional

achievement, that is untenable. To begin with, travel costs incurred to participate in practice or competition (which the district court cited, *see* ER30), *are* expenses that student-athletes legitimately incur to be student-athletes. Likewise, although the court seemed troubled that the SAF has infrequently been used to pay "loss-of-value" insurance premiums for student-athletes, ER30, such premiums are a legitimate expense because the insurance protects the very few ultra-elite student-athletes who are expected to be among the most highly paid professionals against the catastrophic financial consequences of a severe injury, thus enabling them to continue being both students and intercollegiate athletes. Meanwhile, awards that football players may receive if their team makes it to a postseason "bowl" game (non-cash awards that are capped at "several hundred dollars" in value), as well as the post-eligibility graduate-school scholarship that each school may award to two graduating seniors annually, ER27, 31, exemplify the types of reasonable awards for exceptional achievement that the principle of amateurism has long allowed.

Moreover, even if it is not obvious that every allowance falls within the overarching categories identified above, that would not remotely show that defendants' conception of amateurism is incoherent or disconnected from consumer demand. *O'Bannon* makes this clear: Despite arguments from the plaintiffs, the district court, and the dissent about a small number of seeming exceptions among the NCAA's large number of rules (such as above-COA Pell

grants and pre-matriculation prizes won by tennis players, *see* 802 F.3d at 1058-1059, 1077 & n.21, 1078 n.24), this Court concluded that amateurism is a meaningful concept and increases consumer demand, *see id.* at 1073, *quoted supra* p.13. The step-2 question, this Court explained, is not whether "the NCAA's concept of amateurism ha[s] been perfectly coherent and consistent," *id.*, because even the lack of perfect consistency would not demonstrate a professionalization of college sports. The district court erred in failing to recognize this, converting *O'Bannon*'s conclusion that the NCAA must permit student-athletes to receive scholarships up to COA into a trap whereby the NCAA cannot permit them to receive more than COA lest it undermine its entire enterprise and subject itself to constant antitrust liability and judicial oversight.

At most, therefore, the district court's critiques boil down to simple disagreement about what above-COA allowances are consistent with amateurism. But whatever room exists for reasonable disagreement over what counts as a legitimate expense or a modest and reasonable award, the court's disagreement does not show that defendants have drawn those lines in an "arbitrary" way, ER32, let alone that defendants' conception of "amateurism" and "pay" is incoherent. If the "ample latitude" the Supreme Court said the NCAA "must have" means anything, it means that defendants can draw reasonable lines and choose among reasonable alternatives without fear of facing antitrust liability (and possibly treble

damages) because a federal court concludes that it would have drawn the lines differently.

      c.      The district court also pointed to two post-*O'Bannon* "natural experiments," ER36: the increase of the athletic-scholarship limit to COA, and the creation of the University of Nebraska's Post-Eligibility Opportunities (PEO) program, which offers up to $7,500 in post-eligibility financial aid to former Nebraska student-athletes who enroll in certain post-graduate programs at Nebraska, ER36-40; *see also* ER165-167; University of Nebraska, *Post-Eligibility Experiences* (Jan. 6, 2017), https://tinyurl.com/y36pgnzu. That each "natural experiment" yielded "no negative impact on consumer demand," even though each resulted in more student-athletes receiving benefits above COA, was in the court's view additional evidence that amateurism is unnecessary to differentiate college and professional sports or promote consumer demand. ER36-40.

      That is untenable. The court's analysis of these "experiments" repeated the error just discussed: These allowances, like the other allowances discussed above, are consistent with the NCAA's definition of amateurism and therefore their adoption would not be expected to diminish consumer demand. Consequently, neither "experiment" supports the district court's conclusion that greater allowances could exist without harming consumer demand.

In *O'Bannon*, this Court required the NCAA to raise the athletic-scholarship cap to COA precisely because "by the NCAA's own standards, student-athletes remain amateurs as long as any money paid to them goes to cover legitimate educational expenses." 802 F.3d at 1075. Accordingly, the Court elaborated, there was no evidence "suggest[ing] that consumers of college sports would become less interested in those sports if athletes' scholarships covered their full cost of attendance." *Id.* That this Court's expectation appears to have been borne out merely confirms that allowing schools to cover all legitimate expenses is consonant with amateurism; it does not show that amateurism is meaningless or that the much greater allowances ordered by the district court (i.e., ones unrelated to legitimate expenses or modest awards) would *also* be consonant with amateurism. And while the district court was correct that raising the athletic-scholarship cap to COA resulted in more student-athletes receiving financial aid above COA (through Pell grants and SAF or AEF distributions), ER37, that is irrelevant. This Court affirmed the NCAA's definition of amateurism even though NCAA rules "already permitted [student-athletes] to accept Pell grants that raise their total aid package above the cost of attendance." *O'Bannon*, 802 F.3d at 1078 n.24; *see also O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 975 n.5 (N.D. Cal. 2014) (acknowledging SAF distributions can exceed COA). Moreover, in requiring the NCAA to raise the athletic-scholarship cap to COA, this Court certainly did not suggest that the

NCAA needed to require schools to make offsetting reductions in other financial aid lest more student-athletes receive total aid above COA.

Nebraska's PEO program (which nothing in the record suggests fans were even aware of) was in fact implemented under NCAA rules that existed at the time of *O'Bannon*, *compare* ER284 (§15.01.5.2) *with* ER302; *see also* ER165-167. The program is simply an instance of the longstanding practice of providing financial aid to former student-athletes to continue studies at their alma maters. There is no basis to draw any inference about the program's effect on consumer demand, let alone any basis to conclude that the massively greater benefits the district court's injunction permits are consistent with amateurism or would not diminish consumer demand.

### C. The District Court's Less-Restrictive Alternative Is Unsupported And Improper

To carry its burden at step 3, a plaintiff must show that there is an alternative restraint that is substantially less restrictive of competition but "'virtually as effective' in serving the procompetitive purposes of the … current rules," "without significantly increased cost." *O'Bannon*, 802 F.3d at 1074. And given the "ample latitude" due the NCAA, a plaintiff challenging NCAA rules must make a "strong evidentiary showing that its alternatives are viable." *Id.* Here, the district court correctly found that plaintiffs failed to prove that any of their proposed alternatives would be virtually as effective in maintaining the distinction between college and

- 56 -

professional sports.  ER59-63.  Given that failure, the court should have granted judgment for defendants.

Instead, the court adopted the LRA it had divined at step 2 (and revealed only upon entering judgment).  That alternative is not viable.  Its foundational premise—that the true distinction between college athletics and professional sports is that only professionals can receive "*unlimited* payments unrelated to education," ER49-50 (emphasis added)—lacks any record support, and is demonstrably wrong. And even accepting that premise, there is no strong evidence that the alternative is virtually as effective as the challenged rules at preserving the distinction between collegiate and professional sports.  To the contrary, it would convert college athletes into poorly paid (and perhaps not-so-poorly paid) professional athletes. Nor is there the requisite strong evidence that the alternative would not impose substantially increased costs.  And it is not the type of alternative contemplated by antitrust law.[4]

---

[4]     As discussed, *see supra* pp.42-43, the court at step 2 erroneously imposed on defendants the burden that plaintiffs should have borne at step 3.  The court continued with such improper burden-shifting at step 3, noting that although it "asked Defendants several times … to propose … adjustments to … Plaintiffs' proposed [LRAs] that would be more workable," defendants "offered none." ER69.  It was not defendants' burden at step 3 to "offer[]" anything.

1.    *The district court wrongly concluded that the real distinction between college and professional sports is that only professional athletes can receive unlimited pay*

The district court grievously erred in proclaiming that what differentiates professional athletes from collegiate athletes is whether they can receive "unlimited" pay unrelated to education.  To begin with, that claim (which plaintiffs never made) contradicts *Board of Regents* and *O'Bannon*, each of which, as discussed, recognized that what distinguishes college and professional sports is that student-athletes are not paid to play at all.  *See* 468 U.S. at 102; 802 F.3d at 1076.

Moreover, no witness testimony, no document, *nothing* in the record indicates that professional athletes can receive "unlimited" pay.  That is because it is not true.  The NBA, NHL, NFL, MLB, and Major League Soccer all have caps (or something similar) that preclude unlimited payments.  *E.g.*, ER200; Diamond, *How MLB's Luxury Tax Has Put a Deep Freeze on Spending*, Wall St. J. (Jan. 11, 2019), https://tinyurl.com/y5g3wtgk.  And athletes in many professional leagues (particularly minor leagues) are paid very modest amounts.  *See, e.g.*, *Minor League Basketball Teams Offer Some the Chance to Play, to Keep Their NBA Dreams Alive*, Fox News (July 3, 2013) (noting players in some minor basketball leagues "make as little as $100 a game"), https://tinyurl.com/y48nlz69.  The court's redefinition of the line of demarcation is simply fictional.  And because it

was essential to the court's ultimate holding, that redefinition by itself requires reversal.

The court suggested, however, that its new line of demarcation was discernible in the NCAA's practice of allowing certain above-COA amounts. ER50. In the court's view, those allowances have not diminished consumer demand, so "it follows that the distinction between college and professional sports arises because student-athletes do not receive unlimited payments unrelated to education." *Id.* That does not "follow[]" at all. To begin with, the allowances are consistent with traditional amateurism principles, which permit student-athletes to receive legitimate expenses and modest non-cash achievement awards. *See supra* pp.51-52. Moreover, NCAA rules prohibit far more than "unlimited payments unrelated to education," ER50, so even if those allowances have not diminished consumer demand, that would do nothing to support the district court's leap from what NCAA rules do allow to the massively greater allowances the court permitted.

> 2. *The evidence does not show that the district court's alternative would be virtually as effective as the challenged rules at differentiating college and professional sports*

Had the district court recognized the true distinction between professional athletes and amateur college athletes (i.e., that—as *Board of Regents* and *O'Bannon* recognized—amateurs are not paid at all), it could not possibly have

asserted that its alternative is "virtually as effective" as the challenged rules at maintaining that distinction.  But even if the court's distinction were valid, there still would not be "strong eviden[ce]," *O'Bannon*, 802 F.3d at 1074, that its alternative would be virtually as effective as the challenged rules in preserving consumer demand for college sports by differentiating them from professional sports.

To begin with, although the court claimed that its alternative would prevent student-athletes from receiving the unlimited payments supposedly available to professional athletes, the alternative manifestly does not do that.  The court's contrary claim rested on its unexplained assertion that the "education-related" benefits allowed under its alternative are "inherently limited in value."  ER64.  But that assumption is impossible to reconcile with the court's mandate that schools be allowed to offer them in *un*limited amounts.  Given that mandate, nothing would prevent each school from offering every recruit or current student-athlete a "paid post-eligibility internship," ER2-3, for which each could be "paid" *unlimited* amounts in cash.  The same is true of the in-kind benefits allowed under the court's alternative, which by definition encompass only "items *not included* in the cost of attendance calculation" of students' actual academic expenses.  *Id.* (emphasis added).  Schools could offer recruits and student-athletes tens or perhaps hundreds of thousands of dollars' worth of high-end computers, musical instruments

(whether or not the recipient was studying music), vehicles (to get to class), and other unnecessary or inordinately valuable items just because they are nominally "related to the pursuit of academic studies." ER2-3. Moreover, the court's alternative is silent as to whether these "education-related" benefits would fall within the NCAA's limits on selling benefits and awards for cash. The court's LRA therefore would (or at least could, which is enough to doom it) lead to student-athletes being "poorly-paid professional collegiate athlete[s]," *O'Bannon*, 802 F.3d at 1076—in fact, not so poorly paid. This Court has already held that this same district court could not "plausibly conclude that" that scenario "is 'virtually as effective'" as the challenged rules at preserving the procompetitive distinction between college and professional sports. *Id.*

The court's alternative additionally requires that each Division I school be allowed to offer every student-athlete thousands of dollars in cash annually in "academic … awards and incentives," ER97 & n.44, a vague term that could mean nothing more than meeting NCAA academic-eligibility requirements. The court insisted that allowing these payments would not reduce consumer demand or blur the distinction with professional sports because the NCAA already permits a handful of athletics-based awards, the theoretical aggregate value of which is the same as the court's new allowance. ER97. But an assertion is not a "strong evidentiary showing," *O'Bannon*, 802 F.3d at 1074. And in any event, there is no

comparison between allowing: (1) a non-cash award of a particular value to one or a few student-athletes for specific achievements, and (2) payment of that amount in cash to *every* student-athlete just for remaining eligible to play. The former accords with amateurism; the latter epitomizes professional pay. *See O'Bannon*, 802 F.3d at 1076 n.20, *quoted supra* p.47. Moreover, the floor set by the court's LRA—cash in an amount remarkably close to the $5,000 trust-fund payments *O'Bannon* rejected—is far higher than the value of the non-cash awards that even exceptional student-athletes have received under the current rules; nothing in the record shows that any student-athlete has ever received the hypothetical aggregate maximum of athletic awards. In short, the availability of small, non-cash achievement awards for a few student-athletes provides no basis (let alone strong evidence) to conclude that an additional, much larger cash payment for all student-athletes would be virtually as effective as the challenged rules in differentiating college and professional sports, thereby preserving consumer demand for intercollegiate athletics.

The district court also relied on the two "natural experiments" discussed earlier, along with a survey by plaintiffs' expert. ER64-65. But again, the "experiments" are consistent with defendants' (and *O'Bannon*'s and *Board of Regents*') conception of amateurism, *see supra* pp.54-56, whereas the court's LRA is not. And as also explained, even if the allowance of a few post-eligibility

- 62 -

scholarships at one school has not affected consumer demand for college sports nationwide, it does not follow that allowing unlimited paid internships, unlimited post-eligibility scholarships, and unlimited other "education-related" items for every Division I athlete at every school in the country would not affect it either. The latter is a "quantum leap" beyond the former (and beyond what the rules currently allow). *O'Bannon*, 802 F.3d at 1078.

The survey similarly falls far short of the required "strong evidentiary showing." *O'Bannon*, 802 F.3d at 1074. Plaintiffs' survey expert asked college football and basketball fans whether they would watch those sports more or less often if eight different benefits were provided to student-athletes. ER248-252. But the survey tested each benefit in isolation—and with none of the tested benefits described as having *unlimited* value. *See id.*; ER168. It therefore does not satisfy plaintiffs' heavy burden to show that providing every Division I student-athlete with potentially unlimited cash through paid internships, unlimited amounts of all in-kind "education-related" benefits *not* included in COA, and thousands of dollars or more per year in cash through academic awards and incentives will not adversely impact consumer demand. *See O'Bannon*, 802 F.3d at 1078 n.23 (rejecting similarly limited evidence).

Put simply, nothing in the record justifies the district court's departure from *O'Bannon*'s commonsense conclusion: Allowing schools to pay every student-

athlete many thousands of dollars above COA is not "virtually as effective" as the challenged rules at maintaining even the district court's invented distinction between college sports and professional sports—let alone the true distinction.

>    3.    *The evidence does not show that the district court's alternative would not impose significantly increased costs*

The district court found that its LRA would not significantly increase costs. ER66, 68-69; *see also* ER98. But the "strong eviden[ce]" required to support that finding, *O'Bannon*, 802 F.3d at 1074, does not exist. Indeed, all the court said on this issue was that, by removing "NCAA caps on most education-related benefits," its LRA would "eliminate the need to expend resources on compliance and enforcement in connection with such caps." ER66.

That bald assertion cannot be reconciled with the court's injunction, which not only specifies several items that are education-related, but also includes a nebulous catchall, namely, "other tangible items … related to the pursuit of academic studies." ER2-3. The rulemaking and other steps required to enforce that line will unquestionably be costly, as will the judicial proceedings that will ensue if plaintiffs seek contempt after deciding that the NCAA has not been sufficiently punctilious in adhering to the injunction, or if (as the injunction requires) defendants seek pre-approval of any clarifying definition of "education-related" that the NCAA adopts. *See infra* pp.66-69. The court's failure to cite *any* evidence, let alone strong evidence, refuting any of this is fatal.

4.      *The district court's alternative involves improper price setting*

The district court's LRA also involves improper judicial price-setting.  The portion that requires the NCAA to permit cash academic awards and incentives recognizes that there must be *some* limit on such allowances, lest they become "indistinguishable from [payments supposedly] received in professional sports," ER61-62.  But the court's new limit merely resets the cap, i.e., the price, from the current limit to what the court labeled "the athletics participation awards limit," which the court suggested is currently $5,600 annually.  ER61-62, 97, 101.  Such judicial price adjustment is not a proper part of an LRA.  *See Chicago Professional Sports Ltd. Partnership v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) (faulting antitrust court's opinion for "read[ing] like the ruling of an agency exercising a power to regulate rates").  Indeed, the Supreme Court has made clear that antitrust courts are "ill suited" to "identify[] the proper price" of a product, *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).  Antitrust law is concerned with improving *competition*, not with particular prices.  *See* Areeda & Hovenkamp, *Antitrust Law* ¶1913 (4th ed. 2019 update).  Hence, "[i]f members of a joint venture are found to be unlawfully fixing prices at $10, lowering the price to $8 … is not the type of less restrictive alternative contemplated by antitrust law."  *Id.* ¶1505; *see also Texaco Inc. v. Dagher*, 547

- 65 -

U.S. 1, 7 (2006) (a "joint venture ... must have the discretion to determine the prices of the products that it sells").

In fact, the leading antitrust treatise points out that in *O'Bannon*, this Court properly rejected the district court's "idea of a 'less restrictive alternative[]'" that would "permit students to receive deferred compensation in a trust fund of up to $5,000" because that alternative "was really nothing more than disguised price administration." Areeda & Hovenkamp, *Antitrust Law* ¶1505. The very same thing is true here, and provides an additional reason the court's thoroughly flawed rule-of-reason holding should not stand.[5]

## III. THE INJUNCTION IMPROPERLY ARROGATES CONTROL OVER COLLEGE SPORTS TO THE DISTRICT COURT

Even if there were no basis to reverse the district court's judgment, the injunction could not stand because it improperly arrogates to the court an extreme degree of control over college sports. The injunction generally bars the NCAA

---

[5]   In dicta, the district court stated that if a plaintiff fails to carry its burden at step 3, the court should proceed to a fourth step, "wherein the court 'must balance the harms and benefits' of the challenged conduct to determine whether it is 'reasonable.'" ER79; *see also* ER103-106. The court cited no case conducting such balancing, and its view that a fourth step exists is another inconsistency with *O'Bannon*, which described LRAs as the "third and final step" of the rule of reason, 802 F.3d at 1060. In any event, balancing would be inappropriate here for the same reason it would have been inappropriate in *O'Bannon*: There are no "specific, quantifiable amounts to attach to competitive threats and offsetting gains." Hovenkamp, *Antitrust Balancing*, 12 N.Y.U. J.L. & Bus. 369, 378, 383-384 (2016).

from limiting "compensation or benefits related to education."  Even the question whether a particular activity is for "education" cannot always be answered objectively or without reasonable disagreement.  ER255-257.  But the injunction amplifies that vagueness by requiring the NCAA to allow schools to provide unlimited quantities of compensation and benefits that are somehow merely "related to" education.  Moreover, instead of leaving the task of determining what qualifies as "education-related" to defendants—the institutions experienced in and responsible for providing education—the court assigned that task to itself, specifying some items that are "education-related" (but adding a catch-all, thereby ensuring the vagueness problem remains), and permitting its list to be modified only with its pre-approval.  ER2-3.  The injunction thus suffers from two mutually reinforcing flaws.

First, whereas "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed," *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam), the injunction fails to "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1).  The inherent malleability of the term "education-related" will enable plaintiffs to use the threat of contempt to force defendants to expand allowances to the outer limits of plaintiffs' self-interested imagination.  *See Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1047-1048 (9th Cir.

2013) (holding an injunction's "definition of a key phrase, 'Infringement-Related Terms,' … too vague to provide the notice required by Rule 65(d)"). The injunction thus threatens to deter defendants from setting boundaries on permissible compensation, undermining any hope of maintaining the "'revered tradition of amateurism in college sports,'" *O'Bannon*, 802 F.3d at 1062 (quoting *Board of Regents*, 468 U.S. at 120).

Second, by giving the district court the power to resolve disputes that arise from the injunction's inherent vagueness, the injunction empowers the court to "micromanage [the NCAA's] organizational rules," *O'Bannon*, 802 F.3d at 1075— in perpetuity. That assumption of quasi-regulatory power is particularly unwarranted in antitrust cases, because antitrust courts may not behave like "central planners," overseeing the nation's businesses to achieve their preferred economic outcomes. *Verizon*, 540 U.S. at 408. Or put more bluntly, "the antitrust laws do not deputize district judges as one-man regulatory agencies." *Chicago Professional Sports*, 95 F.3d at 597. Judicial assumption of such a regulatory role is particularly improper here, because, the Supreme Court and this Court, as noted, have repeatedly recognized the critical importance of district courts deferring to joint ventures' judgments regarding issues core to the existence of their products, save in extreme circumstances. That, of course, is why *Board of Regents* and *O'Bannon* directed courts to give the NCAA "ample latitude." Instead of doing so,

- 68 -

the injunction denies the NCAA virtually any latitude to manage a central aspect of the amateur sports league that it has overseen for over a century.

## CONCLUSION

The district court's judgment should be reversed and the injunction vacated.

August 16, 2019

Respectfully submitted,

s/ Seth P. Waxman
SETH P. WAXMAN
LEON B. GREENFIELD
DANIEL S. VOLCHOK
DAVID M. LEHN
KEVIN M. LAMB
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 663-6000

*Counsel for the NCAA (filed on behalf, and with the concurrence, of all defendants)*

**(ADDITIONAL COUNSEL LISTED ON FOLLOWING PAGES)**

BART H. WILLIAMS
SCOTT P. COOPER
KYLE A. CASAZZA
JENNIFER L. JONES
SHAWN S. LEDINGHAM, JR.
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
(310) 557-2900

*Counsel for Pac-12 Conference*

LEANE K. CAPPS
CAITLIN J. MORGAN
POLSINELLI PC
2950 North Harwood Street, Suite 2100
Dallas, TX 75201
(214) 397-0030

AMY D. FITTS
POLSINELLI PC
900 West 48th Place, Suite 900
Kansas City, MO 64112
(816) 218-1255

*Counsel for the Big 12 Conference, Inc.
and Conference USA*

MARK A. CUNNINGHAM
JONES WALKER LLP
201 St. Charles Avenue, 50th Floor
New Orleans, LA 70170
(504) 582-8536

*Counsel for Sun Belt Conference*

BETH A. WILKINSON
BRANT W. BISHOP
WILKINSON WALSH + ESKOVITZ LLP
2001 M Street N.W., 10th Floor
Washington, D.C. 20036
(202) 847-4000

SEAN ESKOVITZ
WILKINSON WALSH + ESKOVITZ LLP
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
(424) 316-4000

*Counsel for the NCAA*

JEFFREY A. MISHKIN
KAREN HOFFMAN LENT
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
4 Times Square
New York, N.Y. 10036
(212) 735-3000

*Counsel for the NCAA and Western
Athletic Conference*

ROBERT W. FULLER, III
PEARLYNN G. HOUCK
LAWRENCE C. MOORE, III
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, N.C. 28246
(704) 377-2536

MARK J. SEIFERT
SEIFERT LAW FIRM
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 999-0901

*Counsel for Southeastern Conference*

ANDREW J. PINCUS
CHARLES A. ROTHFELD
RICHARD J. FAVRETTO
Mayer Brown LLP
1999 K Street N.W.
Washington, D.C. 20006
(202) 263-3000

BRITT M. MILLER
ANDREW S. ROSENMAN
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600

*Counsel for The Big Ten Conference, Inc.*

MERYL MACKLIN
BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
(415) 268-1981

RICHARD YOUNG
BRENT E. RYCHENER
BRYAN CAVE LEIGHTON PAISNER LLP
90 South Cascade Avenue, Suite 1300
Colorado Springs, CO 80903
(719) 473-3800

*Counsel for Mountain West Conference*

BENJAMIN C. BLOCK
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
(202) 662-5205

*Counsel for the American Athletic
Conference*

R. TODD HUNT
BENJAMIN G. CHOJNACKI
WALTER HAVERFIELD LLP
The Tower at Erieview
1301 East 9th Street, Suite 3500
Cleveland, OH 44114
(216) 928-2935

*Counsel for Mid-American Conference*

D. ERIK ALBRIGHT
GREGORY G. HOLLAND
FOX ROTHSCHILD LLP
300 North Greene Street, Suite 1400
Greensboro, N.C. 27401
(336) 378-5200

JONATHAN P. HEYL
FOX ROTHSCHILD LLP
101 North Tryon Street, Suite 1300
Charlotte, N.C. 28246
(704) 384-2625

CHARLES L. COLEMAN, III
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111
(415) 743-6900

*Counsel for Atlantic Coast Conference*

## STATEMENT OF RELATED CASES

Defendants are not aware of any related cases pending in this Court.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 19-15566, 19-15662

I am the attorney or self-represented party.

**This brief contains** | 15,387 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ◉ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Seth P. Waxman | **Date** | August 16, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                     *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

On this 16th day of August 2019, I electronically filed the foregoing with the Court using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

s/ Seth P. Waxman
SETH P. WAXMAN