Nos. 19-15566, 19-15662

# In the United States Court of Appeals for the Ninth Circuit

IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION

SHAWN ALSTON, ET AL.,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ET AL.,
DEFENDANTS-APPELLANTS/CROSS-APPELLEES

On Appeal from the United States District Court
for the Northern District of California, No. 14-md-02541,
the Honorable Claudia Wilken, presiding

## REDACTED PLAINTIFFS' RESPONSE BRIEF AND OPENING BRIEF ON CROSS-APPEAL

STEVE W. BERMAN
CRAIG R. SPIEGEL
EMILEE N. SISCO
*Hagens Berman Sobol Shapiro LLP*
*1918 Eighth Avenue, Suite 3300*
*Seattle, WA 98101*
*(206) 623-7292*
*steveb@hbsslaw.com*

JEFFREY L. KESSLER
DAVID G. FEHER
DAVID L. GREENSPAN
*Winston & Strawn LLP*
*200 Park Avenue*
*New York, NY 10166*
*(212) 294-6700*
*jkessler@winston.com*

*Additional counsel on next page*

BRUCE L. SIMON
BENJAMIN E. SHIFTAN
*Pearson, Simon & Warshaw, LLP*
*350 Sansome Street, Suite 680*
*San Francisco, CA 94104*
*(415) 433-9000*
*bsimon@pswlaw.com*

ELIZABETH C. PRITZKER
JONATHAN K. LEVINE
BETHANY L. CARACUZZO
SHIHO YAMAMOTO
*Pritzker Levine LLP*
*180 Grand Avenue, Suite 1390*
*Oakland, CA 94612*
*(415)-692-0772*

LINDA T. COBERLY
*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, IL 60601*
*(312) 558-5600*
*lcoberly@winston.com*

SEAN D. MEENAN
JEANIFER E. PARSIGIAN
*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA 94111*
*(415) 591-1000*
*smeenan@winston.com*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................... 1

ISSUES PRESENTED ON APPEAL ......................................................... 7

ISSUE PRESENTED ON CROSS-APPEAL ............................................ 8

STATEMENT OF JURISDICTION......................................................... 8

STATEMENT OF THE CASE .................................................................. 8

    I.    Background and Procedural History....................................... 8

    II.    The District Court's Analysis Under the Rule of Reason..... 12

A.    Step One:  Anticompetitive Effects................................................ 12

B.    Step Two:  Procompetitive Justifications ...................................... 12

1.    Since *O'Bannon*, the NCAA has increasingly allowed, and schools have increasingly provided, substantial non-educational benefits in addition to the cost of attendance. ........... 14

2.    The widespread practice of offering benefits beyond the cost of attendance has not adversely affected demand. ....................... 20

3.    The record showed no direct connection between the challenged rules and consumer demand. ..................................... 22

C.    Step Three:  Less Restrictive Alternatives .................................... 24

    III.    The Injunction ..................................................................... 28

STANDARD OF REVIEW...................................................................... 29

SUMMARY OF ARGUMENT ................................................................ 30

ARGUMENT ........................................................................................... 35

I.    *O'Bannon* does not foreclose Plaintiffs' claims. .................... 35

A.    As with all antitrust precedent, *O'Bannon* depends on its facts and does not bind a court handling a different challenge.  36

1.    Antitrust cases are necessarily fact-dependent. ........................... 36

2.    The record here is filled with new, undisputed evidence of changed factual circumstances. ...................................................... 39

3.    Defendants' argument for *stare decisis* mischaracterizes both *O'Bannon* and the decision below. .................................................. 41

B.    *Res judicata* does not bar this action because Plaintiffs are not in privity with the *O'Bannon* class and the claims in the two cases are not identical. ............................................................. 45

1.    Plaintiffs here are not in privity with the class in *O'Bannon*. ...... 46

2.    There is no identity of claims for claim-preclusion purposes. ........ 49

II.    The district court did not commit clear error in finding that the challenged rules fail the Rule of Reason. .............. 52

A.    Defendants' complaints about judicial "overmeddling" fly in the face of *O'Bannon*'s holding that NCAA rules are not immune from Rule of Reason scrutiny. ......................................... 53

B.    At Step Two, the district court correctly assigned the relevant burdens and made factual findings supported by ample evidence. ................................................................................ 54

1.    The court's Step Two analysis was based on well-supported findings of fact, not a legally unsound consideration of less restrictive alternatives. ................................................................. 55

2.    Defendants cannot show clear error in the court's rejection of their extremely broad "amateurism" justification. ....................... 57

C.    The district court did not clearly err in finding that Plaintiffs met their burden of proving at least one less restrictive alternative. ..................................................................62

1.    The court did not clearly err in finding the challenged restraints "patently and inexplicably" more restrictive than necessary…….....................................................................63

2.    The court did not clearly err in finding the less restrictive alternative "virtually as effective."................................67

      a.   *Non-cash education-related benefits*......................................68

      b.   *Cash education-related benefits*...........................................71

3.    The district court did not clearly err in finding that the less restrictive alternative can be implemented without significantly increased costs. ..........................................76

    III.   The district court properly retained jurisdiction to enforce its injunction................................................79

CROSS-APPEAL .........................................................80

    I.   The district court abused its discretion by issuing an injunction more limited than the anticompetitive harm it found...................................................................82

    II.   The district court's refusal to grant broader injunctive relief is grounded in legal error............................88

CONCLUSION ...........................................................92

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Maricopa Cty. Med. Soc.*,
457 U.S. 332 (1982) ................................................................89

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001) ................................................62

*Daewoo Elecs. Am. Inc. v. Opta Corp.*,
875 F.3d 1241 (9th Cir. 2017) ................................................51

*Dexter v. Kirschner*,
984 F.2d 979 (9th Cir. 1992) ..................................................29

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) ................................................................88

*FTC v. BurnLounge, Inc.*,
753 F.3d 878 (9th Cir. 2014) ..................................................29

*Garity v. APWU Nat'l Labor Org.*,
828 F.3d 848 (9th Cir. 2016) ..................................................46

*Harkins Amusement Enters., Inc. v. Harry Nace Co.*,
890 F.2d 181 (9th Cir. 1989) ............................................37, 51

*Howard v. City of Coos Bay*,
871 F.3d 1032 (9th Cir. 2017) ....................................45, 50, 52

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) (en banc) ..................................47

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ....................................29, 81, 87

*Int'l Salt Co. v. United States*,
332 U.S. 392 (1947) ................................................................83

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ............................................................. 89

*Law v. Nat'l Collegiate Athletic Ass'n*,
134 F.3d 1010 (10th Cir. 1998) .......................................................... 64

*Lawlor v. Nat'l Screen Service Corp.*,
349 U.S. 322 (1955) ........................................................................... 52

*Levi Strauss & Co. v. California Denim Resources, Inc.*,
2001 WL 348973 (N.D. Cal. Mar. 16, 2001) ..................................... 79

*Lewis v. Ayers*,
681 F.3d 992 (9th Cir. 2012) ................................................. 29, 57, 61

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football
League*,
726 F.2d 1381 (9th Cir. 1984) ........................................................... 84

*Maple Flooring Mfrs.' Ass'n v. United States*,
268 U.S. 563 (1925) ........................................................................... 36

*Media Rights Techs., Inc. v. Microsoft Corp.*,
922 F.3d 1014 (9th Cir. 2019) ........................................................... 52

*Nat'l Basketball Ass'n v. SDC Basketball Club, Inc.*,
815 F.2d 562 (9th Cir. 1987) ....................................................... 37, 38

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
468 U.S. 85 (1984) ............................................................................. 54

*Nat'l Soc. of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978) ........................................................................... 89

*O'Bannon v. NCAA.*,
802 F.3d 1049 (9th Cir. 2015) ................................................... *passim*

*In re Osborne*,
76 F.3d 306 (9th Cir. 1996) ............................................................... 36

*Otter Tail Power Co. v. United States*,
410 U.S. 366 (1973) ........................................................................... 86

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
    890 F.2d 139 (9th Cir. 1989) ................................................................ 88

*Robinson v. Delgado*,
    2012 WL 4753493 (N.D. Cal. Oct. 4, 2012) ........................................ 79

*Rodriguez v. Holder*,
    683 F.3d 1164 (9th Cir. 2012) .............................................................. 58

*Smith v. Bayer Corp.*,
    564 U.S. 299 (2011) ..................................................................... 48, 49

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ................................................................................ 37

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ............................................................................ 48

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ............................................................... 90

*United States v. Bhatia*,
    545 F.3d 757 (9th Cir. 2008) .............................................................. 46

*United States v. Coca-Cola Bottling Co. of Los Angeles*,
    575 F.2d 222 (9th Cir. 1978) ........................................................ 83, 87

*United States v. Crescent Amusement Co.*,
    323 U.S. 173 (1944) ..................................................................... 83, 86

*United States v. Glaxo Group, Ltd.*,
    410 U.S. 52 (1973) .............................................................................. 81

*United States v. Loew's, Inc.*,
    371 U.S. 38 (1962) ....................................................................... 30, 81

*United States v. Mercy Health Servs.*,
    107 F.3d 632 (8th Cir. 1997) .............................................................. 37

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ........................................................ 82, 89

*United States v. Motor Vehicle Mfrs. Ass'n*,
   1982 WL 1934 (C.D. Cal. Oct. 28, 1982) .......................................... 37

*United States v. Paramount Pictures*,
   334 U.S. 131 (1948) .................................................................... 87, 88

*United States v. Schiff*,
   379 F.3d 621 (9th Cir. 2004) ........................................................ 29

*United States v. Silver*,
   245 F.3d 1075 (9th Cir. 2001) ...................................................... 42

*Whole Woman's Health v. Hellerstedt*,
   136 S. Ct. 2292 (2016) ................................................................ 52

*William R. Warner & Co. v. Eli Lilly & Co.*,
   265 U.S. 526 (1924) .................................................................... 86

## Statutes

28 U.S.C. § 1291 .......................................................................... 8

28 U.S.C. § 1331 .......................................................................... 8

28 U.S.C. § 1337 .......................................................................... 8

## Other Authorities

Areeda & Hovenkamp, Antitrust Law: An Analysis of
   Antitrust Principles and their Application (3d & 4th eds.
   2017-2019) ................................................................ *passim*

*Emmert: Ruling Reinforced Fundamentals of* NCAA,
   ESPN.COM (Apr. 4, 2019), https://www.espn.com/college-
   sports/story/_/id/26436658/ruling-reinforced-
   fundamentals-ncaa .............................................................. 27, 75

Fed. R. App. P. 4(a) ................................................................ 8

## INTRODUCTION

The decision before the Court represents the culmination of a ten-day bench trial featuring forty-five fact witnesses, six experts, and tens of thousands of pages of trial exhibits. Judge Claudia Wilken's 104-page decision reflects her careful weighing of this massive body of evidence, in a manner entirely faithful to this Court's prior decisions. Among other things, Judge Wilken found that the record in this case presents a markedly different picture of the business of college football and basketball than a different group of plaintiffs presented in *O'Bannon v. NCAA*. This new record called for new fact-finding and new injunctive relief for Plaintiffs, who suffer undisputed and significant harm from the NCAA's unlawful compensation rules.

Division I basketball and football are big businesses. The NCAA and its member conferences and schools receive billions of dollars every year through the hard work, sweat, and sometimes broken bodies of the elite athletes in these sports. Yet the athletes themselves receive almost none of this revenue. This is no accident; the NCAA and its members have agreed on a system of rules that significantly restrain the compensation and benefits that schools may pay for the athletes' work.

As Judge Wilken found, Defendants did not adopt these rules to promote competition; ***they did so to control their costs***. As a result of these restraints, Plaintiffs receive far less for their services than they would in a competitive market.

For many years, the NCAA and its members have attempted to justify their compensation restrictions under the guise of "amateurism"—supposedly as a way to promote demand for college sports. Indeed, Defendants' brief suggests that this "amateurism" rationale has already been accepted by this Court and can never again be challenged under the antitrust laws. *See, e.g.*, Br. 2-3, 27. The truth is exactly the opposite. In *O'Bannon v. NCAA*, this Court held that "the NCAA is not above the antitrust laws, and courts cannot and must not shy away from requiring the NCAA to play by the Sherman Act's rules." 802 F.3d 1049, 1079 (9th Cir. 2015). The Court also affirmed an injunction against these rules—though it allowed the NCAA to continue to prevent schools from paying anything more for the athletes' names, images, and likenesses than the cost of attending school. According to *O'Bannon*, cash payments greater than the full cost of attendance would be "untethered to educational expenses" and would be a "quantum leap" from

the status quo that would adversely impact consumer demand. *Id.* at 1078.

The factual landscape has since changed. Based on the extensive evidence presented in this case, Judge Wilken found that since *O'Bannon*, "changes had been made … to the amounts and types of permissible student-athlete compensation" (ER21), such that the NCAA now permits "a variety of … payments above the cost of attendance that have no tether to education…." (ER101-102). These payments—in many instances totaling tens of thousands of dollars per athlete each year—are "often [provided] in unrestricted cash." ER27. As a result, it is no longer possible to describe such payments as a "quantum leap" from the status quo. They ***are*** the status quo.

Moreover, the record here shows that these non-education-related payments have had no adverse impact on the demand for elite college basketball and football. To the contrary, consumer interest in these sports has grown since *O'Bannon*, now often generating revenue of more than $100 million a year per school. *See* ER33-34, 36-38. Unlike the athletes, NCAA coaches and administrators have greatly benefitted from this increasing demand, often earning professional-level salaries.

For example, in 2016, the University of Alabama paid its football coach nearly $7 million, while his ostensible boss—the University's president—made $760,000.  ER699.  Even the strength-and-conditioning coach made over half a million dollars.  ER702.

Based on these and other facts, Judge Wilken found that the NCAA could no longer justify its compensation rules through the mantra of "amateurism."  Indeed, she found that Defendants do not follow any coherent principle of "amateurism," that Defendants did not prove their contention that their ever-changing line of "amateurism" is essential to preserving consumer demand for college sports, and that—as defense witnesses unanimously testified—Defendants did not consider consumer demand when enacting their restraints in the first place.  ER24-49.  Amateurism has thus been exposed as a *post hoc* pretext to justify naked restraints on trade.  The real reason for college sports' enduring popularity is that ***the athletes are students at the schools for which they play***—which would be true with or without the challenged rules.  ER48-49.

Giving Defendants the benefit of the doubt, Judge Wilken did find that "some" of the NCAA's compensation rules "may have some" pro-competitive effect "to the extent that they serve to support the distinction between college sports and professional sports" by prohibiting "unlimited payments unrelated to education." ER50; *see also* ER90. But she found that this narrow justification did ***not*** apply to numerous NCAA rules that arbitrarily prohibit or cap various forms of educational benefits and non-educational benefits that would ***not*** constitute "unlimited payments." After all, other aspects of today's NCAA rules permit student-athletes to receive "thousands or tens of thousands of dollars in such compensation, related and unrelated to education," with no adverse effect on demand. ER50. And even this narrow justification, the court found, could be achieved virtually as effectively through a less restrictive alternative (ER58-69)—so the existing rules are unlawful.

Defendants have not shown any clear error in these factual findings. Nor could they, given the extensive evidence Plaintiffs presented. This is no doubt why their principal argument is that Judge Wilken should not have held a trial at all. Instead, they say, she should have

treated *O'Bannon* as preclusive, applied its result, and refused to consider Plaintiffs' new claims on their merits.

This is wrong as a matter of law. *O'Bannon* established the legal analysis that applies in this case, but it does not dictate the result. A single court decision cannot either invalidate or immunize a business practice for all time; a court must adjudicate any claims that come before it, particularly if the factual circumstances have changed. And here there is no doubt that they have. This case involves different plaintiffs than in *O'Bannon*, asserting different claims based on a different record and different circumstances. Judge Wilken did not err in considering these new claims on their merits; it would have been error to do otherwise.

The only error the court made below was in not granting a remedy broad enough to address the full extent of the antitrust violation. The court's injunction still allows the NCAA to enforce existing rules that prohibit or cap (at arbitrarily low levels) various forms of compensation and benefits that are unrelated to education, even though the court found that these restraints—like the restraints on education-related

compensation, which it did enjoin—are not necessary to serve any pro-competitive justification. *See*, *e.g.*, ER33-34, 50. The court should have adopted the remedy proposed by Plaintiffs—enjoining ***all*** the NCAA rules found to be unreasonable restraints, while leaving individual conferences with the autonomy to decide what limits on compensation are necessary to protect consumer demand. This Court should remand the case with instructions to enter this broader injunction—but it should affirm in all other respects.

## ISSUES PRESENTED ON APPEAL

1. Whether this Court's decision in *O'Bannon* operates like any other antitrust precedent, which must be read in light of its facts and does not preclude different claims by different plaintiffs on a materially different factual record.

2. Whether the trial record contains sufficient evidence to support the district court's factual findings that the challenged rules are procompetitive only to the extent they preserve a distinction between college and professional sports by prohibiting the payment of "unlimited" cash, and that a less restrictive alternative would be virtually as effective in accomplishing that goal.

3. Whether the district court properly exercised its power under the Sherman Act to enjoin the NCAA's unlawful restraints on education-related compensation.

## ISSUE PRESENTED ON CROSS-APPEAL

Whether the district court erred in failing to enter an injunction broad enough to remedy all the conduct it found to unreasonably restrain trade, thereby leaving in place the unlawful rules that prohibit or cap various forms of compensation unrelated to education—rules that are far more restrictive than necessary.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1337. After the entry of final judgment on March 12, 2019, Defendants filed a notice of appeal on March 22, and Plaintiffs noticed a cross-appeal on April 5. ER437-440; Fed. R. App. P. 4(a). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

### I. Background and Procedural History

A group of college football and basketball players filed these lawsuits in 2014 against the NCAA and its largest athletic conferences, challenging rules that restrict student-athlete compensation. The Panel

8

on Multidistrict Litigation consolidated the actions in the Northern District of California, where they were assigned to Judge Wilken. Plaintiffs sought and obtained Rule 23(b)(2) certification of classes consisting of current and future student-athletes who play (i) football in the NCAA's Football Bowl Subdivision ("FBS"), which includes the nation's top 120 college football programs; (ii) women's basketball in NCAA Division I; and (iii) men's basketball in NCAA Division I.

While these cases were pending, this Court issued its decision in *O'Bannon*—an antitrust challenge brought against the NCAA by a class of then-current and former football and men's (but not women's) basketball players. These players challenged the NCAA rules that prohibited compensation for the use of their names, images, or likenesses in game footage or videogames. As detailed below, *O'Bannon* held that the NCAA's rules *are* subject to antitrust challenge and that an injunction was appropriate. Still, the Court limited the injunction—allowing the NCAA to maintain rules prohibiting cash payments above the cost of attendance—on the ground that the record did not support broader relief.

Defendants here moved for judgment on the pleadings, arguing that *O'Bannon* foreclosed Plaintiffs' claims. The district court denied

that motion because this case involves a different set of plaintiffs with different claims and evidence—including evidence that showed significant changes in Defendants' rules and behavior since the *O'Bannon* record closed. ER146-151; *see also* ER120-124; ER20-21, 77-78.

Following more than three years of litigation—including extensive discovery that would not have been necessary had this case been merely a repeat of *O'Bannon*—the parties cross-moved for summary judgment. Judge Wilken denied Defendants' motion and granted summary judgment for Plaintiffs in part. She found that Plaintiffs met their burden to show that the challenged rules constitute agreements in restraint of trade that cause significant anticompetitive harm in the relevant markets. She also found that Defendants had raised two possible procompetitive justifications for which there was an issue of fact for trial: (i) promoting the academic integration of athletes with their campuses, and (ii) preserving "amateurism," which Defendants argued was critical for maintaining consumer demand.

After a ten-day bench trial, the court entered judgment for Plaintiffs, concluding that the challenged rules were patently and inexplica-

bly more restrictive than necessary to serve the only procompetitive justification the evidentiary record could support: preserving consumer demand for college sports "as distinct from professional sports" by "prevent[ing] unlimited cash payments unrelated to education such as those seen in professional sports leagues." ER90. The court enjoined the rules limiting (i) non-cash benefits related to education, and (ii) cash awards for achievement in academics (except that the NCAA may require schools to cap such awards at or above whatever level it already permits for awards based on athletic achievement). ER2-5.

The court denied Plaintiffs' request for broader injunctive relief that also would have enjoined unreasonable prohibitions on compensation and benefits ***not*** related to education. Under the injunction proposed by Plaintiffs, the NCAA would be prohibited from enforcing any of these restraints, but individual conferences would be free to set their own limits on compensation—both education-related and non-education-related—under a principle of "conference autonomy," if they believe such limits are necessary to preserve demand.

## II.  The District Court's Analysis Under the Rule of Reason

Both on summary judgment and at trial, the court faithfully applied the Rule of Reason and this Court's decision in *O'Bannon*.

### A.  Step One:  Anticompetitive Effects

The court resolved the first step of the Rule of Reason on summary judgment, finding undisputed evidence that the challenged rules cause "severe" anticompetitive harm in the relevant markets.  ER19-20, 24, 82.  It noted that "[t]he compensation that student-athletes receive under the challenged rules does not correlate meaningfully with the value of their athletic services…."  ER19 (citing report of Plaintiffs' expert, Edward Lazear, President George W. Bush's Chairman of the Council of Economic Advisors).  Indeed, "because elite student-athletes lack any viable alternatives … they are forced to accept … whatever compensation is offered to them by Division I schools…."  ER23.  Defendants have not appealed this ruling.

### B.  Step Two:  Procompetitive Justifications

At trial, Judge Wilken found that Defendants failed to show any positive correlation between the challenged rules and the procompetitive justification of academic integration.  ER51-58.  Although she had concluded in *O'Bannon* that academic integration provided a "narrow"

12

justification for name, image, and likeness restraints (7 F. Supp. 3d at 1003), new facts had emerged over the past five years that compelled a different finding here. ER55-56. For example, the evidence showed that schools require athletes in these sports to work more than forty hours a week for their teams throughout the academic year—which undermines any argument that academic integration is a material goal. *See, e.g.*, ER645-646; ER674-678. Defendants have not appealed the court's rejection of their integration justification—confirming how the markets have changed since *O'Bannon*.

Judge Wilken further found that Defendants could not justify the restraints by invoking "amateurism," both because the rules do not reflect any coherent principle of amateurism, and because Defendants could not show any connection between their ever-changing definition of amateurism and consumer demand. Although she did find a procompetitive justification for some of the rules, it was limited: she held only that there "may" be a justification for "some" of the rules to the extent they preserve the distinction between college and professional sports by

preventing "professional-style unlimited cash payments" that are "unre-lated to education." ER60-62, 90-92. Her conclusions at Step Two rested upon, among others, the following findings of fact.

> **1.      Since *O'Bannon*, the NCAA has increasingly al-lowed, and schools have increasingly provided, substantial non-educational benefits in addition to the cost of attendance.**

In *O'Bannon*, this Court observed that it would be a "quantum leap" from the NCAA's "amateurism" model to permit schools to offer cash compensation that was above the cost of attendance and untethered to education. 802 F.3d at 1078-79. By the time of trial in this case, however, Defendants had taken that leap.

The district court found that the NCAA now permits, and schools provide, the payment of tens of thousands of dollars in benefits (including cash) ***in addition to*** full cost-of-attendance scholarships. ER85, 100. Much of this compensation is not related to education. ER100. While these changes are laudable from the athletes' perspective, their significance for this case—as the court found—is to show that permitting significant amounts of non-education-related, above-cost-of-attendance compensation is now commonplace, without any negative impact on consumer demand. ER101-102.

14

There are many examples of compensation significantly exceeding the cost of attendance—often unrelated to education, and sometimes paid in cash.  They include:

- ***Cash payments from the Student Assistance Fund ("SAF") and Academic Enhancement Fund ("AEF").*** What began as "emergency funds" for athletes in need have greatly expanded since *O'Bannon*, evolving into unregulated cash benefit funds that provide tens of thousands of dollars in some instances.  ER28-30.  These disbursements "have been used for benefits that are not related to education," including legal expenses, iPads, groceries, parking tickets, clothing, travel expenses for athletes and their families, and loss-of-value insurance premiums (to protect athletes' potential earnings as professionals in the NFL, NBA or WNBA).  ER29, n.15; ER37.  Michigan State University, for instance, spent $50,000 in funds from the Student Assistance Fund to purchase a $10 million insurance policy to protect the future earnings of a college basketball player.  ER734.

- ***Cash payments for "miscellaneous expenses."*** These payments can exceed $6,000 per student, per year.  ER36-37; ER730-732.  While they are ostensibly part of the calculation of cost-of-attendance scholarships, NCAA rules permit athletes to use them however they please, including for purchases that have nothing to do with education (such as buying videogames or caring for pets).  ER31; ER728-729; ER1239-1240.

- ***"Athletic participation" awards.*** These awards—provided on top of cost-of-attendance scholarships—are increasingly paid in cash equivalents, including through prepaid credit cards (the equivalent of cash), retail gift cards, or merchandise (like videogames, jewelry, and electronics).  ER27-28; ER453-454; ER1232.  These payments may reach as

15

much as $5,600 a year for awards based on team participation alone. ER85. Awards for individual participation can drive this amount significantly higher. *Compare* ER1232 (describing awards available for team participation) *with* ER666 (Figure 16-3 detailing permissible individual athletic achievement awards). As Big 12 Commissioner Bob Bowlsby testified, while these gifts "were all previously geared toward being mementos of the [] games," the schools' practices have since taken "another turn, and the gift cards are representative of that." ER28. He was "not sure how [the gifts] could be tethered to education." ER443.

- ***New benefits unrelated to education.*** This category includes allowing class members to borrow against anticipated professional earnings, permitting unlimited meals and snacks regardless of cost and guaranteed "medical care … for at least two years after graduation." ER22-23 (citing NCAA bylaws). A new NCAA rule also permits student-athletes to accept payments for meals and transportation from professional sports agents. ER692. Other new benefits include payments of up to $4,000 for family members to travel to certain post-season games (ER77), and post-eligibility graduate "scholarships," which the University of Nebraska, for example, now uses for recruiting (ER1286 ($7,500 per athlete)).

- ***Unlimited cash payments from foreign Olympic committees.*** Since *O'Bannon*, the NCAA changed its rules to permit payments from foreign Olympic committees, like the $740,000 that gold-medalist swimmer and University of Texas student-athlete Joseph Schooling received from the Olympic committee of Singapore. ER32-33; ER735.

These examples (among others) caused the court to find that the NCAA's "amateurism" rules are riddled with exceptions that allow "what a reasonable person could consider to be 'pay for play.'" ER27.

NCAA official Kevin Lennon—who was one of the NCAA's 30(b)(6) designees during discovery—conceded that the rules currently allow many benefits "not related to the principle of amateurism." ER498; *see also* ER483-487, 491-492, 502-503, 520-523, 524-526; ER627 (at trial, agreeing that certain benefits that are currently permitted are not based on "the principle of amateurism"). Indeed, Lennon acknowledged that "the NCAA itself has enacted exceptions to what the NCAA thinks is the amateurism rule"—including an entire section of its regulations entitled "Exceptions to Amateurism Rule" (ER628-629; ER660-662 (NCAA Bylaw 12.1.2.4 *et seq*.))—despite the NCAA's position in *O'Bannon* that "consumers will flee if student-athletes are paid even a small amount of money for colleges' use of their [names, images, and likenesses]." 802 F.3d at 1083.

The non-education-related, above-cost-of-attendance compensation now available for athletes' work does not represent a "small amount of money," nor is it provided to a small number of students. More than 3,000 athletes in the most economically successful ("Power 5") conferences—and more than 1,000 athletes outside the Power 5—received compensation in excess of their cost of attendance through the Student

17

Assistance Fund in 2015-16 alone. ER1227.[1] For example, of the twelve scholarship athletes on the 2015-16 Florida men's basketball team, 75% received full cost-of-attendance scholarships *plus* additional money from the Student Assistance Fund. ER1230. And of the 21 class members on the 2015-16 Villanova men's and women's basketball teams, 19 received compensation exceeding their cost of attendance. ER1233-1234; *see also, e.g.*, ER689 (Ohio State).

On this record, the court found that "[t]he only common thread" connecting the "forms and amounts of currently permissible compensation is that the NCAA has decided to allow it." ER33. Lennon conceded as much, testifying that the NCAA's "membership at any time [now or in the future] … can agree to … permit [additional benefits] without violating the principle of amateurism." ER626. And when asked about the reasoning behind the current compensation restraints, Lennon gave "no meaningful response," leading the court to conclude that "these limitations are arbitrary." ER32. *See also* ER681; ER684-687. In short, Judge Wilken found that "amateurism" is a concept with no substance

---

[1] The Power 5 is made up of the Atlantic Coast Conference (ACC), Big 12, Big Ten, Pac-12 and Southeastern Conference (SEC).

in the NCAA's rules; it is whatever the NCAA currently says it is. ER24-33.

Further, the court found "no evidence" that the challenged rules were "enacted based on any analysis of consumer demand." ER45. On the contrary, the court noted that the NCAA's Lennon could "not recall any instance in his more than thirty years with the organization in which ... the NCAA membership [considered consumer demand] when making rules about compensation." ER88-89. Instead, for all the rules, Lennon recalled "cost considerations." ER641.

A parade of NCAA, conference, and college witnesses admitted that they never conducted any survey (or any other type of market research) about the relationship between compensation rules and consumer demand. ER640-642 (Lennon); ER644 (NCAA Managing Director of Research Todd Petr); ER618 (American Athletic Conference (AAC) Commissioner Mike Aresco); ER442 (Big 12 Commissioner and 30(b)(6) witness Bowlsby); ER604 (Mid-American Conference (MAC) Commissioner and 30(b)(6) witness); ER616 (University of Wisconsin Chancellor Rebecca Blank); ER632 (Ohio State Athletic Director Eugene Smith); ER650 (Wake Forest President Nathan Hatch).

Indeed, the only survey on this issue credited by the district court was presented by Plaintiffs, and it showed that myriad prohibited benefits could be made available to student-athletes without harm to consumer demand. This is no surprise, as one need only pick up a newspaper to witness rapidly changing consumer perceptions about the inequities of NCAA rules restricting athlete compensation. Consumer survey expert Hal Poret conducted Plaintiffs' survey to measure current consumer attitudes about increasing compensation to student-athletes—evidence that, by definition, post-dates *O'Bannon*. The court fully endorsed the Poret survey's conclusion "that viewership and attendance would not be negatively impacted if the [eight compensation] scenarios he tested were implemented individually." ER44.

### 2. The widespread practice of offering benefits beyond the cost of attendance has not adversely affected demand.

The court also found that demand for college sports "as a distinct product … continues apace," despite the exponential growth of the types and amounts of benefits provided above the cost of attendance. ER86-87. Indeed, as these benefits (including cash) have grown, so too have revenues from both Division I basketball and FBS football. *See*, *e.g.*,

ER9-10 (court conclusion); ER 668-670 (Big Ten); ER1164-1168 (ACC); ER1170-1173 (Big 12); ER1175-1179 (Pac-12), 1181-1185 (SEC). In this regard, the court credited the testimony and studies by Plaintiffs' economic expert, Dr. Rascher, who analyzed "whether increases in student-athlete compensation would have an impact on consumer demand" and found no adverse effects. ER36. The court noted that Defendants' economist, by contrast, "did not even attempt to examine" this relationship. ER87.

The revenue growth has been staggering. In the 2015-16 academic year, the Power 5 schools generated ▇▇▇▇▇▇▇▇ from basketball and football, an increase of ▇▇▇▇▇▇ over the prior year. ER1222-24. And in 2016, the NCAA extended its media rights agreement with CBS and Turner Broadcasting for the basketball tournament known as "March Madness" for an additional eight years, paying the NCAA an average annual fee of ▇▇▇▇▇▇—▇▇▇▇▇▇ more per year than before. ER1187-1206.

The NCAA's 30(b)(6) designees during discovery Lennon and Lewis both admitted that the post-*O'Bannon* increases in benefits have not adversely impacted the economic success of college sports. *See*

21

ER486-487, 587 (Lennon); ER595-596 (Lewis). And the court concluded that "actual increases" in benefits after *O'Bannon*—"some of which is related to education and some of which is not"—have not "reduc[ed] … consumer demand for college sports." ER86-88. Instead, this evidence "suggests that future increases in compensation likewise would not [decrease demand]." ER88.

### 3. The record showed no direct connection between the challenged rules and consumer demand.

More broadly, the court found that Defendants failed to prove that the "challenged compensation rules … have any direct connection to [driving] consumer demand" for FBS football and Division I basketball. ER24-25. The court credited the extensive evidence (including from "defendants' own witnesses") showing that demand for these sports is "driven largely by consumers' perception that student-athletes are, in fact, students." ER63, 89. As the court found, "student-athletes would remain students even if their compensation were not limited by the challenged rules." ER89.

Further, the distinction in consumers' minds between college and professional sports "cannot be based on student-athletes not receiving

any compensation and benefits" beyond the cost of attending school, ***because they already receive such benefits***, both "related and unrelated to education." ER50. "[W]hatever understanding consumers have of amateurism," the court found, "they enjoy watching sports played by student-athletes who receive compensation and benefits such as these, because this compensation has been paid and increased while college athletics has become and remains exceedingly popular and revenue-producing." ER33.

Giving Defendants the benefit of the doubt, however, the court concluded that "***some*** of the challenged compensation limits ***may*** have ***some*** effect on preserving consumer demand to the extent that they serve to support the distinction between college sports and professional sports." ER50 (emphases added). This rationale, the court stated, "may" justify Defendants in preventing "professional-style unlimited cash payments" that are "unrelated to education." ER50, 62, 65, 90. Based on this narrow finding, the court proceeded to Step Three of the Rule of Reason.

## C.    Step Three:  Less Restrictive Alternatives

The court then evaluated whether Plaintiffs had proven the exist-ence of a less restrictive alternative to prevent "professional-style un-limited cash payments" that would be "virtually as effective" as the challenged restraints and could be implemented without "significantly increased cost."  ER58-69.  The answer was yes:  one such alternative would be a system in which the NCAA's restrictions on education-re-lated compensation are eliminated, leaving individual conferences to de-cide whether and to what degree any demand-enhancing limitations on educational benefits are warranted at the conference level.  ER60-61.  This alternative was based on the extensive evidence showing that con-ferences are capable to—and in many respects already do—determine what rules on compensation are appropriate to preserve demand.

In fact, after the *O'Bannon* record closed, the NCAA instituted a new structure of conference autonomy that allows the Power 5 confer-ences "to permit the use of [their] resources to advance ... legitimate ed-ucational or athletics-related needs … [and] otherwise enhance student-athlete well-being."  ER659-660 (NCAA bylaw 5.3.2.1.2); ER22-23.  As the court below found, these conferences have "recogni[zed] … criticisms

24

… 'of exploiting student athletes for [their] own financial gain'" and wanted the ability to "divert[] some of their relatively significant resources … toward student-athlete compensation" and away from "unregulated frills" like opulent athletic facilities. ER20-21 (quoting presentation by Power 5 presidents and chancellors and testimony of former University of Nebraska Chancellor Harvey Perlman). Although the Power 5 remain constrained "by overarching NCAA limits that prevent … expan[sion of] compensation beyond a [certain] point," their "legislative enactments [under the new structure] have resulted in greater compensation for student-athletes" and have expanded the "wide variation among conferences and their members in Division I." ER23, 46; ER1220, 1242. Power 5 conferences thus now permit their schools to offer benefits that many other conferences do not. ER1222, 1226, 1233. Yet the trial evidence showed that these increased benefits have not adversely impacted consumer demand. ER33-34.

The evidence at trial further established that each conference already has its own rulemaking, compliance, and enforcement structure. ER658 (NCAA Constitution Art. 3.3.1.1); ER67-68. There is thus no

25

reason to fear that conference-level rulemaking would significantly increase cost. ER66-69; ER609; ER1278; ER1373. Moreover, the court found that "conference officials … would not choose to pay amounts of cash compensation … that would be demand-reducing," so that "[w]hether by survey or trial and error," the conferences "would eventually discover the level" of compensation that "would encourage competition … but would not reduce the demand for their product." ER59.

The court nevertheless expressed a concern that the "inevitable trial-and-error phase could result in miscalculations" and that "this could produce unintended consequences." ER59-60. Based on this concern, the court settled on a less restrictive alternative that would give the conferences autonomy regarding only (i) education-related benefits "provided in kind"—such as post-graduate scholarships, computers, scientific instruments, tutoring, overseas study, and internships; and (ii) educational-incentive awards, paid in cash and tied to academic achievement (such as earning a certain GPA or graduating), up to the financial level of the awards already permitted by the NCAA for athletic achievement. ER2-4. The court found that this less restrictive alternative would be "virtually as effective" as the challenged restraints at

"achieving the only procompetitive effect" that the record supported—preventing "professional-style unlimited cash payments." ER7, 61-62.

The NCAA argues that this less restrictive alternative is "not viable" (Br. 57), but its President, Mark Emmert, has said otherwise, commenting that "the way [the district court] wrote what could and could not be prohibited by the NCAA is not in any way fundamentally inconsistent with what we've been doing for about a decade now."[2] He explained: "Having [the conferences] compete over who can provide the best educational experience is an inherently good thing, not a bad thing from my point of view." *Id.*

Because the court found that Plaintiffs met their burden to prove the existence of a less restrictive alternative, it did not proceed to the final step of the Rule of Reason: balancing anticompetitive harms against procompetitive benefits. ER105-106.[3]

---

[2] *Emmert: Ruling Reinforced Fundamentals of* NCAA, ESPN.COM, Apr. 4, 2019, https://www.espn.com/college-sports/story/_/id/26436658/ruling-reinforced-fundamentals-ncaa.

[3] If this Court were to find that the district court's fact-finding at Step Three was clearly erroneous, it would need to remand for the Step Four balancing analysis.

## III. The Injunction

At the remedy stage, the court denied Plaintiffs' request for an injunction against *all* the NCAA rules found to be unreasonable restraints—an injunction that would have left individual conferences with complete autonomy to implement whatever rules they conclude are demand-enhancing. Instead, the court enjoined the NCAA's rules only as to compensation and benefits related to education. ER107-108. The court thus left in place the NCAA rules that prohibit non-education-related compensation, despite its finding that these overbroad prohibitions too are not necessary to enhance demand. *Compare id. with* ER50 (finding that other NCAA rules already allow payments of "thousands or tens of thousands of dollars in such compensation, related and unrelated to education," with no negative impact on demand) *and* ER30, 33 (similar).

The court's only reason for declining to order the broader relief was its concern about the "unintended consequences" of "trial-and-error" at the conference level. ER59-60. As discussed below, that concern was misplaced, as a matter of law. "Trial-and-error" is, in fact, the very

28

competitive process that antitrust law protects as the lawful path to market-efficient outcomes.

## STANDARD OF REVIEW

With respect to antitrust liability, this Court reviews the district court's findings of fact for clear error and its legal determinations *de novo*. *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 883 (9th Cir. 2014). If the findings are "plausible in light of the entire record," this Court "may not reverse," whether or not it "would have weighed the evidence differently." *Lewis v. Ayers*, 681 F.3d 992, 998 (9th Cir. 2012).

A district court's grant of injunctive relief is reviewed for abuse of discretion. *Dexter v. Kirschner*, 984 F.2d 979, 982 (9th Cir. 1992). The same standard applies to claimed error concerning the scope of any injunction. *United States v. Schiff*, 379 F.3d 621, 625 (9th Cir. 2004). Still, appellate courts must modify injunctions when "necessary to assure that the relief will be effective." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224-25 (9th Cir. 1997) (quoting *United States v. Glaxo Group, Ltd.*, 410 U.S. 52, 64 (1973)). This Court's "duty [is] to examine the decree in light of the record to see that the relief it affords is adequate to prevent the recurrence of the illegality which

brought on the given litigation." *United States v. Loew's, Inc.*, 371 U.S. 38, 52 (1962) (citation omitted).

## SUMMARY OF ARGUMENT

1.   The district court correctly concluded that *O'Bannon* did not preclude Plaintiffs' claims, under either *stare decisis* or *res judicata*. *Stare decisis* stands as a barrier to the reconsideration of legal rules; it does not dictate the outcome of applying those rules to different facts. Changes in the facts warrant a new antitrust analysis and potentially a new outcome.

The legal rule set by *O'Bannon* is straightforward: NCAA rules are not immune from antitrust laws and must be analyzed under the Rule of Reason. That is exactly what the court did in this case. Evaluating a different set of claims based on a different factual record—reflecting changes in the relevant markets, the rules themselves, and the behavior of the NCAA and its members—the court applied the Rule of Reason and concluded that the record required a different result than in *O'Bannon*. The court did not err in deciding to hold a trial and actually perform this analysis, rather than simply importing the result in *O'Bannon*, as Defendants urge.

Nor did the court err in concluding that *O'Bannon* was not preclusive under principles of *res judicata*. There is no privity between the plaintiff groups here and in *O'Bannon*; the classes differ in both time and scope. In addition, the claims are different. *O'Bannon* challenged rules barring athletes from receiving compensation for the use of their names, images, and likenesses; this case concerns the restraints on compensation for athletic services. Further, the court found extensive new facts that have emerged since *O'Bannon*—including changes to the underlying rules, as well as a significant expansion of the amount and variety of compensation beyond the cost of attendance—none of which has had any adverse impact on demand. Whereas *O'Bannon* concluded that allowing payments of cash beyond the cost of attendance would be a "quantum leap," the court here found that Defendants have since taken that leap.

2. The court's factual findings under the Rule of Reason have ample support and may not be set aside under a "clear error" standard of review. The evidence at trial—both expert and otherwise—firmly supports the court's Step Two finding that the restraints serve a procompetitive justification only to the limited extent that they "prevent[]

31

unlimited, professional-level cash payments, unrelated to education, that could blur the distinction between college sports and professional sports and thereby negatively affect consumer demand for Division I basketball and [FBS] football." ER95. And the trial record amply supports the court's Step Three finding that there is a less restrictive alternative that would be virtually as effective in accomplishing that narrow justification without any significant increase in cost. ER96-98.

The district court did not commit any legal error in its Step Two analysis. It did not switch any burdens or import a less restrictive alternative analysis into Step Two. It did exactly what *O'Bannon* instructs: it examined the impact of the challenged restrictions "when compared with having no limits on compensation…." ER90.

In the process, the court properly reviewed the challenged rules in the context of the entire body of NCAA rules—including those that ***allow*** payments of cash and benefits well over the cost of attendance. This evidence—coupled with evidence about the lack of any adverse impact on demand from higher levels of compensation, and the lack of "any coherent definition of amateurism" applied by Defendants since *O'Bannon*—properly led the court to find that Defendants had not

32

proven a broader procompetitive justification based on "amateurism." ER33. As the evidence demonstrated, NCAA rules were not formulated to adhere to any defined principle of amateurism or to prohibit payments that appear to be "pay-for-play." ER24-34. Instead, the rules were adopted to hold down costs. ER641 (Lennon). The only narrow justification found by the court was to prohibit "unlimited, professional-level cash payments, unrelated to education, that could blur the distinction between college sports and professional sports." ER95.

At Step Three, the court put the burden on Plaintiffs and found that they proved a less restrictive alternative based on the testimony of dozens of expert and percipient witnesses and substantial documentary evidence. ER95-103 ("The burden shifts to Plaintiffs…"). The court found that the challenged rules are patently more restrictive than necessary because they prohibit or arbitrarily cap many forms of compensation and benefits that are not of the type—unlimited cash payments unrelated to education—that would undermine the demarcation between college and professional sports. *Id.* A less restrictive alternative would be to provide conferences with autonomy to promulgate and enforce their own rules on education-related compensation. ER102-103. This

would be virtually as effective in achieving the limited procompetitive justification, without any significant additional implementation cost. ER95-103. On appeal, Defendants have not demonstrated that any of these findings is implausible based on the record taken as a whole, so the findings cannot be overturned under the "clear error" standard.

3. The court did not abuse its discretion in retaining jurisdiction over its injunction, nor is its injunction impermissibly vague. Courts routinely retain jurisdiction over motions to modify and enforce an injunction.

4. Although the court's liability findings and analysis were sound and supported by the record, its remedy was too narrow. Under the Rule of Reason, the court found the rules unreasonable in two distinct respects: (i) by restraining education-related benefits, and (ii) by restraining ***non***-education-related benefits. The rules were found to cause undisputed anticompetitive harm in both respects, and both types of rules were found to be far more restrictive than necessary to prohibit unlimited cash payments unrelated to education. The court's injunction, however, leaves in place the challenged restraints on non-education-related compensation. It does so based on a legal error—a concern

34

that the give-and-take of competition between the conferences would be too uncertain, when such give-and-take is the very process that the antitrust laws serve to protect. This Court should remand for entry of the broader injunction Plaintiffs requested—an injunction against ***all*** the unreasonable NCAA rules, leaving the individual conferences with the autonomy to create whatever rules, if any, they determine are necessary to maintain consumer demand.

## ARGUMENT

## I. *O'Bannon* does not foreclose Plaintiffs' claims.

At the heart of Defendants' appeal is their argument that *O'Bannon* resolves this case in their favor under the doctrines of *stare decisis* and *res judicata*. *See* Br. 26-38. In other words, they argue that the district court should have imported the result in *O'Bannon*, without examining the factual record in this case. This argument is mistaken. As the district court explained, "Plaintiffs raise new antitrust challenges to conduct affecting a different class, in a different time period, relating to rules and forms of compensation that are not the same as those challenged in *O'Bannon*." ER78. Accordingly, "the claims in this case are not precluded by *O'Bannon*," and the court was free to consider them on their own merits. *Id.*

35

**A.   As with all antitrust precedent, *O'Bannon* depends on its facts and does not bind a court handling a different challenge.**

### 1.   Antitrust cases are necessarily fact-dependent.

"[S]*tare decisis* is important only for the decision, for the detailed legal consequence following a detailed set of facts." *In re Osborne*, 76 F.3d 306, 309 (9th Cir. 1996).  This principle is critical in antitrust cases, where courts must evaluate market effects based on specific facts—including the nature of the restraints, competitive forces, and consumer preferences, all of which may change over time.  As the Supreme Court has explained, "[e]ach case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and … the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied." *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 579 (1925).

Even for cases involving the same industries or restraints, a single decision does not foreclose a fresh look based on different facts.  *See* Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their Application, ¶ 1205c3 (3d & 4th eds. 2017-2019)

36

("Areeda") ("even a judicial holding that a particular agreement is law-
ful does not immunize it from later suit or preclude its reexamination as
circumstances change"); *cf. State Oil Co. v. Khan*, 522 U.S. 3, 4 (1997)
("there is a competing interest, well represented in this Court's deci-
sions, in recognizing and adapting to changed circumstances and the
lessons of accumulated experience"). As a result, changes in the rele-
vant markets warrant a new antitrust analysis and, if appropriate, a
new and different outcome.[4]

This Court has adhered to this approach in the context of rule-
making by sports associations. For example, in *Nat'l Basketball Ass'n v.
SDC Basketball Club, Inc.*, a district court held that the NBA's fran-

---

[4] *See, e.g., Harkins Amusement Enters., Inc. v. Harry Nace Co.*, 890 F.2d
181, 183 (9th Cir. 1989) ("It is elementary that new antitrust violations
may be alleged after the date covered by a decision of settlement of anti-
trust claims covering an earlier period"); *United States v. Mercy Health
Servs.*, 107 F.3d 632, 637 (8th Cir. 1997) ("a merger which would have
been legal in the past may well be anticompetitive in the future," and
the court will need to "examine the factual circumstances extant at the
time" to determine anticompetitive effects); *United States v. Motor Vehi-
cle Mfrs. Ass'n*, 1982 WL 1934, at *4 (C.D. Cal. Oct. 28, 1982) (modifying
consent decree in antitrust suit in light of changing market conditions,
as restraints "should [not] be condemned in perpetuity without refer-
ence to the peculiar facts of each case").

chise-relocation rules were invalid as a matter of law, "believing the result controlled by the [Ninth Circuit's] decision in the first Los Angeles Raiders case," which held that the NFL's restrictions on franchise relocation were invalid under the Sherman Act. 815 F.2d 562, 564 (9th Cir. 1987) (footnote omitted). This Court reversed, explaining that "[n]either the jury's verdict in *Raiders*, nor the court's affirmance of that verdict, held that a franchise movement rule, in and of itself, was invalid under the antitrust laws." *Id.* at 567. Thus, while "*Raiders I* did establish the law of this circuit in applying the rule of reason to a sports league's franchise relocation rule, … the panel set down no absolute rule for sports leagues. Instead, it examined the facts before it and concluded that the jury's conclusion that the NFL violated the antitrust laws was supported by the record." *Id.*

*O'Bannon* does no more than this. In *O'Bannon*, this Court specified how courts should analyze NCAA restraints—under the Rule of Reason—and then it applied that analysis to the factual record in that case, affirming the district court's decision in most respects. *O'Bannon* does not dictate the outcome of a Rule of Reason analysis in a different case based on a different record in a rapidly evolving market.

### 2. The record here is filled with new, undisputed evidence of changed factual circumstances.

The record in this case reflects changes in the relevant markets since *O'Bannon*, as well as changes in the NCAA rules themselves. In the face of these changes, the court properly concluded that it could not apply the result in *O'Bannon* without evaluating the facts of this case.

For one thing, since *O'Bannon*, the NCAA has increasingly allowed—and schools have increasingly provided—benefits beyond the cost of attendance, much of which are paid in cash. *See supra*, pp.14-18. The new evidence thus shows that paying "cash sums untethered to educational expenses" can no longer be considered a "quantum leap" from existing NCAA rules. *O'Bannon*, 802 F.3d at 1078. An essential premise of the Court's decision in *O'Bannon* was that "[o]nce that [cost-of-attendance] line is crossed, we see no basis for returning to a rule of amateurism and no defined stopping point." *Id.* But the record here shows that Defendants have already crossed that line, without any harm to demand for their product. *See supra*, pp.14-22.

The record also contains new evidence relating to whether NCAA compensation rules serve a procompetitive justification, whether there is a less restrictive alternative to achieve any proven justification, and

what an appropriate remedy would be.  This includes the evidence on
the new conference autonomy that allows the Power 5 "to permit the
use of [their] resources to advance the legitimate educational or athlet-
ics-related needs of student-athletes."  ER659 (NCAA Bylaw 5.3.2.1.2);
ER22-23.  As the court below found, this new autonomy—along with the
increased benefits in these conferences—has neither decreased demand
nor created any significant implementation costs.  ER36-37, 88.  To the
contrary, these conferences have shown themselves able to implement
rules that are less restrictive than NCAA rules, while still preserving
demand.  ER33, 36-37, 67.

Defendants are thus wrong to suggest that the district court's rul-
ing creates the risk of a "new costly and time-consuming lawsuit" every
time a lawyer comes up with a new argument.  Br. 32.  According to De-
fendants, "the district court thought it relevant that plaintiffs 'propose
different alternatives from those considered in *O'Bannon*'"—alterna-
tives that Defendants say are nothing more than new "arguments" by a
new set of lawyers.  Br. 32 (quoting ER135).  But Defendants have left
an important clause out of the passage they quote from the district

court: the court actually said that "because Plaintiffs ***challenge different rules and*** propose different alternatives from those considered in *O'Bannon*, the Court is not precluded from considering [the proposed less-restrictive alternatives]." ER135 (emphasis added). Thus, the claims themselves—not just the arguments—are different from *O'Bannon*, as are the underlying facts and evidence.

### 3. Defendants' argument for *stare decisis* mischaracterizes both *O'Bannon* and the decision below.

In arguing for an *O'Bannon*-dictated result, Defendants misstate the nature of the claims in *O'Bannon*—and in this case as well. They argue that "this Court in *O'Bannon* addressed the same issue presented here: To what extent does antitrust law restrict the NCAA's ability to limit student-athletes' compensation?" Br. 26-27. But *O'Bannon* did not present an issue so broad. As this Court observed, the "gravamen of O'Bannon's complaint was that the NCAA's amateurism rules, insofar as they prevented student-athletes from being compensated for the use of their [names, images, and likenesses], were an illegal restraint of trade." 802 F.3d at 1055. This case, by contrast, challenges the caps on compensation for athletic services themselves, based on a different record. Defendants cannot avoid the fact-intensive nature of *O'Bannon*

41

through an interpretive sleight-of-hand. *See United States v. Silver*, 245 F.3d 1075, 1079 (9th Cir. 2001) ("We decline to adopt such a broad interpretation of our holding in *Arnpriester,* which was decided on a narrow set of facts that are distinguishable from the present case").

Nor can Defendants reframe *O'Bannon* as a declaration about what the Rule of Reason requires in every NCAA case, regardless of the evidence. Br. 26 (arguing preclusion based on *O'Bannon*'s statement that the "'Rule of Reason requires that the NCAA permit its schools to provide up to the cost of attendance to their student athletes. It does not require more'") (quoting 802 F.3d at 1079). The language Defendants quote simply describes the outcome of the Rule of Reason analysis based on the specific record in *O'Bannon*. As the district court explained in this case, "this language from *O'Bannon* [] cannot be read to preemptively bar any Rule of Reason challenge to any NCAA rule that restricts or prohibits student-athlete compensation. Such a broad reading would be inconsistent with the circuit court's statement elsewhere in the opinion that, under the Rule of Reason, the validity of each rule 'must be proved, not presumed.'" ER101 (quoting 802 F.3d at 1064). Again, "even a judicial holding that a particular agreement is lawful

does not immunize it from later suit or preclude its reexamination as circumstances change." Areeda, *supra*, ¶ 1205c3.

Moreover, in this case, both the restraints and Defendants' behavior have changed. Defendants concede as much, though they attempt to cloud the subject by characterizing these changes as "'legitimate.'" Br. 29 (complaining that "the district court 'penalize[d]' the NCAA for 'legitimate conduct,' namely, its recent decisions to adjust slightly a few of its compensation rules") (citation omitted). But Plaintiffs' argument is not that Defendants' new rules are illegitimate; indeed, they produce more compensation for class members. Rather, Plaintiffs' argument is that the changes alter the factual assumption that drove the result in *O'Bannon*; they show that non-education-related cash payments in excess of the cost of attendance are no longer a "quantum leap" from current NCAA practice and will not undermine demand.

Nor are the changes "slight": thousands of athletes are now paid thousands of dollars in above-cost-of-attendance compensation. For example, schools now use the Student Assistance Fund to pay $50,000 insurance premiums for "loss of value" insurance. *See supra*, p.15. (Defendants have also changed their rules so that students may borrow

against their future professional earnings to pay for such insurance). And changes in the rules and how they are interpreted now permit schools to spend thousands of dollars on each athlete to provide, among other things, unlimited food regardless of cost, post-graduate health care, and post-season travel and lodging for family members. ER663 (NCAA Bylaw 15.2.2.1.6, "Meals Incidental to Participation" "revised 4/24/14 effective 8/1/14"); ER664 (NCAA Bylaw 16.5.2.5, "An institution may provide snacks to a student-athlete at any time" "revised 8/7/14, 10/20/14"); ER1292-1293 (example of school paying $2.8 million for lavish athlete food offerings); ER622-623 (health care); ER307 (announcing "waiver" allowing NCAA or College Football Playoff to pay up to $4,000 in travel and lodging for class members' families).

To be sure, the Supreme Court has emphasized the need for "'clear rules in antitrust law.'" Br. 28-29 (quoting *Pac. Bell Tel. Co. v. Linkline Comms., Inc.*, 555 U.S. 438, 452 (2009)). But applying the same legal rules to different facts does not "mudd[y]" the rules themselves, as Defendants claim. Br. 28. The clear legal rule in *O'Bannon* is that the NCAA's restraints "are not exempt from antitrust scrutiny; rather, they must be analyzed under the Rule of Reason." 802 F.3d at 1053. The

district court followed that directive here, applying the Rule of Reason to a different challenge on a different factual record. To accept Defendants' argument would be to ossify *O'Bannon*'s application of law to a particular set of facts for all time, regardless of changes in those facts. *Stare decisis* does not support such a result.

> **B.** **Res judicata does not bar this action because Plaintiffs are not in privity with the *O'Bannon* class and the claims in the two cases are not identical.**

Defendants fare no better with their attempt to invoke *O'Bannon* under the doctrine of *res judicata*. *See* Br. 33-38. *Res judicata* (or claim preclusion) requires (1) identity of the claims, (2) a final judgment on the merits, and (3) privity between the parties. *Howard v. City of Coos Bay*, 871 F.3d 1032, 1039 (9th Cir. 2017). Defendants bear the burden of establishing these elements. *Garity v. APWU Nat'l Labor Org.*, 828 F.3d 848, 855 (9th Cir. 2016). Here, as the district court found, the "class members in the two actions are not in complete privity," and "the conduct and rules challenged, the rights implicated, and the evidence presented and available were not the same in both actions." ER72-73.

### 1. Plaintiffs here are not in privity with the class in *O'Bannon.*

"Privity is a legal conclusion designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved." *United States v. Bhatia*, 545 F.3d 757, 759 (9th Cir. 2008) (citation and internal quotation marks omitted). As the district court explained, there is little overlap between the classes here and the *O'Bannon* class—and no relationship between the class members other than their common participation in college sports. *See* ER73-74.

To begin with, the classes differ in time. The class in *O'Bannon* was limited to then-"current and former student-athletes." 802 F.3d at 1055. The classes here consist of student-athletes who received a written offer for a full grant-in-aid scholarship between the filing of these cases in 2014 and the resolution of any appeals. ER14 n.6. As the district court observed, there is little overlap across the two cases, because most of the class members here would have been recruited into college after the *O'Bannon* class was certified in 2013. ER73.

The class definitions differ substantively too. *O'Bannon* involved only male student-athletes (802 F.3d at 1056 n.4), whereas this case involves women as well (ER73). Further, the *O'Bannon* class was limited to student-athletes "whose images, likenesses and/or names" may be or have been included in game footage or videogames. 802 F.3d at 1055-56. Here, the classes include all student-athletes in Division I basketball and FBS football "who were offered or received a full grant-in-aid athletic scholarship." ER73.

These differences are no small matter. Principles of due process prevent *O'Bannon* from precluding the claims of a different class. "[B]efore an absent class member's right of action [is] extinguishable, due process require[s] that the member receive notice plus an opportunity to be heard and participate in the litigation...." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 564 (9th Cir. 2019) (en banc) (quoting *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 848 (1999)) (internal quotation marks omitted). This is equally, if not more, important in the context of injunctive-relief classes, for which no notice is provided (as Defendants concede, Br. 35). Nor does the requirement of due process have any exception for "virtual representation." In *Taylor v. Sturgell*,

for example, the Supreme Court "repeated the general rule that 'one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" 553 U.S. 880, 893 (2008) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)).

Defendants are wrong to read *Taylor* as holding "only that class certification is sufficient for preclusion, not that the scope of preclusion is dictated by the earlier class definition." Br. 35. Indeed, the Supreme Court has rejected such a narrow interpretation of *Taylor*. In *Smith v. Bayer Corp.*, the Court confirmed that *Taylor* "concerned the propriety of binding nonparties under a theory of 'virtual representation' based on 'identity of interests and some kind of relationship between parties and nonparties.'" 564 U.S. 299, 315 (2011) (quoting *Taylor*, 553 U.S. at 901). *Taylor* "rejected the theory unanimously, explaining that it would 'recogniz[e], in effect, a common-law kind of class action' … 'shorn of [Rule 23's] procedural protections.'" *Id*. In short, where there is no privity between the litigant and non-litigant, Rule 23 provides the ***only*** mechanism by which the non-litigant may be bound by the judgment. That mechanism is necessarily limited by the class definition.

48

Defendants cannot avoid this due process requirement by arguing that it would "allow successive class actions challenging the same policy or practice, simply by constructing each new class to avoid complete overlap with a prior one." Br. 35. The Supreme Court in *Bayer* rejected such an argument, as it "flies in the face of the rule against nonparty preclusion. That rule perforce leads to relitigation of many issues, as plaintiff after plaintiff after plaintiff (none precluded by the last judgment because none a party to the last suit) tries his hand at establishing some legal principle or obtaining some grant of relief." 564 U.S. at 316. As the Supreme Court explained, "our legal system generally relies on principles of *stare decisis* and comity among courts to mitigate the sometimes substantial costs of similar litigation brought by different plaintiffs. We have not thought that the right approach (except in the discrete categories of cases we have recognized) lies in binding nonparties to a judgment." *Id*. at 317.

## 2. There is no identity of claims for claim-preclusion purposes.

Not only is privity lacking, but there also is no identity of claims between this litigation and *O'Bannon*. As discussed above, this case raises different claims based on different facts, many of which arose in

the years after the *O'Bannon* record closed. Defendants' argument on this point mischaracterizes both the law and the facts. *See* Br. 35-37.

As an initial matter, Defendants fail to address the first three factors that govern whether there is an identity of claims: (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; and (3) whether the two suits involve infringement of the same right. *Howard*, 871 F.3d at 1039. No rights established in *O'Bannon* can be destroyed or impaired by a judgment in this action, because the facts have substantially changed. As this Court has observed, a ruling that finds no antitrust liability does not provide the defendants with "immunity in perpetuity from the antitrust laws," if a new set of plaintiffs "allege[s] new antitrust conduct" and presents facts "at least 10 percent different from the facts" alleged in the first lawsuit. *Harkins Amusement*, 890 F.2d at 183. And, of course, the *O'Bannon* court did not grant the NCAA antitrust immunity; it found that NCAA was subject to—and had violated—the antitrust laws.

Further, the claims are different in kind.  As noted above, *O'Bannon* concerned compensation for the use of names, images, and likenesses.  802 F.3d at 1055.  This case concerns compensation for the athletic services themselves.  ER75.  And again, the NCAA's rules, the conditions in the marketplace, and the available proof all changed after *O'Bannon*.  This by itself is sufficient to prevent the application of *res judicata*.  *See Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1249 (9th Cir. 2017) (no *res judicata* where "the two actions … would not involve significantly overlapping facts and evidence").

The fact that *O'Bannon* "used the phrase 'compensation rules' nearly four dozen times" (Br. 36) does not change the nature of the claims or the record in that case.  Many of those references were made when the Court *rejected* the NCAA's arguments that its compensation rules were immune from antitrust scrutiny.  *See, e.g.*, 802 F.3d at 1064-65.  Other uses of the phrase, in context, plainly relate to their impact on compensation for the use of names, images, and likenesses.  *See, e.g.*, *id.* at 1067, 1069, 1071, 1072.

Even with respect to the fourth factor—whether the cases arise out of the same transactional nucleus of facts (*Howard*, 871 F.3d at

51

1039)—Defendants' arguments miss the mark. The "development of new material facts can mean that a new case and an otherwise similar previous case do not present the same claim." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016); *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1022 (9th Cir. 2019) ("'Federal law is clear that post-judgment events give rise to new claims, so that claim preclusion is no bar'") (citation omitted).

The Supreme Court faced just this issue in *Lawlor v. Nat'l Screen Service Corp.*, where an initial antitrust suit was dismissed with prejudice and the lower courts applied *res judicata* to bar a subsequent suit by the same plaintiffs. 349 U.S. 322 (1955). The Court reversed and held that *res judicata* did ***not*** apply, in part because there was "a substantial change in the scope of the defendants' alleged monopoly," which meant that "the [earlier] judgment does not constitute a bar to the instant suit." *Id.* at 328. The changes in the factual record here call for the same result.

## II.    The district court did not commit clear error in finding that the challenged rules fail the Rule of Reason.

The court followed the law set forth in *O'Bannon*, applying the Rule of Reason and concluding—based on a detailed weighing of the

new evidence—that Plaintiffs had carried their burden of establishing antitrust liability. Given the "clear error" standard of review, there is no basis for this Court to set these findings aside.

### A. Defendants' complaints about judicial "overmeddling" fly in the face of *O'Bannon*'s holding that NCAA rules are not immune from Rule of Reason scrutiny.

With respect to the Rule of Reason, Defendants lead with a premise that *O'Bannon* rejected—that the NCAA holds a privileged position under the antitrust laws and must receive "additional deference." Br. 39-40. They argue that for "athletic leagues and other joint ventures," it is more important than in other contexts that courts "not 'micromanage organizational rules' or 'make marginal adjustments to broadly reasonable market restraints.'" Br. 39 (citation omitted). But the restraints in this case were far from "'broadly reasonable'" (*id.*); the court found them patently and inexplicably overbroad. ER96.

Most fundamentally, this Court made clear in *O'Bannon* that "the NCAA is not above the antitrust laws, and courts cannot and must not shy away from requiring the NCAA to play by the Sherman Act's rules." 802 F.3d at 1079. As the Court explained, the Supreme Court has

never "approve[d] the NCAA's amateurism rules as categorically consistent with the Sherman Act." *Id.* at 1063. While it may be true that "a certain degree of cooperation is necessary if the type of competition that [the NCAA] and its member institutions seek to market is to be preserved" (*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 117 (1984)), the Supreme Court and this Court have already taken that into account in holding that the NCAA's rules must be analyzed under the Rule of Reason. Neither *O'Bannon* nor *Board of Regents* leaves any room for an argument that the NCAA should be given "additional deference" (Br. 40) in terms of what restraints are reasonable. Such an argument would give the NCAA the very kind of "blanket antitrust immunity" that *O'Bannon* rejects. 802 F.3d at 1063 n.10.

### B.   At Step Two, the district court correctly assigned the relevant burdens and made factual findings supported by ample evidence.

As noted above, the court resolved Step Two in Defendants' favor, finding a narrow procompetitive justification to the extent the challenged rules prevent "unlimited payments unrelated to education" that "may" distinguish professional and college sports. ER50. Defendants

embrace this finding (*see* Br. 22), but they also make a variety of arguments relating to Step Two, ultimately contending that the procompetitive justification found by the court was too narrow. We address each argument in turn.

### 1. The court's Step Two analysis was based on well-supported findings of fact, not a legally unsound consideration of less restrictive alternatives.

The parties agree that the factual findings of the district court require deference on appeal. Br. 25. In an effort to avoid this standard, however, Defendants attempt to manufacture a legal error out of whole cloth. They say the district court shifted the burdens and "flouted *O'Bannon*'s instruction that at Step Two, the court could 'only consider the benefits of the NCAA's existing rule,'" rather than the benefits of a less restrictive alternative. Br. 41-43 (citing 802 F.3d at n.17). This is simply not so.

The court did exactly what *O'Bannon* instructs: it looked at the impact of the challenged compensation limits "when compared with having no limits on compensation." ER90. The court's discussion about "unlimited" payments in professional sports (to which Defendants now

object, Br. 42) was a response to arguments made by Defendants themselves at trial, and it defined the limited scope of the procompetitive justification; it did not import a less restrictive alternative from Step Three to Step Two.

Moreover, the challenged rules cannot be analyzed in isolation. The court properly examined these rules in the context of the entire body of NCAA rules—including those that *allow* certain payments of cash and benefits well over the cost of attendance. *See* ER24-51. This evidence was part of the record that led the court to reject the broad justification Defendants were claiming—a rationale that tried to link consumer demand to the NCAA's ever-changing line of "amateurism." The court reached this conclusion for two (related) reasons, both amply supported by the record: first, NCAA rules do not reflect any coherent principle of amateurism that consumers could identify with—often allowing payments that would appear to be "pay-for-play"—and second, the significant increase in such payments since *O'Bannon* has had no negative impact on consumer demand. ER27, 33. Nonetheless, the court resolved Step Two in Defendants' favor, finding a narrow procompetitive

justification based on preventing "unlimited payments unrelated to education." ER50. This finding was not based on any intermingling between Step Two and Step Three.

### 2. Defendants cannot show clear error in the court's rejection of their extremely broad "amateurism" justification.

With respect to "amateurism," Defendants' arguments cherry-pick from the record, in a manner not permitted under the "clear error" standard. Doubling down on their false claim that there is "judicial consensus" supporting their "amateurism" justification, Defendants argue that the "evidence at trial confirmed that this judicial consensus is sound." Br. 45. But this argument is based on selected snippets from the trial record (*compare* Br. 45-46 *with* ER27-34), ignoring that the clear-error standard requires examining the record in its entirety. *See Lewis*, 681 F.3d at 998. As this Court has explained, when reviewing for "clear error," a reviewing court "cannot selectively examine some evidence while ignoring other evidence presented to it." *Rodriguez v. Holder*, 683 F.3d 1164, 1176 (9th Cir. 2012) (citation omitted).

Indeed, even when viewed in isolation, the two limited categories of evidence cited by Defendants do not support their claim that amateurism supplies a broad justification. For example, Defendants argue that "[f]act witnesses with decades of experience in college sports, higher education, and sports broadcasting testified that amateurism contributes to the popularity of college sports." Br. 45. But the court found that this testimony by a handful of witnesses was of limited value, given its basis in lay opinion and hearsay. ER89 ("[m]ost of this testimony is predicated on personal opinion and conversations with unidentified fans of college sports with whom witnesses have spoken"). The court held instead, based on the weight of the evidence, that "whatever understanding consumers have of amateurism, they enjoy watching sports played by student-athletes who receive compensation and benefits [well beyond the cost of attendance], because this compensation has been paid and increased while college athletics has become and remains exceedingly popular and revenue-producing." ER33.

Further, the court found that "the rules that permit, limit, or forbid student-athlete compensation and benefits do not follow any coherent definition of amateurism, including Defendants' proffered definition

of no 'pay for play,' or even 'pay.'" *Id.* This finding rests on undisputed evidence showing that student-athletes currently can receive "thousands or tens of thousands of dollars in such compensation, related and unrelated to education, while remaining NCAA amateurs"—evidence that was not part of the record in *O'Bannon.* ER50.

Defendants similarly cannot prove clear error by selectively citing survey evidence by Bruce Isaacson, their own expert. Br. 46. They ignore that Isaacson's survey showed (at most) that 31.7% of college-sports fans "watch or attend college sports" because they like the fact that college players are "'amateurs ***and/or*** are not paid'"—a phrase the court found "hopelessly ambiguous." ER41-42 (emphasis added by the court). Defendants likewise ignore the fact that Isaacson's own survey confirmed that more consumers place a higher emphasis on watching games with "friends or family" than on whether student-athletes are "amateurs and/or not paid." *Id.* Perhaps most fundamentally, Isaacson's survey simply asked respondents whether they "oppose" or "support" compensation changes—not whether compensation changes would cause them to watch or attend fewer games. ER42-43. By contrast, when Plaintiffs' expert Poret asked consumers that very question, he

found no adverse impact on consumer demand. ER847-850. These findings provided more than sufficient support for the district court to credit Poret's analysis and reject Isaacson's. Under a "clear error" standard, that judgment may not be set aside.

Defendants cannot make "amateurism" a legal issue by arguing that "[b]oth the Supreme Court and this Court have made clear that 'amateur' has a well-understood meaning." Br. 46-47. As this Court explained, the Supreme Court in *Board of Regents* did not make any factual findings regarding amateurism, as the issue was not before it. *O'Bannon*, 802 F.3d at 1063 ("The *Board of Regents* Court certainly discussed the NCAA's amateurism rules at great length, but it did not do so in order to pass upon the rules' merits, given that they were not before the Court"). And the *O'Bannon* court made findings only based on the different issues and factual record presented in that case. *See generally, id.* Whatever meaning "amateurism" had to consumers of NCAA sports in 1984—or in 2014—the record below shows that it has no clear meaning today. ER33.

Even the NCAA's executives admitted that the NCAA's definition of "amateur" is "not steeped in any sacred absolute principle that had to

be preserved." ER680-681 (NCAA Vice President); *see also* ER684-685 (NCAA President). Instead, the court heard ample evidence that the meaning of "amateurism" has continually shifted to mean whatever a majority of NCAA members decided it meant at any point in time. *See* ER85 (under Defendants' argument, "compensation constitutes 'pay for play' or 'pay' if the NCAA has decided to forbid it, and compensation is not 'pay for play' or 'pay' if the NCAA has decided to permit it"); *see also* ER491-492 (NCAA 30(b)(6) testimony); ER638-639 (Lennon).

Although Defendants interpret this evidence differently (Br. 45-48), none of their arguments come close to meeting the clear error standard. As long as the district court's findings are "plausible in light of the entire record," this Court "may not reverse," whether or not it "would have weighed the evidence differently." *Lewis*, 681 F.3d at 998. On this record, the flaws in Defendants' "amateurism" justification are more than "plausible."

### C. The district court did not clearly err in finding that Plaintiffs met their burden of proving at least one less restrictive alternative.

Step Three of the Rule of Reason calls for a plaintiff to prove that the procompetitive justification could be accomplished through a less restrictive alternative. This requires proof that: (i) the challenged restraint "is patently and inexplicably stricter than is necessary to accomplish" the procompetitive justification; (ii) the less restrictive alternative is "virtually as effective" in achieving the procompetitive justification; and (iii) the less restrictive alternative may be implemented "without significantly increased cost." *O'Bannon*, 802 F.3d at 1074-75; *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001). The court applied these standards and found that Plaintiffs carried their burden through dozens of expert and percipient witnesses and substantial documentary evidence. *See generally* ER7-8.

Defendants attack the court's factual findings with arguments, not evidence, and thus they cannot demonstrate clear error. And while Defendants try to recast their argument as a legal issue by claiming that the court "imposed on defendants the burden that plaintiffs should have borne at step 3" (Br. 57 n.4), this is simply wrong. The court expressly

put the Step Three burden on Plaintiffs. ER95-96 ("The burden shifts

to Plaintiffs…").

### 1. The court did not clearly err in finding the challenged restraints "patently and inexplicably" more restrictive than necessary.

With ample support in the record, the district court found that the

rules challenged by Plaintiffs prohibit many forms of compensation and

benefits that, if permitted, would have no negative impact on consumer

demand. ER51. Further, even for the benefits that the NCAA permits,

the court found that the challenged rules capped them at arbitrary—in-

deed, "inexplicabl[e]"—levels that have nothing to do with consumer de-

mand. ER92, 96. The record supports these findings, as well as the

court's further conclusion that the challenged rules were more restric-

tive than necessary to achieve any procompetitive justification based on

consumer demand.

In fact, the court found that there is "no evidence that NCAA by-

laws limiting compensation are enacted based on *any* analysis of con-

sumer demand." ER45 (emphasis added). The challenged rules were,

instead, based on a discussion to control costs. ER640-641 (Lennon

could not recall any study of consumer demand presented to support

caps on benefits); ER640, 642 (no studies); ER641 (there was always a discussion of cost). But an agreement among competitors to control costs constitutes an unreasonable restraint, not a procompetitive justification. *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1022-23 (10th Cir. 1998) ("[M]ere profitability or cost savings have not qualified as a defense under the antitrust laws…. Reducing costs for member institutions, without more, does not justify the anticompetitive effects of the [NCAA's] Rule").

Because the restraints were never based on an analysis of demand, it is no surprise that the challenged rules "do not follow any coherent definition of amateurism" and "[t]he only common thread underlying all forms and amounts of currently permissible compensation is that the NCAA has decided to allow it." ER33. As discussed above (*supra*, p.19), senior NCAA executives admitted that the constant evolution of their amateurism rules has been driven—not by any research or discussion about demand—but by the changing whims of the NCAA's membership. Such arbitrary and ever-changing restraints are—quintessentially and "inexplicably"—more restrictive than necessary to preserve demand for college sports as a distinct product.

64

The court went on to examine the record on the two types of re-
straints being challenged—those that restrict education-related benefits
and compensation, and those that restrict ***non***-education-related bene-
fits and compensation. For the former, Plaintiffs presented numerous
examples of educational benefits that the NCAA prohibits under its
rules. ER44 (citing Poret).[5] The Poret consumer survey tested a variety
of these benefits and, as the court concluded, "supports the finding that
the current limits on student-athlete compensation, to the extent they
relate to the scenarios that he tested, are not necessary to preserve con-
sumer demand." ER44. Defendants never rebutted the Poret survey's
showing that consumer demand would be unaffected by such education-
related benefits as (1) unlimited post-eligibility scholarships to complete
undergraduate or graduate degrees at any school, (2) unlimited scholar-
ships to attend vocational school, (3) work-study payments, or (4) or un-
limited expenses related to studying abroad that are not included in the

---

[5] *See also e.g.*, ER555-556 (postgraduate scholarship at another institu-
tion), ER556-557 (vocational school payments), ER558-559 (academic
incentive funds), ER561-562 (health care funds).

cost of attendance. *See* Br. 63; ER42-44. This is enough, by itself, to require this Court to affirm the finding that the current restrictions are more restrictive than necessary.

The overbreadth of the challenged rules is also apparent in the fact that even permissible educational benefits have arbitrary caps. When asked why Senior Scholar Awards for post-graduate scholarships are capped in quantity and amount, for example, Lennon "provided no meaningful response" beyond the say-so of NCAA members. ER32.

The post-*O'Bannon* record also amply supported the court's Step Three findings relating to the overbreadth of the restraints on **non**-educational benefits. Specifically, the court found that each time Defendants provided new non-educational benefits—or increased existing ones—consumer demand has not suffered. ER31-34, 39-40, 76. Since *O'Bannon*, tens of thousands of dollars of benefits have been provided to individual student-athletes unrelated to education and on top of their cost-of-attendance scholarships. ER 27-28, 30, 33, 37. These benefits have included things like clothing, lavish gifts, transportation and lodging for families, expenses in connection with attending various national

sporting events, and insurance policies to guard against loss of professional earnings. *See supra*, pp.14-18. When asked, the NCAA's corporate designee conceded that it permits such benefits without any "relat[ionship] to the principle of amateurism" and that doing so has not harmed consumer demand. ER492-493; ER27-33 (court describing benefits and concluding "increases in compensation since 2015 have not reduced consumer demand").

Against this record, Defendants cannot show that the court committed clear error in finding the challenged NCAA restrictions on both education-related and non-education-related benefits to be "patently and inexplicably stricter than necessary." *O'Bannon*, 802 F.3d at 1075.

### 2. The court did not clearly err in finding the less restrictive alternative "virtually as effective."

The evidence at trial was also more than sufficient to support the finding that the less restrictive alternative would be virtually as effective in achieving the goal of "preventing unlimited, professional-level cash payments, unrelated to education, that could blur the distinction between college sports and professional sports and thereby negatively affect consumer demand." ER95-97. Once again, Defendants have not demonstrated any clear error.

The less restrictive alternative calls for (i) allowing individual conferences to make their own decisions regarding the level of compensation and benefits that they would permit related to education, while also (ii) allowing the NCAA "to limit education-related academic or graduation awards and incentives, as long as the limits are not lower than its limits on athletic performance awards now or in the future." ER60-61. This alternative was not "divined" by the district court on its own, as Defendants suggest. Br. 57. Rather, it was a "less"—though not the least—restrictive alternative supported by the extensive trial record that Plaintiffs presented on the issue.

### a. *Non-cash education-related benefits*

As for *non*-cash benefits related to education, the record contains strong evidence to support the finding that the less restrictive alternative would be just as effective in achieving the narrow procompetitive justification. This is so for several reasons.

*First*, the court found that "according to Defendants' own witnesses, consumer demand for Division I basketball and FBS football is driven largely by consumers' perception that student-athletes are in fact, students." ER63. The less restrictive alternative would preserve

the NCAA's latitude to protect this perception by imposing rules requiring students to enroll in college, attend classes, maintain a certain GPA, and so on—rules that ensure that student-athletes do in fact remain students.

*Second*, removing restraints on non-cash education-related benefits would actually "enhance" the athletes' status as students and their connection to academics. ER63. Defendants' expert admitted that such benefits would yield more positive educational outcomes for students. ER93 ("Defendants' expert, Dr. Heckman, conceded that additional compensation could improve outcomes for student-athletes, belying the notion that the challenged compensation limits, as they currently stand, are necessary to achieve positive student-athlete outcomes").

*Third*, the individual conferences are just as capable as the NCAA—if not more so—to determine what, if any, caps on non-cash education-related benefits might be appropriate to preserve demand. Indeed, every conference or college witness who testified on this subject

admitted that her conference would not advocate for benefits—education-related or not—that would be harmful to demand.[6] Defendants' economist agreed that the conferences—as rational economic decision-makers—would not permit compensation levels that would reduce demand. ER611-612.

This is not merely economic theory; it was established by, among other things, evidence relating to one of the "natural experiments" that occurred after the *O'Bannon* trial ended. In 2015, the Power 5 conferences were granted additional autonomy to adopt certain new benefits for student-athletes. ER21-23. But unlike the less restrictive alternative here—which grants conference autonomy only for ***education***-related benefits—Power 5 autonomy gave those conferences even broader joint decision-making authority with respect to a number of non-education-related benefits as well. This led to the implementation of benefits like unlimited meals and snacks regardless of cost, enhanced medical

---

[6] *See*, *e.g.*, ER624 (Pac-12 Commissioner confirmed he would take a long-term strategic view as to how to respond if Court strikes down current rules); *id.* at ER649 (Wake Forest President confirmed no university president or employee has indicated they would pay harmful amounts of compensation if allowed to do so); *accord* ER651-652 (America East Commissioner).

benefits, and permission for athletes to borrow against their future earnings to purchase loss-of-value insurance against potential professional earnings. ER22-23. Defendants admitted—and the court found—that none of these enhanced benefits hurt demand. ER33-34, 40. This evidence alone is enough to support the court's finding that the conferences will be virtually as effective as the NCAA in setting rules to protect consumer demand.

*Fourth*, and contrary to Defendants' argument (Br. 68-69), the less restrictive alternative would leave both the NCAA and the individual conferences with ample latitude to determine what qualifies as an education-related benefit. Indeed, the latitude of the individual conferences on this issue would be complete, including broad power to limit education-related benefits in whatever manner they see fit. Unlike the NCAA, the individual conferences do not have market power and thus could survive a Rule of Reason challenge to their independent rulemaking.

### b. *Cash education-related benefits*

The second part of the less restrictive alternative found by the district court allows the NCAA "to limit education-related academic or

71

graduation awards and incentives, as long as the limits are not lower than its limits on athletic performance awards now or in the future." ER60-61.  This too has strong support in the record.

The NCAA already permits academic achievement awards in cash through the Student Assistance and Academic Enhancement Funds, which were formerly reserved for emergencies.  *See supra*, p.15; ER 28-30, 37.  Defendants should not be heard to argue that it is not virtually as effective to allow "capped" cash academic incentive payments when the NCAA already allows "uncapped" payments from these funds that can be dispensed by the schools for academic achievement.[7]

Although Defendants' experts suggested at trial that cash awards for academic performance might create perverse incentives, that suggestion had no support in the trial record.  For starters, as just explained, NCAA rules already permit such awards.  Further, the NCAA permits college coaches and administrators ***personally*** to receive the very same type of cash awards based on the academic achievement of

---

[7] ER28-30; ER630-631 (Lennon "not aware of" any cap on use of such funds for an individual student); ER268 (schools are permitted to use the Academic Enhancement Fund to provide "academic achievement or graduation" awards).

their students.[8] Defendants apparently have no concern about the incentives created by permitting a head coach (like Ohio State's Urban Meyer) to receive a $150,000 payment based on his team's GPA;[9] it thus would be hypocritical for them to suggest that a smaller payment—made to a student directly—would create improper incentives.

Moreover, Defendants' own expert admits that the NCAA already permits athletes to receive "approximately $5,600" in team-based athletic participation awards. ER1122; *see also* ER446-450 (example of recent athlete), ER451-454 (awards can be paid in Visa gift cards); ER665 (NCAA Manual listing permissible participation awards). And the total amount of all permitted athletic awards is significantly higher, as $5,600 includes only the awards available for team participation and does not include the many additional awards that are available on an individual basis. *Compare* ER1232 (describing awards available for team participation) *with* ER666 (Figure 16-3, detailing permissible indi-

---

[8] ER635-636 (football coach). *See also* ER634 (Athletic Director acknowledged he can receive thousands in bonuses for athlete academic achievement); ER696-697 (contract terms).

[9] ER635-636.

vidual athletic achievement awards). Given that these athletic perfor-
mance awards have not produced any harm to demand, the court did
not clearly err in concluding that permitting an equivalent payment for
*academic* achievement also would not hurt demand. ER101-102. In-
deed, the Poret survey studied academic achievement incentives (up to
$10,000) and found that allowing such benefits would result in "virtu-
ally zero negative impact on consumer viewership/attendance." ER827.
The court credited Poret's testimony and discredited Defendants' rebut-
tal. ER41-44. This is precisely the kind of weighing by a trial court
that cannot be upset under a "clear error" standard.

There is no basis for Defendants' claim that permitting a specified
cap on cash academic achievement awards amounts to "improper judi-
cial-price setting" or an intrusion on Defendants' "ample latitude." Br.
65-69. It is just the opposite. The court's injunction does not "set" the
cap at any specific level; it allows the NCAA to cap awards for academic
performance *based on whatever the NCAA itself already allows for
athletic performance*. ER101-103; ER3-4 (providing that any limit on
cash or cash-equivalent academic participation awards "shall be in-

creased in the event that the athletics participation awards limit is increased, to ensure that the limit on academic achievement or graduation awards or incentives is never less than the athletics participation awards limit"). It is the NCAA, not the court, that determines what levels of payment would not harm demand.

Finally, even before the post-*O'Bannon* emergence of widespread, substantially-above-cost-of-attendance compensation, this Court found "education-related compensation" to be ***consistent*** with preserving demand. *O'Bannon*, 802 F.3d at 1078. So does the NCAA's top executive today. As previously noted, NCAA President Mark Emmert has publicly endorsed the court's less restrictive alternative, which permits the conferences and schools to compete to provide enhanced education-related benefits:

> [W]e have schools competing now on who can do the best gold-plated locker room … [and] the best recreational facilities[.] Having them compete over who can provide the best educational experience is an inherently good thing, not a bad thing from my point of view.[10]

---

[10]*Emmert: Ruling Reinforced Fundamentals of NCAA, supra* n.2.

Defense witness testimony was in accord: "[e]ducation-related compensation and benefits would enhance the student-athletes' connection to academics" and would thus "be consistent with the values propounded by the NCAA." ER63-64 (court citing ER600-601 (Chancellor Perlman: "I don't think it's inconsistent to provide them with benefits that relate to the educational enterprise")); ER605 (MAC Commissioner and 30(b)(6) witness: compensation above cost of attendance is not problematic because "the key point" is "linking what we're doing to the pursuit of the educational opportunities of the individual involved").

In sum, Defendants offer no evidence to show that the less restrictive alternative would not be virtually as effective in maintaining a distinction from professional-style unlimited payments unrelated to education. And there is certainly no basis to conclude that the court's findings on this issue constitute clear error.

### 3. The district court did not clearly err in finding that the less restrictive alternative can be implemented without significantly increased costs.

Defendants also have not identified any clear error in the court's finding that the less restrictive alternative can be implemented without

significantly increased cost. The NCAA already has a massive rules en-
forcement apparatus, thanks to its nearly 450-page byzantine rulebook.
*See* ER655-657. Under the less restrictive alternative, however, en-
forcement would be streamlined and reduced in cost because the NCAA
would no longer enforce its innumerable arbitrary restrictions on non-
cash education-related benefits. ER66-69; ER609; ER1278; ER1373. As
the court found, "the elimination of NCAA caps on most education-re-
lated benefits [] would eliminate the need to expend resources on com-
pliance and enforcement in connection with such caps." ER66.

Conferences, in turn, would pick up any continued regulation of
non-cash educational benefits, but only if they determine that such limi-
tations are necessary. And even if they do, they are already "required
by the NCAA to have compliance programs." ER67; ER780 (conferences
already investigate rule violations and impose punishment). "Schools
also currently interpret NCAA rules," and "engage in compliance ef-
forts, including investigations, and enforcement of NCAA and confer-
ence rules relating to student-athlete compensation and eligibility" so
an increase in conference autonomy "will impose little or no additional
burden on the schools." ER67-68.

Moreover, the court found that the NCAA's existing enforcement infrastructure could be redeployed—or the cost of funding that infrastructure could be redeployed—to the extent conferences need or want additional resources for enforcement. ER68. And, on top of that, conferences could avail themselves of the NCAA's newly outsourced alternative for policing major rules violations, as recommended by the NCAA Task Force chaired by Dr. Condoleezza Rice. ER66 n.32. The court's findings on these points were also supported by two economists—Rascher and Noll. ER1278, 1373 (Rascher); ER609 (Noll: "the more you relax the rules, the less bureaucracy and regulation you need").

In the face of this substantial evidence, Defendants' argument that the court's finding about implementation costs rests on a "bald assertion" (Br. 64) is demonstrably false. Instead, it is Defendants who rely on the conclusory allegations of witnesses that the court found to "lack[] specificity or support," to be "speculative," or, at best, to be "outweigh[ed] or undermine[d]" by "[o]ther evidence." ER68.

Last, Defendants' complaints that there would be enforcement costs if they violated the court's injunction (Br. 66-69) should be rejected out of hand. Such costs would have nothing to do with implementing

the less restrictive alternative; they would be a self-inflicted consequence of violating the high bar for contemptuous behavior.

## III. The district court properly retained jurisdiction to enforce its injunction.

Defendants simultaneously complain that the court's injunction is too vague to provide notice of what is prohibited, and that the court improperly retained jurisdiction to entertain motions clarifying the meaning of "education-related." Br. 67-68. Neither argument has merit.

Courts routinely retain jurisdiction over motions to modify and to enforce an injunction, as the district court did here. *See, e.g.*, *O'Bannon*, 4:09-cv-03329, ECF No. 292; *Robinson v. Delgado*, 2012 WL 4753493, at *1 (N.D. Cal. Oct. 4, 2012) ("This court shall retain jurisdiction of this action for all purposes, including without limitation, all proceedings involving the interpretation, enforcement, or amendment of this Order and Permanent Injunction"); *Levi Strauss & Co. v. California Denim Resources, Inc.*, 2001 WL 348973, at *2 (N.D. Cal. Mar. 16, 2001) (same). None of the authority cited by Defendants supports their contention that the court's retention of jurisdiction to enforce its own injunction constitutes impermissible micromanagement. Br. 66-67.

As for the question of defining benefits "related to education," all the court did was to state its willingness to entertain motions to amend the injunction to provide such a definition, if Defendants chose to propose one (as they declined to do during trial, ER69). This is the opposite of "arrogat[ing] control." Br. 66. Rather, the court's retention of jurisdiction provides the parties a cost-effective mechanism for amendment, clarification, and enforcement of its injunction. It certainly was no abuse of discretion.

## CROSS-APPEAL

Although its findings of fact and analysis of the Rule of Reason were sound and meticulous, the court made an error at the remedy stage: it entered an injunction that leaves intact a critical component of the anticompetitive harm it found. At Step One, the court found that the rules caused severe anticompetitive harm in two distinct respects: (i) by restraining education-related benefits, and (ii) by restraining ***non***-education-related benefits. At Step Two, the court found no procompetitive justification for either category of restraints, except to the extent that they prohibited unlimited cash payments that "may" cause con-

sumers to conclude there is no distinction between college and professional sports. At Step Three, the court found a less restrictive alternative that rendered both categories of restraints to be unreasonable, making it unnecessary for the court to reach Step Four "balancing" for either category of restraints. Yet, at the remedy stage, the court formulated an injunction that redressed only the anticompetitive harm from the education-related restraints—providing no relief at all for the harm from the unreasonably broad restraints on non-education-related compensation.

Modification of the court's injunction in this case is "necessary to assure that the relief will be effective." *Eastman Kodak*, 125 F.3d at 1124-25 (quoting *Glaxo*, 410 U.S. at 64). This Court's duty is "to examine the decree in light of the record to see that the relief it affords is adequate to prevent the recurrence of the illegality which brought on the given litigation." *Loew's*, 371 U.S. at 52. If the relief fails to meet that standard, there is "an obligation to intervene in this most significant phase of the case." *Glaxo*, 410 U.S. at 64. *See also* Areeda*, supra*, ¶ 1205c3, 325a ("appellate courts have not hesitated to alter decrees they consider … too lenient to be effective").

81

The court should have entered an injunction that prohibited the NCAA from continuing to enforce **either** category of its challenged restraints, as **both** categories were found to be more restrictive than necessary to preserve consumer demand. To the extent new rules are necessary to prevent unlimited payments that "may" reduce demand, those rules can be determined by the individual conferences competing with each other under principles of "conference autonomy."

The court's lone reason for declining this broader relief—its concern about the "unintended consequences" of conferences engaging in "trial and error"—rests on a mistake of law. The trial-and-error process the court feared is nothing more than the very market competition that antitrust law exists to protect—and that the court's injunction was required to restore.

## I.    The district court abused its discretion by issuing an injunction more limited than the anticompetitive harm it found.

"The Supreme Court has explained that a remedies decree in an antitrust case must seek to 'unfetter a market from anticompetitive conduct.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577

(1972)); *see also, e.g., Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) ("A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints"). Moreover, courts are "required[] to decree relief effective to redress [antitrust] violations, 'whatever the adverse effect of such a decree on private interests.'" *United States v. Coca-Cola Bottling Co. of Los Angeles*, 575 F.2d 222, 231 (9th Cir. 1978) (quoting *United States v. E.I. du Pont de Nemours & Co., et al.*, 366 U.S. 316, 326 (1961)); *see also United States v. Crescent Amusement Co.*, 323 U.S. 173, 188 (1944) ("Civil suits under the Sherman Act would indeed be idle gestures if the injunction did not run against the continuance … of the unlawful practice").

Under these authorities, a court's "most important task is to devise a remedy that is reasonably well calculated to restore competitive conditions," which, in the context of a Section 1 violation, can be accomplished by enjoining the anticompetitive agreements at issue and "permitting market forces to do their work." *Areeda, supra*, ¶ 325 (injunction that simply prohibits the unreasonable restraints will often be "sufficient to make the firms behave competitively"), ¶ 1903b (injunction in

*Board of Regents* allowed freedom of action by the "independent, presumably profit-maximizing actors united by the joint venture"; injunction in *Law* allowed "market competition among NCAA schools [to] determine salaries, and no price regulation would be needed"). As this Court has observed, the injunction need not incorporate the less restrictive alternative itself; "regulation … is best left to the marketplace" because "the market itself will deter unwise moves." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1397-98 (9th Cir. 1984).

Here, the district court abused its discretion by issuing an injunction that permits Defendants to continue their unreasonable restraints on non-education-related benefits—restraints that are exponentially more restrictive than the narrow prohibition on "unlimited payments" that the court found may be justified.

On summary judgment, the district court held that Defendants "restrain trade in that they limit … compensation that relates to education" and also "compensation incidental to athletics participation and ***unrelated to education***, including monetary awards that reward per-

formance in athletics." ER15-16 (emphasis added). The court additionally held that both sets of restraints cause significant anticompetitive harm because, *inter alia*, "[t]he compensation that student-athletes receive under the challenged rules does not correlate meaningfully with the value of their athletic services…." ER19.

Then, at trial, the court found that Defendants' restraints on both educational and non-educational compensation were far broader than necessary to achieve the narrow procompetitive justification of preserving the "unlimited" pay distinction between college and professional sports. ER58. For example, the court credited "[t]he only economic analysis in the record that addresses the impact of changes to student-athlete compensation on consumer demand" as "show[ing] that recent increases in student athlete-compensation, related ***and unrelated*** to education, have not decreased consumer demand." ER87-88 (emphasis added). The court thus held that "the current rules … are more restrictive than necessary to prevent demand-reducing unlimited compensation indistinguishable from that observed in professional sports" because the only distinction that needs preserving is "preventing professional-style unlimited cash payments." ER58, 62.

Based on these findings, it was incumbent upon the court to grant injunctive relief sufficient to redress the anticompetitive effects on both educational and non-educational compensation in order to ensure that Defendants will have "no [] opportunity… available [to them] in the future" to continue unreasonably restraining competition. *Crescent Amusement*, 323 U.S. at 190; *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 381 (1973) ("those caught violating the Act must expect some fencing in"); *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 532 (1924) ("[plaintiff] being entitled to relief[] is entitled to effective relief; and any doubt in respect of the extent thereof must be resolved in its favor"). Unfortunately, here, the court granted an injunction that redressed the harm caused only by the NCAA's education-related restraints, allowing the NCAA to continue "to limit compensation and benefits that are unrelated to education provided on top of a" cost of attendance scholarship. ER107-108.

In this fashion, the court left a wide (and unremedied) gulf between the more limited restraints that it found may be justified because they only prohibit "professional-style unlimited cash payments" (ER62) and the challenged NCAA restrictions on non-educational compensation

that the court concluded were more restrictive than necessary (ER58).
It thus erroneously "delegate[ed] the [continued] management of the
system to the discretion of those who … conceive[d] the present conspir-
acy" and failed to address all of the "real evils" that the court itself
found. *United States v. Paramount Pictures*, 334 U.S. 131, 163-65
(1948).

The court should have, instead, granted the broader relief re-
quested by Plaintiffs, which would have enjoined the NCAA's overbroad
restraints on non-educational compensation as well and left it to the
conferences to determine the appropriate demarcation between permis-
sible non-educational compensation and "professional-style unlimited
cash payments." *See Eastman Kodak*, 125 F.3d at 1225-26 (directing
district court to modify an antitrust injunction to require that prices be
set through competition).

The court's failure to "decree relief effective to redress" the full
scope of the anticompetitive harm caused by overbroad restraints re-
quires reversal. *Coca-Cola*, 575 F.2d at 231; *see also Paramount*, 334
U.S. at 160-61 (1948) (rejecting decree that permitted the continuance

of some restraints found to be unreasonable and requiring court to "provide effective relief against the[] continuance" of those restraints).

## II. The district court's refusal to grant broader injunctive relief is grounded in legal error.

The court's sole basis for rejecting the broader "conference autonomy" injunction—which would have enjoined the NCAA from continuing either category of its unreasonable restraints—was that the process of determining how much restriction on non-educational benefits would be necessary would have to proceed through "trial and error" by the conferences. ER59-60. The court worried that this "inevitable trial-and-error phase could result in miscalculations by one or more conferences as to levels of pay that would not reduce demand for the product, and this could produce unintended consequences." *Id*. This concern, however, merely describes the push-and-pull of the very competitive process that antitrust injunctions are required to restore.

Indeed, the Supreme Court has held that "impeding the ordinary give and take of the market place" is exactly what the Rule of Reason prohibits. *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (quotations and citation omitted); *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 164 n.13 (9th Cir. 1989) (same); Areeda,

*supra*, ¶ 1760d ("[b]usiness practice often proceeds by trial and error").

And, as this Court has held: "Every precedent in the field makes clear

that the interaction of competitive forces, not price-rigging, is what will

benefit consumers." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d

979, 988 (9th Cir. 2000). It is for this reason that the Supreme Court

has determined that while competition "may be inherently imprecise

and incapable of taking into account all the variables"—and may even

pose a "risk … that competition will cause some suppliers to market a

defective product"—this is not a basis for abandoning competition under

the Sherman Act. *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S.

679, 694 (1978). On the contrary, "[t]he Sherman Act reflects a legisla-

tive judgment that, ultimately, competition will produce not only lower

prices but also better goods and services." *Id.* at 695.

As this authority demonstrates, the need for conferences to engage

in a trial-and-error process to find the optimal level of compensation is,

as a matter of law, not a proper basis for denying relief broad enough to

"unfetter a market from anticompetitive conduct." *Microsoft*, 253 F.3d

at 103; *cf. Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 346 (1982)

("ruinous competition" is not a legally valid justification for anticompetitive restraints); *United States v. Apple, Inc.*, 791 F.3d 290, 330-32 (2d Cir. 2015) (same). The court's refusal to grant the broader injunction was thus legal error.

But even putting this legal error aside, the trial record establishes that the court's refusal to grant broader injunctive relief was an abuse of discretion. The evidence demonstrated that individual conferences are fully capable of determining what type of compensation would enhance or reduce demand. The court recognized, for example, that "[p]laintiffs and their experts strenuously argue[d] … ***perhaps correctly***, that if this alternative [of conference autonomy on non-educational benefits] were adopted, conference officials, as rational economic actors, would not act contrary to their members' aggregate economic interests, and would not choose to pay amounts of cash compensation unrelated to education that would be demand-reducing for Division I sports." ER59 (emphasis added); ER60 (finding that the individual conferences could use "market research and … gradual increases in cash compensation to student-athletes [in order] to determine an amount that would not be demand-reducing").

Similarly, Defendants' economist, Dr. Elzinga, admitted that he would expect individual conferences to take into account the consumer demand impact of their compensation rules. ER611-612. So did every percipient defense witness who addressed this topic. *See supra*, pp.69-70.

Furthermore, as described above, the "natural experiment" of Power 5 conference autonomy provides additional evidence that the conferences can effectively manage the creation of new non-educational compensation without reducing demand. *See supra*, pp.70-71. So does the NCAA's existing practice relating to the administration of tens of millions of dollars from the Student Assistance and Academic Enhancement Funds, under which schools and conferences enjoy discretion to determine how these cash payments are awarded to athletes. ER28-30. In both of these respects, the court determined that Power 5 conference autonomy has not led to any adverse impact on consumer demand. ER37-38.

In sum, the injunction is legally flawed and an abuse of discretion because it is too narrow to provide all the relief that the antitrust laws

require for the anticompetitive harms found. This Court should remand the case to the district court to enter a broader injunction.

## CONCLUSION

For the reasons above, Plaintiffs ask that the Court (i) affirm the district court's liability determination; and (ii) grant Plaintiffs' cross-appeal on remedy and remand for entry of the broader injunction presented below by Plaintiffs (Pls.' Cl. Arg. at 41-42 (Dkt. 1155-1))—an injunction that not only prohibits the NCAA from enforcing its education-related restraints, but also redresses the competitive harm from the restraints on non-education-related compensation.

Dated:    October 23, 2019                    Respectfully submitted,


HAGENS BERMAN SOBOL                    WINSTON & STRAWN LLP
SHAPIRO LLP
                                       By *s/ Jeffrey L. Kessler*
By *s/ Steve W. Berman*                Jeffrey L. Kessler
Steve W. Berman                        David G. Feher
Craig R. Spiegel                       David L. Greenspan
Emilee N. Sisco                        200 Park Avenue
1918 Eighth Avenue, Suite 3300         New York, NY 10166-4193
Seattle, WA 98101                      Telephone: (212) 294-6700
Telephone: (206) 623-7292              *jkessler@winston.com*
*steveb@hbsslaw.com*                   *dfeher@winston.com*
*craigs@hbsslaw.com*                   *dgreenspan@winston.com*
*emilees@hbsslaw.com*
                                       Linda T. Coberly
                                       35 W. Wacker Drive
PEARSON, SIMON & WARSHAW,               Chicago, IL 60601
LLP                                    Telephone: (312) 558-5600
                                       *lcoberly@winston.com*
By *s/ Bruce L. Simon*
Bruce L. Simon                         Sean D. Meenan
Benjamin E. Shiftan                    Jeanifer E. Parsigian
350 Sansome Street, Suite 680          101 California Street
San Francisco, CA 94104                San Francisco, CA 94111
Telephone:  (415) 433-9000             Telephone: (415) 591-1000
*bsimon@pswlaw.com*                    *smeenan@winston.com*
*bshiftan@pswlaw.com*                  *jparsigian@winston.com*

*Class Counsel for the Consolidated*   *Class Counsel for the Consolidated*
*Action Plaintiffs*                    *Action Plaintiffs*

PRITZKER LEVINE LLP


By  *s/ Elizabeth C. Pritzker*
    Elizabeth C. Pritzker
    Jonathan K. Levine
    Bethany L. Caracuzzo
    180 Grand Avenue, Suite 1390
    Oakland, CA 94612
    Telephone: (415) 692-0772

*Additional Class Counsel*

## STATEMENT OF RELATED CASES

Consolidated Action Plaintiffs are not aware of any related cases pending in this Court.

Dated:     October 23, 2019

                              **WINSTON & STRAWN LLP**


                              *s/ Jeffrey L. Kessler*
                              Jeffrey L. Kessler

                              *Counsel for the Consolidated Action Plaintiffs*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** ___19-15566, 19-15662___

I am the attorney or self-represented party.

**This brief contains** 17245 **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[x] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Jeffrey L. Kessler*_____ **Date** _October 23, 2019_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

---

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                          *Rev. 12/01/18*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: October 23, 2019

**WINSTON & STRAWN LLP**

*s/ Jeffrey L. Kessler*
Jeffrey L. Kessler

*Counsel for the Consolidated Action Plaintiffs*