**Nos. 19-15566, 19-15662**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION
ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION

SHAWNE ALSTON; MARTIN JENKINS; JOHNATHAN MOORE; KEVIN PERRY; WILLIAM
TYNDALL; ALEX LAURICELLA; SHARRIF FLOYD; KYLE THERET; DUANE BENNETT;
CHRIS STONE; JOHN BOHANNON; ASHLEY HOLLIDAY; CHRIS DAVENPORT; NICHOLAS
KINDLER; KENDALL GREGORY-MCGHEE; INDIA CHANEY; MICHELLE THOMAS; DON
BANKS, "DJ"; KENDALL TIMMONS; DAX DELLENBACH; NIGEL HAYES; ANFORNEE
STEWART; KENYATA JOHNSON; BARRY BRUNETTI; DALENTA JAMERAL STEPHENS,
"D.J."; JUSTINE HARTMAN; AFURE JEMERIGBE; ALEC JAMES,
*Plaintiffs-Appellees-Cross-Appellants*,

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE NCAA; PACIFIC 12
CONFERENCE; CONFERENCE USA; THE BIG TEN CONFERENCE, INC.; MID-AMERICAN
CONFERENCE; SOUTHEASTERN CONFERENCE; ATLANTIC COAST CONFERENCE;
MOUNTAIN WEST CONFERENCE; THE BIG TWELVE CONFERENCE, INC.; SUN BELT
CONFERENCE; WESTERN ATHLETIC CONFERENCE; AMERICAN ATHLETIC
CONFERENCE,
*Defendants-Appellants-Cross-Appellees.*

Appeals from the United States District Court for the Northern
District of California, No. 4:14-md-2541 (Wilken, J.)

## DEFENDANTS' JOINT RESPONSE-AND-REPLY BRIEF

SETH P. WAXMAN
LEON B. GREENFIELD
DANIEL S. VOLCHOK
DAVID M. LEHN
KEVIN M. LAMB
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 663-6000

December 23, 2019                    *Counsel for the NCAA*

**ADDITIONAL COUNSEL LISTED ON INSIDE COVER**

BART H. WILLIAMS
SCOTT P. COOPER
KYLE A. CASAZZA
JENNIFER L. JONES
SHAWN S. LEDINGHAM, JR.
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
(310) 557-2900

*Counsel for Pac-12 Conference*

LEANE K. CAPPS
CAITLIN J. MORGAN
POLSINELLI PC
2950 North Harwood Street, Suite 2100
Dallas, TX 75201
(214) 397-0030

AMY D. FITTS
POLSINELLI PC
900 West 48th Place, Suite 900
Kansas City, MO 64112
(816) 218-1255

*Counsel for the Big 12 Conference, Inc. and Conference USA*

MARK A. CUNNINGHAM
JONES WALKER LLP
201 St. Charles Avenue, 50th Floor
New Orleans, LA 70170
(504) 582-8536

*Counsel for Sun Belt Conference*

BETH A. WILKINSON
BRANT W. BISHOP
WILKINSON WALSH + ESKOVITZ LLP
2001 M Street N.W., 10th Floor
Washington, D.C. 20036
(202) 847-4000

SEAN ESKOVITZ
WILKINSON WALSH + ESKOVITZ LLP
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
(424) 316-4000

*Counsel for the NCAA*

JEFFREY A. MISHKIN
KAREN HOFFMAN LENT
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
4 Times Square
New York, N.Y. 10036
(212) 735-3000

*Counsel for the NCAA and Western Athletic Conference*

ROBERT W. FULLER, III
PEARLYNN G. HOUCK
LAWRENCE C. MOORE, III
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, N.C. 28246
(704) 377-2536

MARK J. SEIFERT
SEIFERT LAW FIRM
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 999-0901

*Counsel for Southeastern Conference*

**ADDITIONAL COUNSEL LISTED ON FOLLOWING PAGE**

ANDREW J. PINCUS
CHARLES A. ROTHFELD
RICHARD J. FAVRETTO
Mayer Brown LLP
1999 K Street N.W.
Washington, D.C. 20006
(202) 263-3000

BRITT M. MILLER
ANDREW S. ROSENMAN
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600

*Counsel for The Big Ten Conference, Inc.*

MERYL MACKLIN
BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
(415) 268-1981

RICHARD YOUNG
BRENT E. RYCHENER
BRYAN CAVE LEIGHTON PAISNER LLP
90 South Cascade Avenue, Suite 1300
Colorado Springs, CO 80903
(719) 473-3800

*Counsel for Mountain West Conference*

BENJAMIN C. BLOCK
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
(202) 662-5205

*Counsel for the American Athletic Conference*

R. TODD HUNT
BENJAMIN G. CHOJNACKI
WALTER HAVERFIELD LLP
The Tower at Erieview
1301 East 9th Street, Suite 3500
Cleveland, OH 44114
(216) 928-2935

*Counsel for Mid-American Conference*

D. ERIK ALBRIGHT
GREGORY G. HOLLAND
FOX ROTHSCHILD LLP
300 North Greene Street, Suite 1400
Greensboro, N.C. 27401
(336) 378-5200

JONATHAN P. HEYL
FOX ROTHSCHILD LLP
101 North Tryon Street, Suite 1300
Charlotte, N.C. 28246
(704) 384-2625

CHARLES L. COLEMAN, III
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111
(415) 743-6900

*Counsel for Atlantic Coast Conference*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ............................................................................1

ARGUMENT ...................................................................................5

I. NOTHING MATERIAL CHANGED AFTER *O'BANNON* AFFIRMED
THE NCAA'S CONCEPTION OF AMATEURISM ...................................5

    A.   *O'Bannon* Held That The NCAA's Eligibility Rules,
        Despite Permitting Some Amounts Above COA,
        Maintain A Shared And Meaningful Conception Of
        Amateurism ........................................................................6

    B.   The NCAA's Eligibility Rules Are Substantially The
        Same As They Were At The Time Of *O'Bannon* ..............................10

II. *O'BANNON* FORECLOSES PLAINTIFFS' CLAIMS ................................15

    A.   Stare Decisis ......................................................................16

        1.   *O'Bannon*'s rule-of-reason analysis produced a
            generally applicable holding that is binding here ....................17

        2.   *O'Bannon*'s holding is not limited to NIL
            payments ..................................................................19

        3.   The facts here are not materially different from
            *O'Bannon* .................................................................20

    B.   Res Judicata .......................................................................22

        1.   Plaintiffs' privity arguments lack merit .................................23

        2.   Plaintiffs' attempt to distinguish the claims here
            from those in *O'Bannon* fails .........................................24

III.  PLAINTIFFS' DEFENSES OF THE DISTRICT COURT'S RULE-OF-
       REASON ANALYSIS LACK MERIT ..................................................27

       A.    Plaintiffs Are Wrong That Providing "Ample Latitude,"
             As *Board Of Regents* And *O'Bannon* Both Require,
             Means Only That NCAA Eligibility Rules Are Analyzed
             Under The Rule Of Reason ....................................................30

       B.    Plaintiffs' Arguments Do Not Excuse The District
             Court's Step-2 Errors ...........................................................31

             1.    Plaintiffs' own arguments make clear that the
                   district court erroneously shifted their step-3
                   burden onto defendants ...............................................31

             2.    Plaintiffs fail to justify the district court's rejection
                   of the NCAA's conception of amateurism .................35

       C.    The District Court's LRA, Which Rests On A
             Redefinition Of The Difference Between College And
             Professional Sports That Even Plaintiffs Do Not Defend,
             Would Professionalize College Sports...................................39

             1.    Plaintiffs ignore defendants' arguments about key
                   errors underlying the district court's LRA...............39

             2.    Plaintiffs do not show that the challenged rules are
                   patently and inexplicably stricter than necessary ...................41

             3.    Plaintiffs do not show that the district court's LRA
                   would be virtually as effective as the challenged
                   rules at differentiating college and professional
                   sports ...........................................................................46

             4.    Plaintiffs fail to show that the court's LRA would
                   not impose significantly increased costs....................51

             5.    Plaintiffs do not rebut defendants' explanation that
                   the court's LRA involves improper price setting ...................53

IV.   THE INJUNCTION IS UNLAWFUL .....................................................54

CROSS-APPEAL ....................................................................................... 55

SUMMARY OF ARGUMENT ................................................................... 55

ARGUMENT ............................................................................................. 57

PLAINTIFFS' PLEA TO EXPAND THE INJUNCTION IS MERITLESS ............................... 57

    A.    Plaintiffs Wrongly Suggest That The District Court Held
           The NCAA's Restrictions On Payments Unrelated To
           Education To Be Unlawful ................................................... 58

    B.    Plaintiffs' Challenges To The District Court's Rejection
           Of Their Preferred Injunction Conflict With Economic
           Theory, Precedent, And The Record ................................... 61

          1.    Economic theory ...................................................... 61

          2.    Precedent .................................................................. 63

          3.    The record ................................................................ 65

CONCLUSION .......................................................................................... 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012) ......................................36

*Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982) .....................64

*Costantini v. Trans World Airlines*, 681 F.2d 1199 (9th Cir. 1982).......................26

*FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986) ................................63

*Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001)....................................17

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11 F.3d 1460 (9th Cir. 1993) ......................................25

*In re Osborne*, 76 F.3d 306 (9th Cir. 1996)................................16, 17, 20

*Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401 (2015)............................16

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ................................64

*Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998) ..........................................36, 45, 51

*Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955) ............................25

*Levi Strauss & Co. v. California Denim Resources, Inc.*, 2001 WL 348973 (N.D. Cal. Mar. 16, 2001) ................................55

*Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir. 1984) ..................................60, 61

*Maple Flooring Manufacturers' Ass'n v. United States*, 268 U.S. 563 (1925)................................19

*McCormack v. NCAA*, 845 F.2d 1338 (5th Cir. 1988) ...........................................35

*Media Rights Technologies, Inc. v. Microsoft Corp.*, 922 F.3d 1014 (9th Cir. 2019) ................................26

*National Basketball Ass'n v. SDC Basketball Club, Inc.*, 815 F.2d 562 (9th Cir. 1987) .........................................................................19, 21

*National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978)................................................................................64

*NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984)................................................................ 3, 7, 9, 31, 32, 40, 48, 56, 62

*O'Bannon v. NCAA*, 7 F. Supp. 3d 955 (N.D. Cal. 2014) ...................8, 36

*O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015).........................................*passim*

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) ..................60

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139 (9th Cir. 1989) ..................................................................64

*Robinson v. Delgado*, 2012 WL 4753493 (N.D. Cal. Oct. 4, 2012).......................54

*Smith v. Bayer Corp.*, 564 U.S. 299 (2011) ...........................................23

*Smith v. NCAA*, 139 F.3d 180 (3d Cir. 1998) .........................................35

*Taylor v. Sturgell*, 553 U.S. 880 (2008)..................................................23

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)................................64, 65

*United States v. Coca-Cola Bottling Co.*, 575 F.2d 222 (9th Cir. 1978)................60

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)...........................65

*United States v. Ramos-Medina*, 706 F.3d 932 (9th Cir. 2013) ..............................22

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).............................25

## DOCKETED CASES

*In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. 09-1967 (N.D. Cal.) ...........................................................8, 13

*NCAA v. O'Bannon*, Nos. 14-16601 & 14-17068 (9th Cir.).....................................9

*O'Bannon v. NCAA*, No. 09-3329 (N.D. Cal.).....................................................8, 12

## STATUTES AND RULES

15 U.S.C.
  §4 .................................................................................................60
  §25 ...............................................................................................50
  §26 ...............................................................................................60

20 U.S.C. §1087*ll*......................................................................12

Federal Rule of Civil Procedure
  Rule 23 .........................................................................................24
  Rule 65 .........................................................................................54

S.B. 206 (Cal. Sept. 30, 2019) ...................................................6

## OTHER AUTHORITIES

Areeda, Phillip E. & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2019
  update) .....................................................................................48, 64

https://studentaid.ed.gov/sa/types/work-study ............................38

https://studentaid.ed.gov/sa/types/international .........................38

Olson, Mancur, *The Logic of Collective Action* (1971).................48, 62

Report of the NCAA Board of Governor's Meeting (Oct. 29, 2019),
  https://bit.ly/393LVKK.............................................................6

Tracy, Marc, *Top Conferences to Allow Aid for Athletes' Full Bills*,
  N.Y. Times (Jan. 17, 2015), https://nyti.ms/2rlqVy7.................21

## INTRODUCTION

Plaintiffs provide no sound basis to affirm the district court's judgment, let alone to expand the court's injunction. Four years ago, in *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), this Court concluded that: (1) the NCAA has long adhered to a "shared conception" of amateurism that bars student-athletes from being "paid for performance"; (2) NCAA rules that reasonably preserve this tradition of amateurism are procompetitive; and (3) those rules could lawfully prohibit payments untethered to legitimate expenses, but they were unlawful to the extent that they prohibited payments to student-athletes up to their schools' cost of attendance (COA). *Id*. at 1075, 1076 n.20, 1079. Yet in this case—which is essentially a repeat of *O'Bannon*—the district court held that: (1) defendants' conception of amateurism was incoherent and meaningless; (2) the NCAA's compensation rules are procompetitive *only* to the extent they prohibit student-athletes from receiving unlimited pay; and (3) the NCAA can thus be ordered to allow payments to student-athletes untethered to legitimate expenses. Hence, whereas in *O'Bannon*, this Court reversed the district court's determination that the NCAA must permit student-athletes to receive up to $5,000 per year above their legitimate educational costs, the same district court here ordered relief similar in nature to what this Court overturned in that case—only far more expansive.

*O'Bannon* unquestionably precludes the relief sought in this suit—and indeed the suit itself.

In responding, plaintiffs often just repeat the district court's analysis, while ignoring defendants' detailed arguments demonstrating why that analysis was incorrect. Nothing plaintiffs say changes the fact that the decision below is, as explained, inconsistent with both the holding and the reasoning of *O'Bannon*.

Plaintiffs' leading claim is that the district court's departures from *O'Bannon* are permissible because in the few years following this Court's decision, the NCAA significantly changed its rules and otherwise abandoned the model of amateurism *O'Bannon* found procompetitive. That is false. Defendants' conception of amateurism remains unchanged. And the only post-*O'Bannon* rule changes have been slight adjustments that are consistent with that conception.

Because the facts here are materially the same as *O'Bannon*'s, that decision forecloses this lawsuit under both stare-decisis and res-judicata principles. Plaintiffs' contrary arguments do nothing to undermine the conclusion that this case is an attempted do-over, with virtually identical plaintiff classes resurrecting failed arguments from that case in an effort to relitigate issues that were settled there. Although plaintiffs aver that there is nothing wrong with defendants having to face the same lawsuit over and over, *O'Bannon* itself recognized the importance of preventing that scenario.

Plaintiffs' arguments regarding the rule of reason are likewise infirm. To begin with, plaintiffs say nothing at all about three core errors the district court made. *First*, as defendants explained at length, the court proclaimed a new line between professional and college sports (i.e., that only professionals receive *unlimited* pay). That line, however, has no basis in the record and is contrary to *O'Bannon*, *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984), and every other relevant judicial precedent. *Second*, the court did not find—as *O'Bannon* requires—that its supposedly less-restrictive alternative to the challenged NCAA rules would be virtually as effective in preserving the true distinction: that only student-athletes are amateurs, i.e., not paid to play. *Third*, the court's alternative would not be virtually as effective in maintaining even the court's invented line, because that alternative would allow student-athletes to receive unlimited cash payments and unlimited in-kind benefits. These errors alone warrant reversal.

Plaintiffs similarly cannot refute defendants' showing that the district court's rule-of-reason analysis improperly conflated steps 2 and 3, by doing precisely what *O'Bannon* forbade: requiring defendants to prove (at step 2) that their existing restraints are *necessary* to maintain the distinction between college and professional sports, rather than requiring plaintiffs (at step 3) to prove that those restraints are not necessary. Nor do plaintiffs deny that the court's less-restrictive

- 3 -

alternative—which the court first articulated after trial—would not be virtually as effective as the NCAA's rules at maintaining the true distinction between professional and college sports. Finally, while plaintiffs constantly invoke the clear-error standard of review for factual findings, that standard cannot inoculate the district court's unwarranted skepticism of amateurism and erroneous adoption of unsupported alternatives, any more than it did in *O'Bannon*.

Undeterred, on cross-appeal plaintiffs urge this Court to order even greater relief than the district court did. They argue that the district court erred by leaving in place restrictions on payments that are not related to education. All the errors that require vacatur of the present injunction foreclose its expansion *a fortiori*. But even if the current injunction were valid, plaintiffs' contention would fail: Even the district court found that restrictions on payments unrelated to education could not be eliminated without erasing the distinction between college and professional sports. Plaintiffs' argument against that conclusion—that the conferences individually would maintain effective compensation limits—has no record support and contradicts the basic economic insight that undergirded *Board of Regents* and *O'Bannon*: some collective agreement by defendants is necessary to make intercollegiate athletics available as a distinct product.

The judgment should be reversed and the injunction vacated.

## ARGUMENT

## I. NOTHING MATERIAL CHANGED AFTER *O'BANNON* AFFIRMED THE NCAA'S CONCEPTION OF AMATEURISM

This Court held in *O'Bannon* that the NCAA's amateurism rules serve the procompetitive purpose of setting college sports apart from professional sports, thereby widening consumer choice and increasing consumer demand for college sports. The heart of plaintiffs' entire case is their argument (Br. 1, 3) that the "factual landscape" changed "markedly" after *O'Bannon*. Specifically, plaintiffs contend (*id.* at 3) that after *O'Bannon*, the NCAA abandoned its longstanding model of amateurism by significantly revising its rules, "such that the NCAA now permits '[various] payments above [COA] that have no tether to education,'" with "no adverse impact on the demand for elite college basketball and football." *See also, e.g.*, *id.* at 1, 14-16. According to plaintiffs, this supposed development provides a basis not only to revisit issues resolved in *O'Bannon*, despite stare decisis (*id.* at 39-40, 43-44) and res judicata (*id.* at 49-52), but also to hold, contrary to *O'Bannon*, that the NCAA can achieve its procompetitive aims while allowing student-athletes to receive *some* pay for play (*e.g.*, *id.* at 58-60, 66-67, 70-71, 91).

None of this is correct. The NCAA's amateurism rules were not materially revised after *O'Bannon*. The rules plaintiffs invoke that allow student-athletes to receive amounts above COA existed in substantially the same form then. The

minor adjustments made to those rules are nowhere near the "quantum leap" the deferred payments in *O'Bannon* represented: compensation purely for being a student-athlete, without any connection to the categories of allowances traditionally considered consistent with amateurism, i.e., any connection to legitimate expenses or special achievement. And the fact that more student-athletes than before receive amounts above COA flows largely from the relief *O'Bannon* itself ordered (raising the athletic-scholarship cap to COA), which this Court deemed consistent with defendants' conception of amateurism. Hence, the fact that consumer demand remains strong post-*O'Bannon* is unsurprising, because there have been no changes that depart from that conception.[1]

    **A.**    ***O'Bannon* Held That The NCAA's Eligibility Rules, Despite Permitting Some Amounts Above COA, Maintain A Shared And Meaningful Conception Of Amateurism**

This Court observed in *O'Bannon* that the NCAA's compensation rules reflect a "shared conception" of amateurism. 802 F.3d at 1076 n.20. The key

---

[1]     After defendants filed their opening brief here (and thus well after the trial record closed), California enacted legislation requiring in-state schools to permit student-athletes to be paid for use of their names, images, and likenesses beginning in 2023. *See* S.B. 206 (Cal. Sept. 30, 2019). In response, the NCAA and its members have begun exploring whether student-athletes could be paid for use of their NILs "in a manner consistent with the values and beliefs of intercollegiate athletics," including maintaining "the distinction between collegiate and professional opportunities." Report of the NCAA Board of Governor's Meeting 3-4 (Oct. 29, 2019), https://bit.ly/393LVKK. The California legislation has not produced any change in the NCAA's rules.

principle of that shared conception is that student-athletes are not "paid for performance." *Id.* Indeed, this Court recognized that "not paying student-athletes is *precisely what makes them amateurs*," *id.* at 1076—just as the Supreme Court had earlier recognized that "to preserve the character and quality of [NCAA athletics,] athletes must not be paid," *Board of Regents*, 468 U.S. at 102. This long-held principle was (and is) embodied in NCAA rules, including the rule barring student-athletes from using their "athletics skill (directly or indirectly) for pay in any form" in their sport. ER1413 (§12.1.2).

NCAA rules at the time of *O'Bannon* did allow student-athletes to receive various amounts, falling into three categories long deemed consistent with amateurism: (1) legitimate academic expenses, i.e., expenses incurred to be an enrolled student at a particular institution; (2) legitimate athletic expenses, i.e., expenses related to participation in intercollegiate sports; and (3) limited non-cash awards in recognition of exceptional academic or athletic achievement. *See* Opening Br. 9-12; ER1422-1439 (*e.g.*, §§15.01.6, 15.02.5, 16.4, 16.5.2; figs. 16-1, 16-2, 16-3). Over time, the NCAA has adjusted the limits and items within these categories, but the categories themselves have remained essentially unchanged for decades. ER638-639.

At the time of *O'Bannon*, student-athletes were allowed to receive certain amounts above COA, which reflects each school's estimate of the typical cost of

attending that school, *see* Opening Br. 10.  Both the district court and this Court in

*O'Bannon* discussed some of the same above-COA allowances that have been

raised here.  This Court noted, for example, that student-athletes could "accept Pell

grants even when those grants raise their total financial aid package above" COA.

802 F.3d at 1059.  Similarly, the district court observed that student-athletes with

"an unexpected 'special financial need'" could "receive additional aid beyond"

COA through the Student Assistance Fund (SAF), which the NCAA distributes to

schools to assist with student-athletes' individualized financial needs, such as

clothing, school supplies, and computers.  *O'Bannon v. NCAA*, 7 F. Supp. 3d 955,

972 n.5 (N.D. Cal. 2014); *see also id.* at 972 n.6, 974.[2]

These references to above-COA allowances were in no way tangential to the

decisions in *O'Bannon*.  To the contrary, the district court there relied heavily on

the allowances in concluding that "the NCAA does not consistently adhere to a

single definition of amateurism."  7 F. Supp. 3d at 1000.  The plaintiffs likewise

cited such allowances in arguing on appeal that the "NCAA's current version of

---

[2]     The *O'Bannon* record also showed that:  student-athletes could borrow
against future earnings to purchase disability insurance, ER301 (§12.1.2.4.4);
schools and conferences could "provide medical and related expenses and services
to a student-athlete," ER1431 (§16.4); and certain student-athletes could receive
financial assistance to obtain insurance for loss due to serious injury, Staurowsky
Report 49, 51, *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*,
No. 09-1967 (N.D. Cal. Nov. 15, 2013), ECF No. 898-20; Trial Tr. 2152,
*O'Bannon v. NCAA*, No. 09-3329 (N.D. Cal. June 20, 2014), ECF No. 245.

'amateurism' is vague and manipulable," Appellees' Br. 9, *NCAA v. O'Bannon*, Nos. 14-16601 & 14-17068 (9th Cir. Jan. 21, 2015); *accord id.* at 51 ("vague and malleable"). And the dissent cited the allowances in stating that "'amateurism' has proven a nebulous concept," 802 F.3d at 1083 (op. of Thomas, C.J.).

Nonetheless, this Court—after reciting the district court's criticisms of the NCAA on this point, *see* 802 F.3d at 1058-1059—rejected the contention that the NCAA's "culture of amateurism" had "eroded," or that the NCAA's traditional conception of amateurism was incoherent or "divorced from" consumer demand. *Id.* at 1073-1074, 1076 & n.20, 1078 n.24. Rather, the Court held, the "core element" of what makes college sports different from and more popular than other products (like minor-league professional sports) is a "shared conception of what makes an amateur an amateur"—i.e., that amateurs are not "'paid for performance.'" *Id.* at 1076 n.20; *accord Board of Regents*, 468 U.S. at 101-102.

Based on this reasoning, *O'Bannon*—mindful of the danger of "open[ing] the floodgates to new lawsuits," 802 F.3d at 1075—drew a line regarding what the NCAA must allow student-athletes to receive. In doing so, the Court took pains to distinguish "legitimate educational expenses" from even limited sums disconnected from legitimate expenses. *Id.* Were antitrust courts to mandate the latter, the Court explained, there would be no "stopping" future "challenge[s]" to "arbitrary" judicial price-setting. *Id.* at 1078-1079. Hence, the Court held, the

NCAA's below-COA cap on athletic scholarships was inconsistent with the Sherman Act because "the NCAA's own standards" allowed coverage of legitimate educational expenses. *Id.* at 1075. But, the Court also held, the district court had clearly erred in requiring the NCAA to permit deferred cash payments above COA (i.e., payments unrelated to legitimate expenses or modest participation awards), because one could not "plausibly conclude that being a poorly-paid professional collegiate athlete is 'virtually as effective' … as being an amateur." *Id.* at 1076.

### B. The NCAA's Eligibility Rules Are Substantially The Same As They Were At The Time Of *O'Bannon*

Defendants' opening brief recited these points in detail (*e.g.*, at 8-15, 31-32, 48-53). Plaintiffs nonetheless stake their case on the claim that defendants effected a sea change after *O'Bannon*. As explained below, *see* pp.27-55, reversal would be required even if material post-*O'Bannon* rule changes had been made. But in fact, plaintiffs' claim is false: All the allowances plaintiffs cite (Br. 15-16) not only existed at the time of *O'Bannon* (or are closely analogous to those that did), but also are consistent with the "shared conception" of amateurism that *O'Bannon* affirmed.

For example, plaintiffs assert (Br. 15) that the SAF (and another fund, the Academic Enhancement Fund) have transformed from "emergency funds" into "unregulated cash benefit funds." The rule governing SAF and AEF payments,

however, has not changed in any relevant respect. *Compare* ER284-285
(§15.01.6.1) *with* ER303 (§15.01.6.1). And the specific uses of SAF and AEF
funds the district court cited (and plaintiffs repeat) are limited to items long
deemed consistent with amateurism: legitimate educational expenses, legitimate
athletic expenses, and modest awards for special achievement. In particular,
plaintiffs highlight (Br. 15) payments for loss-of-value insurance premiums. But
plaintiffs offer no response to defendants' explanation (Opening Br. 52) that such
insurance is a legitimate expense to protect against the risk of loss that could be
incurred during athletic competition. More generally, the "guiding principle" of
the SAF and AEF remains to "assist student-athletes in meeting financial needs
that arise in conjunction with participation in intercollegiate athletics, enrollment in
an academic curriculum or to recognize academic achievement." ER269. None of
this represents a departure from the conception of amateurism *O'Bannon* upheld.

Plaintiffs also say (Br. 15) that after *O'Bannon*, defendants began permitting
"[c]ash payments for 'miscellaneous expenses,'" payments that (plaintiffs say)
"can exceed $6,000 per student, per year." But as plaintiffs admit, those payments
are what *O'Bannon* mandated: "stipends" to cover the educational expenses that
are part of COA but were excluded by the athletic-scholarship cap *O'Bannon*
invalidated, i.e., certain "books and supplies, transportation, and other expenses,"
802 F.3d at 1054 & n.3, 1061; *see also* Plaintiffs' Br. 15 (recognizing that these

- 11 -

payments are "part of the calculation of cost-of-attendance scholarships"); *see also* ER31; ER129 (district court recognizing the same). *O'Bannon* required that increase precisely because it was consistent with the NCAA's model of amateurism—and even though the increase would result in student-athletes more frequently receiving amounts above COA. *See* 802 F.3d at 1074-1076. Furthermore, while plaintiffs note that the cash payments *O'Bannon* required can be used for "miscellaneous expenses," that is exactly what they were intended to cover, because the difference between the old scholarship cap and COA *is* miscellaneous expenses associated with attending school. *See id.* at 1054 n.3 (stating that the gap comprised non-required "books and supplies, transportation, and other expenses"); *see also* 20 U.S.C. §1087*ll*(2) (COA includes "miscellaneous personal expenses"). Whether or not some student-athletes (or other students) actually use the funds to cover the costs of attending school, the fact remains that they are intended, and are calculated under federal guidelines, to cover legitimate educational expenses.

Plaintiffs next invoke (Br. 15-16) the NCAA's current allowance of "'[a]thletic participation' awards." But again, such awards were permitted at the time of *O'Bannon*—for virtually identical achievements, and in virtually identical amounts and forms (including gift cards). *Compare* ER1438-1439 *with* ER296-ER297; *see also* Opening Br. 32 n.3; Trial Tr. 908-909, *O'Bannon v. NCAA*, No.

09-3329 (N.D. Cal. June 13, 2014), ECF No. 222. Plaintiffs also note (Br. 15-16) that a student-athlete could theoretically obtain awards valued above $5,000 (depending on the number of honors received). That too was true at the time of *O'Bannon*. *Compare* ER1438-1439 *with* ER296-297; *see also* Staurowsky Report 51, *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. 09-1967 (N.D. Cal. Nov. 15, 2013), ECF No. 898-20 (asserting student-athletes could receive awards totaling $5,880-$6,280). Moreover, no evidence shows that any student-athlete ever received awards valued anywhere close to that hypothetical amount. *See* Opening Br. 62.

Plaintiffs next recite (Br. 16) supposedly "[n]ew benefits unrelated to education." None of those indicates a material change since *O'Bannon*. The University of Nebraska's PEO program, for instance, was implemented under rules that predated *O'Bannon* and limited the program to educational expenses. *See* Opening Br. 56. And other allowances plaintiffs list—for borrowing against anticipated professional earnings to purchase loss-of-value insurance, unlimited meals and snacks, limited post-graduation medical care, and family travel for certain events—all existed in substantially the same form when *O'Bannon* was decided. The only changes have been to adjust some of the caps slightly or (as in the case of medical expenses) to make some coverage mandatory rather than optional. *Compare* ER1435 (§16.11.1.4) *with* ER294 (§16.11.1.4) (insurance);

ER1425, 1431-1433 (§§15.2.2.1.7, 16.5.2) *with* ER1407 (§15.2.2.1.6) and ER292 (§16.5.2.5) (meals and snacks); ER1431 (§16.4) *with* ER290 (§16.4) (medical care); ER1433 (§16.6) *with* ER305 (§16.6) and ER307 (family travel).  It is untenable to suggest that anything materially changed—let alone that defendants abandoned amateurism—because NCAA rules now allow student-athletes to borrow against future earnings to obtain loss-of-value insurance in addition to disability insurance, or now require schools to provide medical benefits that were previously optional.

Finally, plaintiffs inveigh (Br. 16) against allowing "[u]nlimited cash payments" to Olympians.  At the time of *O'Bannon*, however (and indeed long before), the NCAA permitted the rare student-athlete who participated in the Olympics to receive payments from the U.S. Olympic Committee, recognizing the unique experience and national importance such participation involves.  The only post-*O'Bannon* change was the extension of this allowance to non-U.S. athletes. *Compare* ER1414-1415 (§§12.1.2.1.4.1.2, 12.1.2.1.5.1) *with* ER282 (§§12.1.2.1.4.1.3, 12.1.2.1.5.2).  It is not a material change to create parity between U.S. and foreign student-athletes by extending the pre-*O'Bannon* allowance to awards for foreign students given by their countries' Olympic governing bodies.

In short, the supposed post-*O'Bannon* revolution that permeates plaintiffs' arguments is fictional.  And because the allowances plaintiffs cite conform to the

- 14 -

conception of amateurism that the NCAA has adhered to since long before *O'Bannon*, it is unsurprising that—as plaintiffs pervasively note (*e.g.*, Br. 20-23)— their existence has not adversely affected consumer demand for intercollegiate sports. The absence of such adverse effects does not remotely show either that defendants' conception of amateurism is incoherent or that consumer preferences have changed—let alone that the changes ordered by the district court, which would permit student-athletes to receive vastly greater amounts, would not adversely affect demand. Defendants' opening brief explained all this (at 51-56); plaintiffs' failure to respond confirms that their "the-world-has-changed" argument is meritless.

## II.   *O'BANNON* FORECLOSES PLAINTIFFS' CLAIMS

Plaintiffs offer no way to reconcile the district court's judgment either with *O'Bannon*'s holding that "[t]he Rule of Reason requires that the NCAA permit its schools to provide up to the cost of attendance to their student athletes," but "does not require more," or with its admonition that courts not "micromanage organizational rules" because "courts should not use antitrust law to make marginal adjustments to broadly reasonable market restraints." 802 F.3d at 1075, 1079. Plaintiffs instead argue (1) that *O'Bannon* has stare-decisis effect only as to the fact that the rule of reason applies, and (2) that the conflict between *O'Bannon* and the decision below is permissible because after *O'Bannon*, defendants abandoned

the "shared conception" of amateurism that drove the outcome there, *id*. at 1076 n.20.

Plaintiffs likewise deny that *O'Bannon* has any res-judicata effect here, pressing the same superficial differences between that case and this one that the district court cited—and enthusiastically embracing the prospect of endless antitrust class actions against defendants, even though *O'Bannon* condemned that prospect, *see* 802 F.3d at 1079. In plaintiffs' view, even where a restraint's effects are as comprehensively litigated as in *O'Bannon*, any trivial difference can give rise to a new rule-of-reason analysis, with its "notoriously high litigation costs and unpredictable results," *Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401, 2411 (2015).

All of these arguments fail.

## A. Stare Decisis

As this Court has explained (in a case plaintiffs cite), judicial decisions "furnish[] the rule for the determination of a subsequent case involving identical or similar material facts." *In re Osborne*, 76 F.3d 306, 309 (9th Cir. 1996), *cited in* Plaintiffs' Br. 36; *see also O'Bannon*, 802 F.3d at 1079 n.1 (op. of Thomas, C.J., concurring in relevant part) (recognizing the binding effect of a prior precedent). Decisions thus do "more than decid[e] who wins and … loses in a particular case";

they announce "rule[s] of decision" to "govern … future cases." *Hart v. Massanari*, 266 F.3d 1155, 1176-1177 (9th Cir. 2001).

The key "rule" that *O'Bannon* "furnish[ed]," *Osborne*, 76 F.3d at 309, was that because "cover[ing] legitimate educational expenses" is consistent with amateurism, the NCAA must permit schools to provide student-athletes with athletic scholarships up to COA, but it is "not require[d]" to permit "more." 802 F.3d at 1075, 1079. That rule governs the "determination" of this case because, although plaintiffs craft their request for relief differently, this case involves "similar material facts." *Osborne*, 76 F.3d at 309. And *O'Bannon*'s rule requires reversal because the district court required the NCAA to allow above-COA payments that do not cover legitimate expenses or recognize special achievement. *See* Opening Br. 26-28.

In response, plaintiffs do not deny that the injunction here goes far beyond what *O'Bannon* required the NCAA to permit—indeed, far beyond what the district court erroneously ordered in *O'Bannon*. Instead, they offer various other reasons why *O'Bannon* should not control here. Each is without merit.

### 1. O'Bannon*'s rule-of-reason analysis produced a generally applicable holding that is binding here*

Plaintiffs contend (*e.g.*, Br. 44) that *O'Bannon*'s only relevant holding was that NCAA amateurism rules "must be analyzed under the Rule of Reason," 802 F.3d at 1053. But this Court resolved much more than that threshold issue. In fact,

after disposing of that issue, the Court spent over *8,800 words* addressing others, *see id.* at 1064-1079. Plaintiffs cannot simply excise huge swaths of the decision—including this Court's conclusion that the district court had clearly erred in requiring the NCAA to permit student-athletes to receive payments above COA that were in no way tied to student-athletes' expenses.

To be sure, that conclusion drew on the record there. But *Osborne* and *Hart* refute plaintiffs' suggestion that that means *O'Bannon* has no precedential force here. So does *O'Bannon* itself: The Court explained that absent the clear line it adopted, "plaintiffs [would] continue to challenge" the limits, leaving the NCAA "no basis for returning to a rule of amateurism" and no "'latitude' to superintend college athletics." 802 F.3d at 1078-1079. That reasoning would make no sense if (as plaintiffs insist) the Court did not intend the line to govern future cases.[3]

Plaintiffs also suggest (Br. 36-39) that the usual operation of stare decisis recedes here because this is an antitrust case. But defendants explained why that is wrong (Opening Br. 29-30), and the cases plaintiffs cite in response do not help

---

[3]     Any suggestion that stare decisis is inapplicable because defendants have already crossed the line *O'Bannon* drew is meritless. *O'Bannon* required the NCAA to allow athletic scholarships up to COA because COA (as the Court explained) is tethered to expenses that are categorically consistent with defendants' traditional conception of amateurism. The Court never suggested that any allowance above COA would necessarily vitiate defendants' conception of amateurism—indeed, the Court approved of that conception while aware that there were already such allowances.

them. To the contrary, both *Maple Flooring Manufacturers' Ass'n v. United States*, 268 U.S. 563 (1925), and *National Basketball Ass'n v. SDC Basketball Club, Inc.*, 815 F.2d 562 (9th Cir. 1987), recognize that prior decisions—including antitrust decisions—furnish rules that govern future cases except when a future case involves "essential differences in the facts," *Maple Flooring*, 268 U.S. at 579, or is otherwise "vastly different," *SDC Basketball*, 815 F.2d at 568.

Other cases plaintiffs cite (Br. 37 n.4) are inapposite because those cases involved plaintiffs who claimed that new acts taken after the prior decision were themselves unlawful. Here, although plaintiffs claim that the NCAA's compensation rules changed significantly after *O'Bannon*—a claim that fails in any event because both cases involved the same set of rules—they decline (Br. 43) to challenge those supposed modifications. Plaintiffs instead contend that the changes have undermined the factual assumption on which *O'Bannon* rests. That is wrong for reasons discussed above, *see* pp.5-15, and below, *see* pp.20-22.

## 2. O'Bannon*'s holding is not limited to NIL payments*

Plaintiffs next argue (Br. 41) that even if *O'Bannon*'s rule-of-reason holding applies in future cases, that holding, and the underlying analysis, are limited to the context of payments for using student-athletes' names, images, and likenesses (NILs). *Accord* ER74-75. Defendants' opening brief addressed that argument (at 30-31), explaining that *O'Bannon*'s rule of decision did not depend on payments

being for NIL use.  Rather, *O'Bannon* recognized that the plaintiffs were

challenging an *application* of the NCAA's general compensation limits.  *See, e.g.*,

802 F.3d at 1055 ("[A]n athlete is prohibited—with few exceptions—from

receiving *any* 'pay' based on his athletic ability, whether from boosters, companies

seeking endorsements, or would-be licensors of the athlete's name, image, and

likeness.").  Because the "detailed set of facts" from which the "legal

consequence[s]" in *O'Bannon* "follow[ed]," *Osborne*, 76 F.3d at 309, was not

limited to the tying of benefits to NIL use, *O'Bannon*'s rule of decision extends

beyond claims for NIL payments.  Plaintiffs ignore defendants' arguments.

       **3.**    *The facts here are not materially different from* O'Bannon

Finally, plaintiffs argue (Br. 43) that *O'Bannon* is not controlling because

subsequent "changes" to the NCAA's compensation rules "alter the factual

assumption that drove the result in *O'Bannon*" and "show that non-education-

related cash payments in excess of [COA] are no longer a 'quantum leap' from

current NCAA practice."  As explained, however, the changes to which plaintiffs

point are immaterial.  *See supra* pp.5-15.  Likewise, although plaintiffs point to

increases in the number of student-athletes receiving amounts above COA, that is

largely the result of raising the cap on athletic scholarships—a change *O'Bannon*

required precisely because doing so was consistent with amateurism.  *See, e.g.*,

ER1226-1227; *O'Bannon*, 802 F.3d at 1075. None of this indicates that defendants abandoned amateurism after *O'Bannon*.

Given all this, plaintiffs' reliance on *SDC Basketball* (Br. 38-39) is misplaced. There, this Court distinguished an earlier decision because the two cases involved "vastly different" antitrust issues, arising out of different rules maintained by different defendants in "substantially different" markets, 815 F.2d at 568. Here, by contrast, plaintiffs ask this Court to disregard what *O'Bannon* said about the materially identical body of rules maintained by the same organization in the same market.

Plaintiffs next note (Br. 39-40) that recent rule changes increased some conferences' authority to cover certain items, such as food and medical care. According to plaintiffs (*id.* at 40), "this new autonomy—along with the increased benefits in these conferences—has [not] decreased demand." To begin with, however, *O'Bannon* itself noted these expanded allowances. *See* 802 F.3d at 1054-1055 (citing Tracy, *Top Conferences to Allow Aid for Athletes' Full Bills*, N.Y. Times (Jan. 17, 2015)). Those allowances, moreover, are the same ones discussed earlier, so as explained, it is unsurprising that they have not affected consumer demand. More generally, the autonomy conferences are still subject to "overarching NCAA limits that prevent [them] from expanding compensation beyond a point determined by the NCAA through its traditional rulemaking

- 21 -

process." ER23; *accord* ER1376 (autonomy conferences "can't do anything …
that would violate the principles of amateurism"). The autonomy changes
therefore do not reflect a post-*O'Bannon* shift in the structure of intercollegiate
sports or in the relationship between NCAA compensation limits and demand, let
alone a shift sufficient to justify ignoring the Court's rule-of-reason holding there.

If there is anything meaningfully different between this case and *O'Bannon*,
it is the supposedly less-restrictive rules plaintiffs say should be imposed. But as
defendants explained (Opening Br. 32), LRAs are simply arguments made as part
of a challenge to existing restraints, and "[t]his panel is not free to disregard the
decision of another panel … because we think the arguments have been
characterized differently or more persuasively" than before. *United States v.
Ramos-Medina*, 706 F.3d 932, 939 (9th Cir. 2013). Plaintiffs respond that they are
both "propos[ing] different alternatives," *and* "challeng[ing] different rules." Br.
41 (emphasis omitted). That is unavailing because plaintiffs do not challenge rules
that are different in any meaningful sense. *See supra* pp.5-15, 19-22. *O'Bannon*'s
on-point holding is therefore binding.

### B. Res Judicata

Defendants' opening brief explained (at 33-38) that res judicata separately
bars plaintiffs' claims because plaintiffs were adequately represented by the

injunctive class certified in *O'Bannon* and their claims could have been brought in that case. Plaintiffs have no good response

### 1. *Plaintiffs' privity arguments lack merit*

Plaintiffs first contend (Br. 46-49) that they are not in privity with the *O'Bannon* plaintiffs. That argument fails.

Although *Taylor v. Sturgell*, 553 U.S. 880 (2008), rejected "a theory of 'virtual representation,'" *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011), that does not mean—as plaintiffs argue (Br. 48)—that res judicata applies only if later plaintiff classes fall completely within an earlier plaintiff class. As defendants explained (Opening Br. 34-35), *Taylor* did not involve a class action. And *Smith* held that "[n]either a *proposed* class action nor a *rejected* class action may bind nonparties." 564 U.S. at 315 (emphases added). Neither case addressed whether a *certified* class—a mandatory class seeking a prospective injunction, no less—can adequately represent and thus bind a later class whose members have the same interests with respect to the same allegedly unlawful policy maintained by the same defendant. In those circumstances, there is no sound basis to expose the defendant to perpetual re-litigation. Plaintiffs cite no contrary authority.

Despite the substantial overlap in class membership, plaintiffs suggest a divergence of interests between the plaintiffs in the two cases. For example, they say (Br. 46-47) that the two cases' classes "differ in time"; that the *O'Bannon* class

did not include women; and that the *O'Bannon* class was limited to student-athletes whose NILs could be used, whereas the classes here are composed of student-athletes who were offered a full athletic scholarship.  None of that responds to the fundamental point that defendants' opening brief highlighted (at 33, 36-37):  Those differences are irrelevant to res judicata because they do not affect which compensation rules apply (or how), or any other issue material to whether the rules are valid under antitrust law.  Plaintiffs, moreover, do not deny defendants' argument (Opening Br. 34) that if any of these differences *were* material, the district court would have had to create subclasses to reflect them.

Plaintiffs nonetheless insist (Br. 47) that the lack of perfect overlap between the two cases' classes is "no small matter" because the non-overlapping plaintiffs here would not have "receive[d] notice plus an opportunity to be heard" in *O'Bannon*.  But notice is not required for injunctive class actions (and was not provided to class members here or in *O'Bannon*).  *See* Opening Br. 35.  Plaintiffs' rejoinder—that notice is "equally, if not more, important in the context of injunctive-relief classes, for which no notice is provided" (Br. 47)—cannot be squared with Federal Rule of Civil Procedure 23.

> ### 2.    *Plaintiffs' attempt to distinguish the claims here from those in* O'Bannon *fails*

Plaintiffs' efforts to deny the identity of claims between the two cases is equally flawed.  In response to defendants' showing (Opening Br. 35-37) that this

case and *O'Bannon* arise out of the same transactional nucleus of facts—defendants' longstanding principle of amateurism and the compensation limits that implement it—plaintiffs again argue (Br. 51) both that *O'Bannon* involved only NILs and that the "marketplace" subsequently changed. Those assertions are wrong for the reasons already given. *See supra* pp. 5-15, 19-22. Plaintiffs also contend (Br. 51) that "the available proof" regarding the NCAA's rules changed here. But as noted, they disclaim (Br. 43) any challenge to any rule revisions. Res judicata thus applies because "no new conspiracy was alleged" here, "just continuation of commercial activity pursuant to the old arrangements held not to be" unlawful. *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11 F.3d 1460, 1464 (9th Cir. 1993).

By contrast, the authorities plaintiffs cite (Br. 52) involved claims premised on new unlawful acts that "could not possibly have been sued upon in the previous case," *Lawlor v. National Screen Service Corp*., 349 U.S. 322, 328 (1955) ("former action" could not "extinguish[] claims" for "new antitrust violations" that "did not even then exist"); *cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2306 (2016) (pre-enforcement facial challenge to a law did not preclude a later as-applied challenge based on "postenforcement consequences" of the law that "were unknowable before it went into effect"). Res judicata was rejected in those cases because it "does not apply to claims that were not in existence and could not have

been sued upon … when the allegedly preclusive action was initiated." *Media Rights Technologies, Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021 (9th Cir. 2019). Here, plaintiffs' claims assuredly "could have been asserted" in *O'Bannon*, *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir. 1982). Plaintiffs do not deny this. Nor do they deny the fact that simply seeking different injunctive relief in a later suit is insufficient to avoid res judicata, *see* Opening Br. 37.

Plaintiffs next invoke (Br. 50) three other "factors" regarding "whether there is an identity of claims," namely, "(1) whether rights or interests established in the prior judgment would unquestionably be destroyed or impaired by … the second action; (2) whether substantially the same evidence is presented in the two actions; and (3) whether the two suits involve infringement of the same right." But as defendants' opening brief explained (at 35-36), those factors are typically irrelevant because under this Court's precedent, the common-nucleus factor is usually "outcome determinative," *Media Rights*, 922 F.3d at 1029.

In any event, these factors favor preclusion. First, the NCAA interest that *O'Bannon* recognized—not to be forced by antitrust courts to allow schools to provide more than legitimate educational expenses or to have their judgments about how to preserve the distinction between college and professional sports judicially micromanaged—would be destroyed by the decision below. Second, the plaintiffs in both cases relied on substantially the same evidence (often prepared by

the same experts). Third, both cases involved allegations of the same violation of the Sherman Act, based on the same underlying supposed conspiracy.

Lastly, plaintiffs suggest (Br. 50) that preclusion here would confer "immunity in perpetuity" on defendants. That is wrong. Preclusion would prevent perpetual re-litigation of essentially the same claims by essentially the same plaintiffs, while leaving open the possibility of new antitrust lawsuits if in the future, defendants restrained trade in ways different from those adjudicated in *O'Bannon*.

\* \* \*

The NCAA spent years defending itself in *O'Bannon* against largely the same antitrust claims and arguments presented here by largely the same plaintiffs. Yet even before that case was tried, the NCAA (joined this time by the conferences) had to start over and proceed through years more litigation, culminating in a second multi-week trial, a second injunction (allowing payments that *O'Bannon* held did not have to be allowed), and now a second appeal. Stare-decisis and res-judicata principles bar such a wholesale reprisal.

## III. PLAINTIFFS' DEFENSES OF THE DISTRICT COURT'S RULE-OF-REASON ANALYSIS LACK MERIT

Even if plaintiffs' "the-world-has-changed" contention had merit, and if *O'Bannon* did not foreclose this case at the threshold, *O'Bannon* makes clear that the district court's rule-of-reason analysis was fatally flawed.

Defendants carried their burden at step 2 of the rule of reason to show that "the NCAA's compensation rules serve [a] procompetitive purpose[]," *O'Bannon*, 802 F.3d at 1073. Differentiating college sports from professional sports is procompetitive; maintaining the traditional amateur status of college sports contributes to that differentiation; and the challenged NCAA rules preserve that traditional conception of amateurism. These points are grounded in *O'Bannon*, other precedent, and the record—and the district court did not find otherwise.

Because defendants carried their step-2 burden—a determination plaintiffs acknowledge and have not appealed (*see* Br. 56)—the only question under the rule of reason should have been whether, at step 3, plaintiffs carried their heavy burden to show that there is a substantially less-restrictive set of compensation restrictions that is virtually as effective at distinguishing between college and professional sports, without substantially increased costs. *See O'Bannon*, 802 F.3d at 1074. They did not, and that should have been the end of the case.

Instead, the district court, while still at step 2, subjected the challenged rules to a step-3 inquiry, asking whether specific rules are "necessary" to achieve defendants' procompetitive ends. The court thereby improperly shifted the burden from plaintiffs to defendants. Next, the court rejected the traditional conception of amateurism because it believed that by allowing student-athletes to receive certain amounts above COA, defendants revealed their longstanding conception of

- 28 -

amateurism to be meaningless—even though (as discussed) *O'Bannon* both approved that conception, despite the existence of the same or similar above-COA allowances, and mandated the scholarship-cap increase that has driven most of the increase in amounts received above COA. Finally, the court took the critical (and critically flawed) step of replacing that traditional conception with one that has *no* factual basis, namely, one in which the difference between amateurs and professionals is that only professionals are paid "unlimited amounts." Even plaintiffs do not defend that assertion.

Even if the court's reconceptualization of college sports at step 2 were appropriate, its step-3 analysis was not. Plaintiffs adduced no evidence that supports the court's LRA. That is unsurprising, given that neither the court nor plaintiffs mentioned the LRA until the court presented that alternative in its post-trial opinion (to match the new line of demarcation between college and professional sports that the court also introduced in that opinion). On appeal, moreover, plaintiffs do not defend the court's LRA as a viable way to achieve the court's *own line*, let alone to maintain the actual distinction between college and professional sports—the one both *O'Bannon* and *Board of Regents* recognized. Plaintiffs' arguments at step 3 (like their cross-appeal) are an attempt to invalidate *all* NCAA compensation limits, an approach even the district court rejected.

- 29 -

### A. Plaintiffs Are Wrong That Providing "Ample Latitude," As *Board Of Regents* And *O'Bannon* Both Require, Means Only That NCAA Eligibility Rules Are Analyzed Under The Rule Of Reason

Defendants' opening brief explained (at 39) that binding precedent requires courts to avoid using the rule of reason to "micromanage" organizations' rules, *O'Bannon*, 802 F.3d at 1075. Defendants' opening brief further explained (at 39-40) that this is especially true in the context of sports leagues and other joint ventures. In response, plaintiffs argue (Br. 54) that granting defendants special deference would give them "the very kind of 'blanket antitrust immunity' that *O'Bannon* rejects." That is incorrect. As defendants acknowledged (Opening Br. 38-39), antitrust courts can invalidate an NCAA bylaw under the rule of reason if it "has no procompetitive benefits or the plaintiff makes a compelling showing that its procompetitive benefits could be achieved in a substantially less restrictive way"—that is, if the plaintiff shows the restraint to be "*patently and inexplicably* stricter than is necessary to accomplish … its procompetitive objectives," *O'Bannon*, 802 F.3d at 1075. But *Board of Regents* and *O'Bannon* make clear that courts may not second-guess sports leagues' judgments regarding how to structure their activity, as long as those judgments are reasonably designed to promote a procompetitive end.

Equally baseless is plaintiffs' claim (Br. 54) that although the Supreme Court and this Court have admonished that the NCAA must have "ample latitude"

to superintend college sports, *see* Opening Br. 5 (citing cases), those courts meant only that NCAA eligibility rules must be analyzed under the rule of reason rather than being invalidated as illegal per se. *O'Bannon* refutes that claim: The Court explained there that because "the Supreme Court has admonished that we must generally afford the NCAA 'ample latitude,'" courts analyzing NCAA rules must require a "strong evidentiary showing" by plaintiffs at step 3. 802 F.3d at 1074 (quoting *Board of Regents*, 468 U.S. at 120). Judicial deference thus guides (rather than merely warrants) application of the rule of reason to NCAA compensation rules. As explained below and in defendants' opening brief (*e.g.*, at 39-40, 53-54, 56-57), the district court did not follow binding precedent on this point, instead affording defendants no latitude in its rule-of-reason analysis.

### B. Plaintiffs' Arguments Do Not Excuse The District Court's Step-2 Errors

#### 1. *Plaintiffs' own arguments make clear that the district court erroneously shifted their step-3 burden onto defendants*

At step 2 of the rule of reason, the district court improperly considered alternatives to the challenged rules, thereby shifting plaintiffs' heavy step-3 burden onto defendants. *See* Opening Br. 42-43. Plaintiffs deny this, claiming (Br. 55) that the court did at step 2 "exactly what *O'Bannon* instructs," by "look[ing] at the impact of the challenged compensation limits 'when compared with having no limits on compensation'" (quoting ER90). That is not correct.

At step 2, "the correct inquiry" is: "What procompetitive benefits are served by the NCAA's existing rule[s]?" *O'Bannon*, 802 F.3d at 1073 n.17. The district court correctly found that "maintaining a distinction between college sports and professional sports" is "importan[t] to consumer demand," ER49, and therefore procompetitive; *accord id.* at 1072; *Board of Regents*, 468 U.S. at 88, 102. And the court found that compensation restrictions play a role in distinguishing college and professional sports. It is therefore indisputable that defendants carried their burden to show that the NCAA's existing compensation restrictions serve a procompetitive end. Upon reaching that conclusion, the district court should have turned to step 3, and required plaintiffs to make a strong showing that the existing compensation restrictions are considerably stricter than necessary.

Instead, the court improperly conducted at step 2 what is unquestionably a step-3 inquiry: whether college sports could be differentiated from professional sports in some *other* (less-restrictive) way. The court's answer was yes: College and professional sports could remain distinct (and popular), the court thought, if the NCAA's rules "prevent unlimited cash payments unrelated to education." ER90. But that conclusion (which improperly redefines defendants' product) does not mean the challenged rules fail to provide a procompetitive benefit, which is the step-2 question. Even if "anything-short-of-unlimited-pay" were truly the distinguishing feature of college sports, the challenged rules would still serve to

- 32 -

maintain that distinction, because they do prevent the receipt of unlimited pay. The district court did not say otherwise.

The court did, however, declare that some of the current rules are not "*necessary* to achieve th[e] procompetitive effect" of "preserving consumer demand for college sports as distinct from professional sports" because they could be loosened without permitting unlimited pay. ER90 (emphasis added); *see also* ER91 (deeming some rules "not necessary to prevent unlimited cash compensation unrelated to education"). But again, that is a step-3 question. *O'Bannon* makes this clear: At step 2, this Court concluded only that the challenged rules were procompetitive because they "promot[e] [the NCAA's] current understanding of amateurism." 802 F.3d at 1073. The Court did not consider whether the rules were "necessary" to achieve that procompetitive benefit until it moved to step 3. *Id.* at 1074. Indeed, at step 2 the Court referred to necessity solely to explain that it had to move to step 3, stating that "not every rule adopted by the NCAA that restricts the market is necessary to preserving the 'character' of college sports. We thus turn to the final inquiry." *Id.*

Plaintiffs nonetheless argue (Br. 56-57) that the district court's discussion of "unlimited" payments at step 2 was proper, because that discussion merely "defined the limited scope of the procompetitive justification," namely,

"preventing 'unlimited payments unrelated to education.'"  But that is *precisely*

what *O'Bannon* forbids:

> The dissent suggests that during the second step the district court
> defined the procompetitive benefits as "limits on large amounts of
> student-athlete compensation preserve the popularity of the NCAA's
> product."  But this cannot be right.  During the second step, the
> district court could only consider the benefits of the NCAA's existing
> rule prohibiting NIL payments—it could not consider the potential
> benefits of an alternative rule (such as capping large payments).

802 F.3d at 1073 n.17 (citation omitted).  Whether the procompetitive justification

of differentiating college from professional sports has a "limited scope" because it

could be achieved by rules that cap payments to student-athletes at some large but

less-than-unlimited amount is a question about LRAs, on which plaintiffs should

have borne the burden at step 3.[4]

Finally, plaintiffs argue (Br. 56) that "the challenged rules cannot be

analyzed in isolation," but must be considered "in the context of the entire body of

NCAA rules."  That is true, but it does not justify the district court's burden-

shifting—and plaintiffs do not explain their contrary view.  Instead, they switch to

different arguments, including that "NCAA rules … often allow[] payments that

---

[4]    Plaintiffs also assert (Br. 55-56) that the district court's discussion about
"unlimited" payments in professional sports "was a response to arguments made
by" defendants at trial.  Plaintiffs cite nothing to support their assertion—because it
is wrong.  Defendants never urged the court to define the line between college and
professional sports in terms of "unlimited" compensation, or to evaluate at step 2
whether the challenged rules were necessary to achieve any procompetitive benefit.

- 34 -

would appear to be 'pay-for-play.'" As explained herein and in defendants'

opening brief, those other arguments lack merit. *See supra* pp.5-15, 19-22; *infra*

pp.35-38. But again, plaintiffs' "context" argument does not excuse the district

court's legal error in shifting plaintiffs' step-3 burden to defendants at step 2.

> 2. *Plaintiffs fail to justify the district court's rejection of the NCAA's conception of amateurism*

Despite finding that the challenged NCAA rules are procompetitive, the

district court concluded that defendants' conception of amateurism is incoherent

and disconnected from consumer demand. *E.g.*, ER25. Defendants' opening brief

explained (at 44-56) how that conclusion contravenes precedent (and the record).

Plaintiffs' responses are meritless.

Plaintiffs first accuse defendants (Br. 57) of "false[ly] claim[ing] that there

is a 'judicial consensus'" recognizing that the NCAA's no-pay conception of

amateurism is procompetitive because it differentiates college from professional

sports and promotes consumer demand. But plaintiffs never dispute that the courts

defendants cited to show that consensus (Opening Br. 44), including the Supreme

Court and this Court, said precisely what defendants claimed. A host of other

courts, moreover, has reached the same conclusion. *See Smith v. NCAA*, 139 F.3d

180, 186-187 (3d Cir. 1998) ("[W]e agree … that, in general, the NCAA's

eligibility rules allow for the survival of the product, amateur sports, and allow for

an even playing field.") (subsequent history omitted); *McCormack v. NCAA*, 845

F.2d 1338, 1343-1345 (5th Cir. 1988) ("The NCAA markets college football as a product distinct from professional football. The eligibility rules create the product and allow its survival in the face of commercializing pressures."); *Agnew v. NCAA*, 683 F.3d 328, 341 (7th Cir. 2012) ("[T]he Sherman Act does apply to NCAA regulations, but most regulations will be a 'justifiable means of fostering competition among amateur athletic teams,' and are therefore procompetitive."); *Law v. NCAA*, 134 F.3d 1010, 1017-1018, 1021, 1022 n.14 (10th Cir. 1998) ("[C]ourts should afford the NCAA plenty of room under the antitrust laws to preserve the amateur character of intercollegiate athletics[.]"). Defendants are not aware of *any* prior decision rejecting the NCAA's pursuit of amateurism as procompetitive. Even the district court in *O'Bannon* agreed that the NCAA's preservation of amateurism contributed to consumer demand. *See* 7 F. Supp. 3d at 999-1001.

Plaintiffs also contend (Br. 60) that judicial consensus is irrelevant because "amateurism" is not "a legal issue." Rather, they say, "*O'Bannon* made findings [regarding amateurism] only based on the different issues and factual record presented" there. That is doubly flawed. First, *O'Bannon* made clear that the meaning (and procompetitive benefits) of amateurism is *not* delimited by the evidence in a particular case: Responding to the dissent's argument that the record there showed amateurism to be "a nebulous concept prone to ever-changing

definition," 802 F.3d at 1083 & n.5 (op. of Thomas, C.J.), the Court explained that "we" must "have some shared conception of what makes an amateur an amateur—or, more precisely, the difference between amateurs and professionals." *Id.* at 1076 n.20. And the difference, the Court continued, is that "if you're paid for performance, you're not an amateur." *Id.* That remains defendants' conception of amateurism, and the district court (as in *O'Bannon*) had no sound basis to question that conception or defendants' commitment to it. *See id.* at 1073 ("[T]he district court probably underestimated the NCAA's commitment to amateurism.").

Second, the issues and factual record there were not materially different. *See supra* pp.5-15. In fact, the factual record here confirms amateurism's coherence and connection to consumer demand. Plaintiffs assert (Br. 60) that amateurism—despite having had a clear meaning between at least 1984 (when *Board of Regents* was decided) and 2015 (when this Court decided *O'Bannon*)—"has no clear meaning today" because NCAA rules supposedly follow no consistent definition. But in saying this, plaintiffs ignore the detailed discussion in defendants' opening brief (*e.g.*, at 8-12) of how the definition of amateurism in the NCAA's constitution, and defendants' overarching amateurism framework more generally, are the same as they have been for decades. Even the evidence plaintiffs cite (Br. 60-61) shows that recent rule changes did *not* alter defendants' basic amateurism principles, instead reflecting adjustments *within* the traditional

amateurism framework. ER638-639, 684-685; ER1376; ER1379-1381; ER1397-1398; *see also supra* pp.5-15. Plaintiffs also ignore defendants' citation (Opening Br. 52-53) of *O'Bannon*'s explanation that the step-2 question is not whether "the NCAA's concept of amateurism had been perfectly coherent and consistent," 802 F.3d at 1073, but rather whether the NCAA's model of amateurism maintains the distinction between college and professional sports. As the judicial consensus confirms, it does.[5]

---

[5]     As defendants' opening brief explained (at 45-48), the record supports that judicial consensus. Plaintiffs assert in response (Br. 58) that the district court deemed several witnesses' testimony about the importance to consumers of amateurism to be "of limited value, given its basis in lay opinion and hearsay." The court actually discounted that testimony for a different—and incorrect—reason, namely, that there is supposedly "no way to know what [amateurism] means to the consumers these witnesses reported on," ER46. That cannot be squared with *O'Bannon*'s recognition that there is a "shared conception" of amateurism: that student-athletes are not paid to play. Plaintiffs also echo the court in contending (Br. 59-60) that the results of the survey conducted by their expert, Hal Poret, support the court's ruling. But Poret's survey was "addressed to the wrong question," *O'Bannon*, 802 F.3d at 1077. Nearly all the "scenarios" he tested are already permitted or could have been construed by respondents in a manner consistent with amateurism. *Compare* ER834-836 *with* ER1401, 1403, 1406, 1408-1410 (§§3.2.4.8, 3.2.4.18, 15.01.5.2, 16.4, 16.5.2.2, 16.5.2.5, 16.5.2.6), https://studentaid.ed.gov/sa/types/international, and https://studentaid.ed.gov/sa/types/work-study. His findings thus do not support the court's conclusion that allowing payments disconnected from legitimate expenses or genuine achievement would not diminish consumer demand.

C. **The District Court's LRA, Which Rests On A Redefinition Of The Difference Between College And Professional Sports That Even Plaintiffs Do Not Defend, Would Professionalize College Sports**

1. *Plaintiffs ignore defendants' arguments about key errors underlying the district court's LRA*

Defendants' opening brief identified a trio of central errors in the district court's step-3 analysis that relieved plaintiffs of their burden to "make a strong evidentiary showing that its alternatives are viable here" and deprived defendants of the "'ample latitude' to superintend college athletics" they "must" be afforded. *O'Bannon*, 802 F.3d at 1074. Plaintiffs ignore all three errors. Those errors (individually and certainly collectively) make clear that the judgment cannot stand.

*First*, the district court gravely erred in proclaiming that professional sports differ from college sports not because only professional athletes are paid to play— as both *Board of Regents* and *O'Bannon* said—but because only professionals can receive *unlimited* pay, while college athletes can receive only *some* pay. Opening Br. 57-61. Defendants explained that this imagined line of demarcation was both the "foundational premise" of the court's LRA and "essential to the court's ultimate holding." *Id.* at 57, 59. Yet plaintiffs offer *no defense* of the court's redefinition: no citations to record evidence supporting it (there is none), no responses to defendants' exposition (*id.* at 58-59) of why it is indisputably false (and supported by unsound reasoning), not even an endorsement of the district

- 39 -

court's view that access to unlimited pay characterizes professional sports. Plaintiffs' silence on this critical point speaks volumes.

*Second*, defendants explained (Opening Br. 59-60) that the district court did not and could not find that its LRA would be virtually as effective as the challenged rules in maintaining the traditional line of demarcation between college and professional sports, i.e., that only professionals are paid to play their sport, *see Board of Regents*, 468 U.S. at 102; *O'Bannon*, 802 F.3d at 1076 & n.20. Here too, plaintiffs offer no response.

*Third*, even as to the district court's manufactured distinction, the court's LRA would not be virtually as effective as the challenged rules, because in fact it *would* allow student-athletes to receive unlimited cash and in-kind payments purely to play. Opening Br. 60-61. For example, schools could promise each recruit or current student-athlete a "paid post-eligibility internship"—at *any* salary—or luxury cars on the pretext that they will be used to get to class. ER2-3; *see* Opening Br. 60. Yet again, plaintiffs have nothing to say in response.

Plaintiffs do offer various step-3 arguments, which lack merit for the reasons discussed in the following subsections. But even if those arguments were valid,

they would still leave the foregoing errors undisturbed. Those fundamental errors establish that the court's LRA is not viable, necessitating reversal.[6]

> 2.      *Plaintiffs do not show that the challenged rules are patently and inexplicably stricter than necessary*

Plaintiffs contend (Br. 63-67) that the district court correctly found the challenged rules to be "*patently and inexplicably* stricter than is necessary" to accomplish their procompetitive objectives, the standard for invalidating an NCAA compensation restriction at step 3. *O'Bannon*, 802 F.3d at 1075. That is incorrect.

a.      *O'Bannon* held that capping athletic scholarships below COA was patently and inexplicably stricter than necessary because there was no argument that the below-COA cap served amateurism: NCAA witnesses had testified at trial that raising the athletic-scholarship cap to COA was consistent with the NCAA's conception of amateurism, 802 F.3d at 1075, and the NCAA itself had already raised that cap to COA, *id.* at 1054-1055. Furthermore, "[n]othing in the record … suggested that," if that cap was raised to COA, "consumers of college sports would become less interested in those sports." *Id.* at 1075. Put simply, the below-COA cap had merely excluded part of a well-defined set of legitimate educational

---

[6]      As defendants explained (Opening Br. 57 n.4), the improper burden-shifting the court undertook at step 2 continued at step 3. Plaintiffs label that explanation "simply wrong" (Br. 62) because the court *recited* the proper standard. They do not, however, address (let alone explain) the court's language that defendants' opening brief cited. It is obviously possible for a court to state a correct standard but then reveal in the course of its analysis that it is not adhering to that standard.

expenses the NCAA otherwise allows schools to cover and was therefore not reasonably necessary to preserve amateurism. *Id.* Here, by contrast, the challenged rules are reasonably necessary to preserve defendants' conception of amateurism. *See supra* pp.35-38. Thus, even if the record indicated that amateurism could be preserved while tinkering at the margins of the challenged limits, that would in no way show that the limits are either patently or inexplicably stricter than necessary, let alone both.[7]

b.    It is important to note that plaintiffs introduced *no* evidence that the LRA the district court imposed would be equally (or even remotely) as effective as the NCAA's amateurism rules. In arguing the contrary (Br. 65), plaintiffs rely entirely on Poret's consumer survey. But that survey (even overlooking its flaws, *see supra* n.5), does not support the district court's LRA because the scenarios the survey attempted to test do not correspond to what the court's LRA requires. As defendants' opening brief noted (at 63), the survey tested only a handful of

---

[7]    Plaintiffs assert (Br. 66) that the rules must be more restrictive than necessary because "the [district] court found that each time Defendants provided new non-educational benefits—or increased existing ones—consumer demand has not suffered." But again, the adjustments the court and plaintiffs rely on are (unlike those the court ordered) consistent with the traditional conception of amateurism, so there is no reason they would affect demand. And whether the NCAA's current restrictions are strictly necessary or could be relaxed slightly still is irrelevant; the question is whether the lines the NCAA has drawn are reasonably necessary to preserve amateurism.

payments and other benefits—each in isolation—whereas the court's LRA

mandates a sweeping set of new cash payments and unlimited in-kind benefits,

*combined*.  Plaintiffs offer no answer.[8]

Even if Poret's survey had shown that certain challenged rules are not

strictly "necessary," that would not show that they are *patently and inexplicably*

more restrictive than necessary.  While "marginal adjustments" could perhaps be

made to the challenged rules without undermining the distinction between college

and professional sports, "courts should not use antitrust law" to effect minor

revisions to otherwise valid restraints, *O'Bannon*, 802 F.3d at 1075.

c.    Plaintiffs argue (Br. 63-64) that defendants did not rely on "*any*

analysis of consumer demand" in adopting the challenged rules.  To begin with,

---

[8]    The survey also did not test, even in isolation, the effect of two key components of the LRA:  "tangible items" "related to education" and paid post-eligibility internships.  *See* ER250-252.  It did test a *one-time* graduation "incentive" of up to $10,000, but it confusingly indicated that this incentive "would be available for athletes who earn their degree after their eligibility expires," ER835—rendering it unclear whether survey respondents believed the scenario involved limited incentives to student-athletes who fail to graduate before their eligibility expires or incentives available to all student-athletes who obtain a degree.  Testing a one-time graduation incentive of up to $10,000 is also insufficient support for the district court's conclusion that *yearly* "academic" and "graduation" incentives of $5,600—or potentially $15,000 or more as plaintiffs would have it, ER1444-1445—will not diminish demand.  That is especially true given that survey respondents said they would watch college sports less often if student-athletes could receive yearly "academic incentive payments" of up to $10,000.  ER846.

defendants and their member schools are not profit-maximizing businesses seeking to create the most popular sports product possible. (If they were, they would eliminate most sports, since almost none generate enough revenue to cover their expenses. Opening Br. 7.) Defendants and their members are higher-education institutions committed to maintaining a sports league that contributes to and enhances the overall educational experience of university communities generally and of student-athletes in particular.

That aside, conference officials *have* commissioned studies investigating the connection between amateurism and consumer demand. *See, e.g.*, ER201-207; ER1386-1393. But defendants need not conduct a consumer demand analysis each time they adjust the limits on what student-athletes may receive. *O'Bannon* is clear on this point. The dissent suggested that each compensation rule must indeed be tested by reference to its effect on consumer demand, because "the distinction between amateur and professional sports is not for the court to delineate. It is a line for consumers to draw." 802 F.3d at 1082 n.4 (op. of Thomas, C.J.). The Court disagreed, explaining that there must be a "shared conception of what makes an amateur an amateur." *Id.* at 1076 n.20. In particular, it noted, an amateur is one who is not paid to play. *Id.* The Court then evaluated the challenged rules against this shared conception—without reference to any analyses about whether consumer demand would decrease if student-athletes received athletic scholarships up to

- 44 -

COA or deferred payments for use of their NILs. And it affirmed the NCAA's prerogative to maintain its compensation limits (other than the below-COA scholarship cap) even though the NCAA had not adduced evidence showing it had relied on market studies to define those limits initially. *See id.* at 1076-1079.

d.    Plaintiffs relatedly contend (Br. 63-64) that the challenged rules are improperly "based on a discussion to control costs." That is wrong. Fidelity to the principle of amateurism is what drives NCAA rulemaking regarding eligibility, and especially compensation limits. Hence, the trial testimony was that defendants as a matter of course evaluate proposed rule changes to determine whether they would "violate the principle of amateurism," ER1380-1381, and that any proposals that might "look[] like pay" would be brought to the attention of the NCAA Board of Directors, ER1384-1385. The NCAA witness plaintiffs cite regarding costs (Br. 63-64) testified that any rule defendants adopt "must be consistent with the principle of amateurism," ER1382-1383.

To the extent plaintiffs suggest that defendants (and members of other joint ventures) are entirely precluded from considering costs, they are mistaken. The case plaintiffs cite (Br. 64) says that "[r]educing costs … *without more*" is not a procompetitive justification. *Law*, 134 F.3d at 1023 (emphasis added). Here, there was no evidence that defendants adopted the challenged rules purely, or even principally, to control their costs.

- 45 -

e.      Lastly, plaintiffs assert (Br. 66-67) that the challenged rules set "arbitrary caps."  For example, plaintiffs say, there is no reason why the rules provide that schools can award two student-athletes a $10,000 Senior Scholar Award each for graduate school, rather than permitting more than two awards, or a higher dollar amount per award.  That argument—attacking how defendants have drawn lines that are necessary but inevitably the product of judgment—is a direct challenge to the Supreme Court's and this Court's holding that defendants must have ample latitude to superintend college athletics.  Again, simply asserting that the lines could have been drawn elsewhere cannot possibly be enough to satisfy plaintiffs' heavy burden to show that the challenged rules are patently and inexplicably more restrictive than necessary.

> 3.      *Plaintiffs do not show that the district court's LRA would be virtually as effective as the challenged rules at differentiating college and professional sports*

Even if a restraint is patently and inexplicably more restrictive than necessary, it can only be replaced by an alternative that is "virtually as effective" at achieving the procompetitive benefits.  *E.g.*, *O'Bannon*, 802 F.3d at 1074.  As explained, the district court never found (and plaintiffs do not argue) that its alternative would be virtually as effective as the challenged rules in preserving the distinction between professional and college sports that *Board of Regents* and *O'Bannon* recognized.  *See* Opening Br. 59-60; *supra* p.40.  And because the

alternative would allow student-athletes to receive unlimited cash and non-cash payments, plaintiffs likewise do not contend that the alternative would preserve even the distinction the district court invented (i.e., that professional athletes but not college athletes receive unlimited pay). Plaintiffs nonetheless insist that the virtually-as-effective standard is satisfied. That argument fails.

a. With respect to non-cash "education-related benefits," plaintiffs assert (Br. 68-69) that the LRA would be virtually as effective as the challenged rules because consumer demand for college sports is "'driven largely by consumers' perception that student-athletes are … students'" (quoting ER63), and the NCAA could retain "rules that ensure that student-athletes do in fact remain students."

That argument, however, would mean there should be no limits on payments to student-athletes, because student-athletes would still be students even with unlimited payments. Such a regime is of course plaintiffs' plea on cross-appeal, but it is directly contrary to the district court's conclusion that a way in which college and professional sports differ is the amount of permissible compensation. It is also clearly contrary to *O'Bannon*, which held that even "poorly-paid" professional athletes are distinct from collegiate athletes. 802 F.3d at 1076. Indeed, that is why this Court rejected the same district court's order that student-athletes be allowed to receive up to $5,000 above COA in deferred payments, *id.* at 1076-1078. Plaintiffs' argument likewise gainsays *Board of Regents*, which

- 47 -

explained that "preserv[ing] the character and quality of the [NCAA's] 'product,'" required not only that athletes "be required to attend class," but also that they "not be paid." 468 U.S. at 102.

Plaintiffs also argue (Br. 69-71) that conferences, acting individually, could maintain amateurism just as well as a single nationwide rule does. But while plaintiffs say (Br. 70) this assertion is not "merely economic theory," it is in fact not sound economic theory at all. Both this Court and the Supreme Court have recognized that "the 'integrity of the [NCAA's] product cannot be preserved except by mutual agreement.'" *O'Bannon*, 802 F.3d at 1069 (quoting *Board of Regents*, 468 U.S. at 102) (other quotation marks omitted); *accord Board of Regents*, 468 U.S. at 117 ("a certain degree of cooperation is necessary" to preserve the "competition that [the NCAA] and its member institutions seek to market"). Without agreement upon compensation limits, individual conferences would face constant pressure to ease their limits further and further in hopes that their member institutions would gain an advantage over others, regardless of whether the limits were optimal for the conferences collectively or for intercollegiate athletics overall. In other words, organized athletics presents a classic collective-action problem, which requires cooperation to prevent harmful free riding. *See* Olson, *The Logic of Collective Action* (1971).

The evidence plaintiffs cite (Br. 70 n.6) is not to the contrary.  One conference commissioner's intention to take "a long-term strategic view" (*id*.) does nothing to show that conferences would actually resist the pressure they would face to allow substantially increased or unlimited compensation.  The same is true of the fact that a particular university president or conference commissioner had not heard that any school would allow "harmful amounts of compensation" (*id*.).  Indeed, the same president whose testimony plaintiffs cite also testified that "there is … a deep sense that some [university presidents] would" allow ever-increasing payments.  ER649.

Plaintiffs say (Br. 70-71) that recent experience with conference "autonomy" validates their claim that conferences would do just as well at preserving necessary limits.  That is wrong.  As the district court noted, the autonomy conferences remain constrained by "overarching NCAA limits that prevent [them] from expanding compensation beyond a point determined by the NCAA through its traditional rulemaking process."  ER23; *see also supra* pp.21-22.  Those limits preclude conferences from engaging in a "race to the bottom."  Moreover, whereas plaintiffs' LRA contemplates each conference acting individually, the NCAA's autonomy structure requires the "autonomous" conferences to act through agreement, ER1403-1405 (*e.g.*, §5.3.2.1.7).  Accordingly, there is no basis for

plaintiffs' claim that conference autonomy (Br. 70) is any kind of relevant "natural experiment" (a claim the district court did not embrace, *see* ER36-40).

b.      Plaintiffs next claim (Br. 72) that the district court's LRA is virtually as effective as the challenged rules with regard to the *cash* benefits it allows because the NCAA already permits academic-achievement awards to be paid in cash from the SAF and AEF.  That does not follow.  As plaintiffs acknowledged below, the district court's LRA would allow schools to pay every student-athlete substantial sums in cash simply for maintaining academic eligibility, i.e., for being on a team.  *See* ER1445; ER1416-1421 (eligibility rules).  There is no evidence the SAF and AEF ever have been used to provide anything like such payments.  That is unsurprising, given that NCAA rules require that any payments from the funds, including "to recognize academic achievement as determined by the conference offices," be consistent with the NCAA's amateurism principles.  ER269; ER276 (§2.9); ER1376; *supra* pp.37-38.  And as defendants explained (Opening Br. 61-62), there is no comparison between allowing a genuine award to recognize special achievement and allowing tens of thousands of dollars in cash payments to all student-athletes merely for being on a team.

Plaintiffs also contend (Br. 73) that the LRA's mandated allowance for academic awards is consistent with maintaining consumer demand because NCAA rules already permit the same amount in athletic awards.  But defendants explained

(Opening Br. 61-62) that the existing maximum amount allowed for athletic awards is not a proper comparator because that comprises a combined array of modest non-cash awards for exceptional athletic achievement. And that maximum allowance could be attained (if ever) by relatively few student-athletes, whereas the incentive specified by the LRA would be paid in *cash* to *every* student-athlete. Plaintiffs offer no response.

Finally, plaintiffs raise (Br. 72-73) the irrelevant fact that the NCAA allows coaches and administrators to receive cash awards based on their students' academic achievement. That coaches and administrators are paid as professionals (because they *are* professionals) says no more about the status of student-athletes than the fact that elementary school teachers are paid as professionals says about whether third graders are professionals. *See Law*, 134 F.3d at 1022 n.14 ("courts have only legitimized rules designed to ensure the amateur status of student athletes, not coaches").

### 4. *Plaintiffs fail to show that the court's LRA would not impose significantly increased costs*

Although plaintiffs say (Br. 76-79) they carried their burden to adduce "strong eviden[ce]" that the district court's LRA would not impose substantially increased costs, *O'Bannon*, 802 F.3d at 1074, in fact they offered none. Instead, they echo the court's *ipse dixit* that loosening restrictions on student-athlete compensation will necessarily reduce enforcement costs; in the words of a witness

- 51 -

plaintiffs quote (Br. 78), "the more you relax the rules, the less bureaucracy and regulation you need."  But the court did not "relax the rules" in the sense of reducing their number; it redrew the line between the permissible and the impermissible.  And as defendants explained (Opening Br. 64), the court's new line is enormously vague; for example, it includes a catch-all of "other tangible items … related to the pursuit of academic studies," ER2-3.  No record evidence (let alone strong evidence) shows that enforcing this new nebulous line will not be more costly.  That is the central point, and plaintiffs never address it.

Plaintiffs also echo the district court in asserting (Br. 78) that funds for "the NCAA's existing enforcement infrastructure could be redeployed" to conference-level enforcement.  *See also* ER68.  The record contains no evidence about the advisability or cost of such deployment.  And that possibility does not address, let alone answer, the key point just discussed:  the absence of strong evidence about the costs required to enforce the district court's nebulous novel line.

Defendants' opening brief further explained (at 64) that substantial costs will be imposed in the near-certain event plaintiffs move for contempt on the ground that defendants have not interpreted the injunction's vague terms to their liking, or if defendants (seeking to avoid such proceedings) request pre-approval of their efforts to clarify the injunction.  Plaintiffs breezily dismiss such costs (Br. 78-79) as self-inflicted consequences of contemptuous behavior.  That is wrong.  As just

reiterated, they would be the consequence of the district court's use of unclear language to define key terms of its injunction.

5. *Plaintiffs do not rebut defendants' explanation that the court's LRA involves improper price setting*

Defendants' opening brief explained (at 65-66) that the district court's LRA—like the $5,000-per-year trust fund rejected in *O'Bannon*—involves improper judicial price setting because it merely adjusted the cap on cash academic "awards and incentives" to that for non-cash athletics awards (currently, $5,600 in the district court's view). Plaintiffs respond (Br. 74-75) that the LRA does not "set" the price, but instead "allows" the NCAA to set the price by adjusting the limits on athletics awards. But it was the court, not defendants, that ruled that the "limit on [cash] academic achievement or graduation awards" must be "never less than the [non-cash] athletics participation awards limit." ER4. And it was the court, not defendants, that decided to take an award recognizing exceptional achievement (one that even theoretically relatively few student-athletes could ever approach) and turn it into a benefit that *every* student-athlete may receive, regardless of any achievement. In short, the court did exactly what defendants said: "reset[]the cap … from the current limit to what the court labeled 'the athletics participation awards limit,'" Opening Br. 65. As courts and commentators agree, such judicial price setting is impermissible. *See id.* at 65-66.

## IV.  The Injunction Is Unlawful

Defendants' opening brief explained (at 20-21, 66-69) that the district court's injunction improperly assumes quasi-regulatory authority over a critical element of intercollegiate athletics, by barring defendants from "limit[ing]" "benefits related to education," including "tangible items … related to the pursuit of academic studies," and reserving to the court the sole power to interpret that vague language.  The injunction thus comports with neither Federal Rule of Civil Procedure 65(d) nor antitrust law.

In response, plaintiffs assert (Br. 79) that "[c]ourts routinely retain jurisdiction over motions to modify and enforce an injunction."  But the problem is not the retention of jurisdiction; the problem is the injunction's vagueness and its express contemplation of a significant ongoing role for the district court. Defendants explained that in detail (Opening Br. 66-67), yet plaintiffs, after acknowledging the issue (Br. 79), offer no answer.[9]

---

[9]     If *O'Bannon* and the other cases plaintiffs cite are intended to be a response, they are unavailing.  The *O'Bannon* injunction drew two clear lines:  scholarships up to COA and deferred payments of up to $5,000 per year above COA.  Those lines gave the NCAA notice of its obligations and thus prevented the court from using a vague injunction as a mechanism for continually revisiting the basic terms of the NCAA's joint venture.  That is why the NCAA did not object to the injunction in *O'Bannon* on comparable grounds.  The other cases plaintiffs cite likewise employed more focused language to provide clear notice and thereby cabin the court's power.  *See Robinson v. Delgado*, 2012 WL 4753493, at *1 (N.D. Cal. Oct. 4, 2012) (requiring defendants to allow plaintiff to participate in meal

Plaintiffs also assert (Br. 71) that the injunction "leave[s]" defendants "with ample latitude to determine what qualifies as an education-related benefit," because "all the [district] court did was to state its willingness to entertain motions to amend the injunction to provide … a definition" of that term, *id.* at 80. That is untenable: The injunction specifies items that defendants must permit as "education-related" and allows the list to be modified only with the court's advance approval. ER3. Defendants are therefore left with little if any of the ample latitude the Supreme Court and this Court have held the antitrust laws provide them.

## CROSS-APPEAL

## SUMMARY OF ARGUMENT

Plaintiffs' arguments for expanding the injunction lack merit for all the reasons that the judgment and current injunction cannot stand. But even if the judgment and current injunction were valid, plaintiffs' cross-appeal arguments would still fail. Those arguments rest largely on the false premise that the district court found restrictions on payments unrelated to education to be unlawful, and simply failed to conform the injunction to that finding. In reality, the court found: (1) that those restrictions are procompetitive because they help distinguish college

---

program); *Levi Strauss & Co. v. California Denim Resources, Inc.*, 2001 WL 348973, at *1-2 (N.D. Cal. Mar. 16, 2001) (prohibiting defendants from selling clothing with symbol or mark resembling plaintiff's).

from professional sports, a finding that plaintiffs do not challenge on appeal, and (2) that eliminating the restrictions would not be virtually as effective at preserving that distinction because doing so would allow unlimited pay, which even the court recognized would professionalize college sports.

Plaintiffs also claim that nationally agreed-upon restrictions on student-athletes' compensation are not reasonably necessary to prevent such pay. But that claim—which the district court rejected—is refuted by the record, precedent, and economic theory. Indeed, the central economic insight underpinning *Board of Regents* and *O'Bannon* is that league sports present a classic collective-action problem, requiring an enforceable agreement among members on key restraints "if the product is to be available at all," *Board of Regents*, 468 U.S. at 101. If conferences were permitted to set compensation restrictions individually, they would face enormous pressure from each other to continually raise their limits to attract better athletes—even though that would hurt the collective enterprise by erasing the distinction between college and professional sports. Contrary to plaintiffs' assertion, the recent practice of "conference autonomy" does not suggest otherwise because, among other things, the conferences can only exercise rulemaking "autonomy" subject to the NCAA compensation restrictions.

In short, much like the district court's decision itself (and plaintiffs' defense of it), plaintiffs' cross-appeal strays far from controlling precedent and depends on

misunderstood or non-existent facts. Plaintiffs' cross-appeal should therefore be rejected.

## ARGUMENT

### PLAINTIFFS' PLEA TO EXPAND THE INJUNCTION IS MERITLESS

Plaintiffs contend (Br. 80) that "[a]lthough [the district court's] findings of fact and analysis of the Rule of Reason were sound and meticulous, the court made an error at the remedy stage." In particular, whereas the court enjoined limits on "benefits related to education," ER2, plaintiffs say (Br. 81-82) that it abused its discretion by not also barring limits on payments *un*related to education. Plaintiffs therefore argue the court was required to enjoin *all* NCAA limits on compensation. That is meritless.

As a threshold matter, all of the reasons discussed above and in defendants' opening brief for why the judgment should be reversed and the injunction vacated apply *a fortiori* to the even more radical injunction plaintiffs desire. Because plaintiffs failed to prove that any of the challenged NCAA rules violate antitrust law, none may properly be enjoined.

But even if the court's finding of a violation were valid, there would still be no basis to expand the injunction. The district court found that "[r]ules that prevent unlimited payments such as those observed in professional sports leagues … are procompetitive." ER50. Since plaintiffs nowhere challenge that finding

(*see, e.g.*, Br. 31-32), there can be no basis for an injunction requiring that conferences and schools be permitted to do just that.

### A. Plaintiffs Wrongly Suggest That The District Court Held The NCAA's Restrictions On Payments Unrelated To Education To Be Unlawful

Plaintiffs argue (Br. 85-86) that the district court found the existing limits on pay unrelated to education to be *un*lawful. That is incorrect.

The court concluded that "the distinction between college and professional sports arises because student-athletes do not receive unlimited payments unrelated to education, akin to salaries seen in professional sports leagues." ER50. Although the logic underlying this conclusion was thoroughly flawed, *see* Opening Br. 59, the conclusion led the court to determine that NCAA compensation rules are "procompetitive" if they "prevent unlimited payments such as those observed in professional sports leagues," "includ[ing] those … necessary to limit compensation and benefits unrelated to education." ER50-51; *see also* Plaintiffs' Br. 31-32. And that in turn led the court to find that plaintiffs' first proposed LRA—which, like the injunction they seek here, "would prohibit the NCAA from placing any limits on compensation or benefits, whether or not related to education," ER58—"would not be as effective as the current rules in preserving consumer demand." ER59; *see also* ER60 ("Plaintiffs' second proposed alternative likewise would not be as effective in achieving the procompetitive

effect of the challenged rules to the extent that it would remove the NCAA caps on … compensation and benefits that are unrelated to education.").  The reason, the court expounded, was that eliminating NCAA limits on non-education-related payments would "leave[] open the possibility that at least some conferences would allow their schools to offer student-athletes unlimited cash payments that are unrelated to education … akin to those observed in professional sports leagues." ER59.

Contrary to plaintiffs' suggestion, therefore, the district court found that NCAA limits on non-education-related payments are procompetitive and could not be eliminated without diminishing the rules' procompetitive benefits.  Plaintiffs' recitation of the court's analysis (Br. 85) conspicuously stops abruptly when it reaches the court's statement that NCAA rules "'preventing professional-style unlimited cash payments'" are procompetitive (quoting ER62), a finding, again, that plaintiffs do not dispute.  Plaintiffs, in other words, disregard the final piece of the court's analysis, where the court found that abolishing all limits on non-education-related payments is not a viable LRA.

Given that finding, the court could not enjoin the NCAA's limits on payments unrelated to education.  Antitrust law "confer[s] jurisdiction on the federal courts 'to prevent and restrain *violations*.'"  Areeda & Hovenkamp, *Antitrust Law* ¶325a (4th ed. 2019 update) (emphasis added) (quoting 15 U.S.C.

§25); *accord, e.g.*, 15 U.S.C. §4. The provisions in the antitrust laws specifically about injunctions are similarly limited, authorizing courts to grant "injunctive relief … against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. §26; *see also id.* §4. That is why this Court in *O'Bannon* upheld the injunction only insofar as it invalidated the below-COA cap on athletic scholarships—the only restriction the Court found to violate the antitrust laws. *See* 802 F.3d at 1074-1076.

None of the cases plaintiffs cite (Br. 82-87) allows a court to enjoin lawful conduct. To the contrary, the very passages plaintiffs quote show that those cases involved "relief effective to redress *antitrust violations*." *United States v. Coca-Cola Bottling Co.*, 575 F.2d 222, 231 (9th Cir. 1978) (emphasis added); *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 381 (1973) (addressing remedies to be issued against "those caught violating the [Sherman] Act").

Perhaps recognizing this, plaintiffs move to citing *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir. 1984), for the proposition (Br. 84) that an antitrust injunction "need not incorporate the less restrictive alternative itself." That proposition has no relevance here because the cross-appeal question is not whether the injunction should have implemented a proposed LRA. The questions on cross-appeal are whether the district court found the non-education-related restraints to be unlawful and, if not, whether it could

enjoin them anyway. The answer to each question is no. Nothing in *Los Angeles Memorial Coliseum* suggests otherwise.[10]

### B. Plaintiffs' Challenges To The District Court's Rejection Of Their Preferred Injunction Conflict With Economic Theory, Precedent, And The Record

Plaintiffs ultimately acknowledge (Br. 88) the district court's conclusion that their proposal to eliminate all limits on payments unrelated to education would not be virtually as effective as the current limits at differentiating college from professional sports, because conferences might individually set no limits on payments unrelated to education, or set limits that were too lax, ER59-60. Plaintiffs argue (Br. 88) that that scenario reflects "merely … the push-and-pull of the very competitive process that antitrust injunctions are required to restore." That argument is inconsistent with economic principles, precedent, and the record.

### 1. *Economic theory*

As explained, *see supra* pp.48-49, basic economic theory teaches that without a binding nationwide rule, individual conferences would face enormous pressure to raise their compensation limits beyond the optimal point for consumer demand. Individual conferences would be driven to keep raising their limits

---

[10]     Plaintiffs' argument also distorts that decision. When this Court remarked that "regulation … is best left to the marketplace rather than private agreement," 726 F.2d at 1397, *quoted in* Plaintiffs' Br. 84, it was not discussing the propriety of injunctive relief. It was explaining why the challenged restraint was unlawful. *See id.* at 1397-1398.

because they would not bear all the associated costs; some of those costs would be borne by the other conferences (and their member schools). The conferences would thus have incentives to take actions that, while beneficial individually (at least in the short run), would be destructive in the aggregate. *See* Olson, *supra*.

As also explained, *see supra* p.48, *Board of Regents* recognized that defining amateurism standards is a collective-action problem, requiring agreed-upon rules. The Supreme Court recognized that a "certain degree of cooperation is necessary if the type of competition that [the NCAA] and its member institutions seek to market is to be preserved." 468 U.S. at 117. And, the Court elaborated:

> the integrity of the [NCAA's] "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable.

*Id.* at 102.

*O'Bannon* also recognized this. The Court quoted this same passage from *Board of Regents*, *see* 802 F.3d at 1062, and its invalidation of the district court's mandate to allow up to $5,000 per year in deferred payments reflects the same understanding of these basic economic principles. If plaintiffs' position were sound, the Court would not have deemed that mandate to be less effective than the challenged rules at providing all of the procompetitive benefits. It would instead

- 62 -

have left it to the conferences to determine individually where to set the optimal limit.

### 2. *Precedent*

The authorities plaintiffs cite (Br. 88-89) do not support their argument. Their leading case is *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), which they invoke in stating (Br. 88) that "'impeding the ordinary give and take of the market place' is exactly what the Rule of Reason prohibits." (quoting 476 U.S. at 459). But the full sentence plaintiffs excerpt shows that *Indiana Federation* supports rejection of plaintiffs' LRA. The Supreme Court stated that "an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place' cannot be sustained under the Rule of Reason" only "[a]bsent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services." 476 U.S. at 459 (citation omitted). And the Court cited *Board of Regents* as a case involving a "procompetitive virtue" in the form of "the creation of efficiencies." *Id. Indiana Federation* thus shows that courts need *not* give free rein to "the ordinary give and take of the market place" when a challenged restraint provides legitimate procompetitive benefits that cannot be achieved in a less restrictive way.

- 63 -

That is what the district court found to be true here regarding the NCAA's limits on pay unrelated to education.[11]

Other passages plaintiffs cite, meanwhile, simply explain that horizontal price-fixing agreements are ordinarily illegal per se. *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343-348 (1982); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986-989 (9th Cir. 2000). That is irrelevant given the clear holdings of *Board of Regents* and *O'Bannon* that NCAA eligibility rules are *not* per se illegal but rather must be analyzed under the rule of reason. Still other passages plaintiffs cite (including one from the Second Circuit that plaintiffs fail to note was for a single judge) explain that avoidance of social, ethical, or other non-economic harms of competition is not a procompetitive justification under the antitrust laws. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 692-696 (1978); *United States v. Apple, Inc.*, 791 F.3d 290, 329-334

---

[11]    The footnote plaintiffs cite (Br. 88) from *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139 (9th Cir. 1989) (en banc), simply quotes the language above from *Indiana Federation*. (Plaintiffs, however, fail to indicate that the footnote appears in the dissent. *See id.* at 164 n.13 (Norris, J., dissenting).) As for the treatise plaintiffs cite (Br. 88-89), there too plaintiffs quote selectively: The treatise explains that any proposed LRA "must be both practicable and effective in fact" because "[b]usiness practice often proceeds by trial and error, and many alternatives that seem practicable on paper prove not to be so in practice." Areeda & Hovenkamp, *Antitrust Law* ¶1760d. That undermines plaintiffs' position, as they provided no strong evidence that the drastic step of removing all limits on payments to student-athletes unrelated to education would be "practicable" or "effective."

(2d Cir. 2015) (op. of Livingston, J.); *see also id.* at 296.  That is equally irrelevant, because avoiding such harm is not the procompetitive justification offered by defendants.  Lastly, the passage plaintiffs quote from *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), recited the general purposes of "a remedies decree" in a monopolization case when an antitrust violation is found, *see id.* at 103.  As explained, the district court here did not find that NCAA rules limiting payments unrelated to education are unlawful.

### 3.    The record

Plaintiffs argue finally (Br. 91) that the record shows that devolving rulemaking authority to the conferences would not harm consumer demand.  It shows no such thing.

As an initial matter, plaintiffs incorrectly describe the district court's relevant holdings.  The district court did not find, as plaintiffs say (Br. 90), that "individual conferences are fully capable of determining what type of compensation would enhance or reduce demand."  While recognizing the theoretical possibility that individual conferences might calibrate limits to optimize consumer demand, *see* ER59, the court deemed that possibility insufficient to find the absence of coordinated limits "virtually as effective" as the challenged rules, given the substantial risk that the conferences would set no limits, or set limits too

high, and thereby harm consumer demand. ER59-60. Plaintiffs ignore this determinative part of the court's analysis.[12]

Plaintiffs argue (Br. 91) that the recent practice of limited "conference autonomy" and the administration of the SAF and AEF show that abolition of all NCAA limits would not reduce demand because conferences could impose any necessary limits. But as explained, conference autonomy and those funds operate *within* the NCAA's traditional amateurism framework. *See supra* pp. 10-11, 21-22, 48-50. Hence, neither autonomy nor either fund shows anything about how individual conferences would regulate payments, or how demand would be affected, absent NCAA limitations on compensation unrelated to education.[13]

In sum, plaintiffs lack even "meager"—much less the requisite "strong"—evidence that their proposed LRA of limitless non-education-related payments would be virtually as effective as the challenged limits at differentiating college from professional sports. *O'Bannon*, 802 F.3d at 1074, 1079. They are therefore

---

[12]    Nor did the court say, as plaintiffs contend (Br. 90), "that the individual conferences could use 'market research and … gradual increases in cash compensation … to determine an amount that would not be demand-reducing.'" The court explicitly said that "the NCAA" could do that. ER60.

[13]    Moreover, although defendants' expert and some lay witnesses testified that conferences and schools acting individually might "take into account the consumer demand impact of their compensation rules," Plaintiffs' Br. 91, that possibility is consistent with the economic reality of the collective-action problem discussed above.

not entitled to an injunction invalidating those limits and devolving control to the conferences acting individually.

## CONCLUSION

The district court's judgment should be reversed and the injunction vacated.

December 23, 2019                                Respectfully submitted,

s/ Seth P. Waxman
SETH P. WAXMAN
LEON B. GREENFIELD
DANIEL S. VOLCHOK
DAVID M. LEHN
KEVIN M. LAMB
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 663-6000

*Counsel for the NCAA (filed on behalf, and with the concurrence, of all defendants)*

**(ADDITIONAL COUNSEL LISTED ON FOLLOWING PAGES)**

BART H. WILLIAMS
SCOTT P. COOPER
KYLE A. CASAZZA
JENNIFER L. JONES
SHAWN S. LEDINGHAM, JR.
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
(310) 557-2900

*Counsel for Pac-12 Conference*

LEANE K. CAPPS
CAITLIN J. MORGAN
POLSINELLI PC
2950 North Harwood Street, Suite 2100
Dallas, TX 75201
(214) 397-0030

AMY D. FITTS
POLSINELLI PC
900 West 48th Place, Suite 900
Kansas City, MO 64112
(816) 218-1255

*Counsel for the Big 12 Conference, Inc. and Conference USA*

MARK A. CUNNINGHAM
JONES WALKER LLP
201 St. Charles Avenue, 50th Floor
New Orleans, LA 70170
(504) 582-8536

*Counsel for Sun Belt Conference*

BETH A. WILKINSON
BRANT W. BISHOP
WILKINSON WALSH + ESKOVITZ LLP
2001 M Street N.W., 10th Floor
Washington, D.C. 20036
(202) 847-4000

SEAN ESKOVITZ
WILKINSON WALSH + ESKOVITZ LLP
11601 Wilshire Boulevard, Suite 600
Los Angeles, CA 90025
(424) 316-4000

*Counsel for the NCAA*

JEFFREY A. MISHKIN
KAREN HOFFMAN LENT
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
4 Times Square
New York, N.Y. 10036
(212) 735-3000

*Counsel for the NCAA and Western Athletic Conference*

ROBERT W. FULLER, III
PEARLYNN G. HOUCK
LAWRENCE C. MOORE, III
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, N.C. 28246
(704) 377-2536

MARK J. SEIFERT
SEIFERT LAW FIRM
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 999-0901

*Counsel for Southeastern Conference*

ANDREW J. PINCUS
CHARLES A. ROTHFELD
RICHARD J. FAVRETTO
Mayer Brown LLP
1999 K Street N.W.
Washington, D.C. 20006
(202) 263-3000

BRITT M. MILLER
ANDREW S. ROSENMAN
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600

*Counsel for The Big Ten Conference, Inc.*

MERYL MACKLIN
BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
(415) 268-1981

RICHARD YOUNG
BRENT E. RYCHENER
BRYAN CAVE LEIGHTON PAISNER LLP
90 South Cascade Avenue, Suite 1300
Colorado Springs, CO 80903
(719) 473-3800

*Counsel for Mountain West Conference*

BENJAMIN C. BLOCK
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
(202) 662-5205

*Counsel for the American Athletic Conference*

R. TODD HUNT
BENJAMIN G. CHOJNACKI
WALTER HAVERFIELD LLP
The Tower at Erieview
1301 East 9th Street, Suite 3500
Cleveland, OH 44114
(216) 928-2935

*Counsel for Mid-American Conference*

D. ERIK ALBRIGHT
GREGORY G. HOLLAND
FOX ROTHSCHILD LLP
300 North Greene Street, Suite 1400
Greensboro, N.C. 27401
(336) 378-5200

JONATHAN P. HEYL
FOX ROTHSCHILD LLP
101 North Tryon Street, Suite 1300
Charlotte, N.C. 28246
(704) 384-2625

CHARLES L. COLEMAN, III
HOLLAND & KNIGHT LLP
50 California Street, Suite 2800
San Francisco, CA 94111
(415) 743-6900

*Counsel for Atlantic Coast Conference*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 19-15566, 19-15662

I am the attorney or self-represented party.

**This brief contains** | 15,299 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⦿ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ⦿ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Seth P. Waxman | **Date** | December 23, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                       *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

On this 23rd day of December 2019, I electronically filed the foregoing with the Court using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

s/ Seth P. Waxman

SETH P. WAXMAN