**Nos. 19-15566, 19-15662**

# In the United States Court of Appeals for the Ninth Circuit

IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION

SHAWNE ALSTON, ET AL.,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ET AL.,
DEFENDANTS-APPELLANTS/CROSS-APPELLEES

On Appeal from the United States District Court
for the Northern District of California, No. 14-md-02541,
the Honorable Claudia Wilken, presiding

## PLAINTIFFS' REPLY BRIEF ON CROSS-APPEAL

STEVE W. BERMAN
CRAIG R. SPIEGEL
EMILEE N. SISCO
*Hagens Berman Sobol Shapiro LLP*
*1918 Eighth Avenue, Suite 3300*
*Seattle, WA 98101*
*(206) 623-7292*
*steveb@hbsslaw.com*

JEFFREY L. KESSLER
DAVID G. FEHER
DAVID L. GREENSPAN
*Winston & Strawn LLP*
*200 Park Avenue*
*New York, NY 10166*
*(212) 294-6700*
*jkessler@winston.com*

*Additional counsel on next page*

BRUCE L. SIMON
BENJAMIN E. SHIFTAN
*Pearson, Simon & Warshaw, LLP*
*350 Sansome Street, Suite 680*
*San Francisco, CA 94104*
*(415) 433-9000*
*bsimon@pswlaw.com*

ELIZABETH C. PRITZKER
JONATHAN K. LEVINE
BETHANY L. CARACUZZO
*Pritzker Levine LLP*
*180 Grand Avenue, Suite 1390*
*Oakland, CA 94612*
*(415) 692-0772*

LINDA T. COBERLY
*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, IL 60601*
*(312) 558-5600*
*lcoberly@winston.com*

JEANIFER E. PARSIGIAN
*Winston & Strawn LLP*
*101 California Street*
*San Francisco, CA 94111*
*(415) 591-1000*
*jparsigian@winston.com*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................1

ARGUMENT .......................................................................3

    I.    The district court found the challenged restraints un-
        lawful, including with respect to their overbroad re-
        strictions on non-education-related benefits. ........................3

    II.   Once it found all the challenged restraints unlawful,
        the court should have enjoined them, rather than or-
        dering an alternative set of restraints that leave much
        of their competitive harm unremedied....................................9

    III.  If the law required a remedy "as effective" at achieving
        the procompetitive justification, the record shows that
        a more complete remedy would meet that test here. ...........13

CONCLUSION ......................................................................18

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bhan v. NME Hosps. Inc.*,
  929 F.2d 1404 (9th Cir. 1990) ................................................................ 6

*Cty. of Toulomne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001) .......................................................... 5, 6

*Ford Motor Co. v. United States*,
  405 U.S. 562 (1972) ........................................................................ 9, 10

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ............................................................... 11

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football
  League*,
  726 F.2d 1381 (9th Cir. 1984) ....................................................... 10, 11

*N. Pac. Ry. v. United States*,
  356 U.S. 1 (1958) ................................................................................ 11

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
  802 F.3d 1049 (9th Cir. 2015) ................................................ 6, 14, 17

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................................ 9

## Other Authorities

Areeda & Hovenkamp, *Antitrust Law: An Analysis of
  Antitrust Principles & Their Application* (3d & 4th eds.,
  2017–2019) ........................................................................... 10, 12, 13

*Exiting Big Ten commish Jim Delany on his 30-year tenure
  and the future of college sports*, CBSSPORTS.COM, Jan. 2,
  2020, https://www.cbssports.com/college-
  football/news/exiting-big-ten-commish-jim-delany-on-his-
  30-year-tenure-and-the-future-of-college-sports/ .............................. 17

NCAA Bylaw 12.1.2.1 ........................................................................ 4

NCAA Bylaw 12.1.2.1.3.1 ................................................................. 4

NCAA Bylaw 12.1.2.1.3.2 ................................................................. 4

NCAA Bylaw 12.1.2.1.4.1 ................................................................. 4

NCAA Bylaw 12.02.10 ...................................................................... 4

NCAA Bylaw 16.02.2 ........................................................................ 4

NCAA Bylaw 16.02.3 ........................................................................ 4

NCAA Const. Art. 3.3.1.1 ............................................................... 15

Report of the NCAA Board of Governors October 29, 2019
Meeting,
https://ncaaorg.s3.amazonaws.com/committees/ncaa/exec_
boardgov/Oct2019BOG_Report.pdf ....................................... 8

**INTRODUCTION**

Defendants' response brief makes a fundamental mistake: it confuses the remedy phase of an antitrust case with Step Three of the Rule of Reason. This is the same error the district court made at the remedy stage—an error that led it to leave a significant portion of the anticompetitive harm unremedied. Defendants' brief fails to comprehend this issue, much less give an effective response. As a result, it provides no basis to deny the relief requested in the Cross-Appeal.

The district court's analysis under the Rule of Reason was clear. The court found that the set of challenged restraints has anticompetitive effects in terms of *both* education-related *and* non-education-related benefits (Step One). And while the court did find a narrow procompetitive justification—preserving a distinction between college and professional sports by avoiding unlimited payments (Step Two)—it also found that a less restrictive alternative would be virtually as effective (Step Three). As a result, the challenged restraints—with *all* of their anticompetitive effects on education-related and non-education-related benefits—are unlawful under Section 1 of the Sherman Act. ER101–02.

1

Having reached this conclusion, the court should have ordered a more complete, more traditional remedy that enjoins *all* of the unlawful restraints. Plaintiffs' Response Brief and Opening Brief on Cross-Appeal 82–88, Dkt. 59 ("Pls.' Br."). Instead, at the remedy stage, the court returned to the less restrictive alternative analysis of Step Three, substituting its own judgment about how best to achieve the procompetitive justification. This led the court to enjoin the unlawful restraints *only to the extent they limit certain benefits related to education.* Beyond that, the unlawful restraints—and the anticompetitive effects that the district court found—will continue to inflict harm as before.

As Plaintiffs have explained, this was an abuse of discretion. *Id.* Faced with unlawful agreements restraining trade, a trial court's responsibility is to remove them—not to replace them with a different combination of restraints that the court finds less unreasonable. *Id.* at 84–88. The court's concern that enjoining all the challenged rules would lead to an uncertain period of "trial and error" reflects both a mistake of law (*id.* at 88–90) and an inconsistency with the facts (*id.* at 90–91). For all these reasons, the liability finding should be affirmed,

2

but the Cross-Appeal should be granted and the case remanded for entry of more complete relief that will free the market from all of the anti-competitive effects of restraints the court found unlawful.

## ARGUMENT

### I.   The district court found the challenged restraints unlawful, including with respect to their overbroad restrictions on non-education-related benefits.

Defendants' first argument is premised on the assertion that the court did not find any unlawfulness in the NCAA's "existing limits on pay unrelated to education." Defendants' Joint Response-and-Reply Brief 58, Dkt. 87 ("Reply/Resp. Br."). That is incorrect. This case concerns a single, unified set of price-fixing restraints—what Defendants refer to as the "current, interconnected set of NCAA rules that limit the compensation [athletes] may receive in exchange for their athletic services." ER6; *see also* ECF No. 1128, Defs.' Closing Arg. at 29. All of these interconnected restraints were evaluated together and held to be unlawful. There was no separate finding that restraints on non-education-related benefits are lawful while restraints on education-related benefits are unlawful. To the contrary, most of the interconnected, challenged restraints simultaneously limit both education-related and non-education-related benefits in the text of the same rules without any

3

differentiation. *See* ER279 (Bylaw 12.02.10 "**Pay**. Pay is the receipt of funds, awards or benefits not permitted by the governing legislation of the Association for participation in athletics"); ER281 (Bylaw 12.1.2.1 "**Prohibited Forms of Pay**" include Bylaw 12.1.2.1.4.1 "Cash, or the equivalent thereof (e.g., a trust fund), as an award for participation in competition at any time");[1] ER288 (Bylaw 16.02.2 "**Excessive Expense**. An excessive expense is one not specifically authorized under regulations of the Association concerning awards, benefits and expenses"); *id.* (Bylaw 16.02.3 "**Extra Benefit**. An extra benefit is any special arrangement by an institutional employee or representative of the institution's athletics interests to provide a student-athlete or the student-athlete family member or friend a benefit not expressly authorized by NCAA legislation").

Defendants' response depends on ignoring half of the district court's conclusions. Defendants point to the court's Step Two finding

---

[1] NCAA Bylaws 12.1.2.1.3.1 and 12.1.2.1.3.2 (ER281) prohibit "Educational Expenses" but the definitions include educational expenses prior to college enrollment or from an outside sports team or organization. The rules bear no relationship to education-related expenses analyzed by the court below, which addressed benefits provided by the individual school after the student enrolls.

that "[r]ules that prevent unlimited payments such as those observed in professional sports leagues … are procompetitive." Reply/Resp. Br. 57 (quoting ER50). But then they ignore the court's Step Three finding that these very rules are overbroad, that there is a less restrictive alternative, and that, as a result, the entire set of interconnected restraints is unlawful. ER30, 33, 50, 58–69. In reaching this conclusion, the court specifically found that the less restrictive alternative it identified would be "virtually as effective" in achieving the limited procompetitive justification that the court found at Step Two. ER58–69. As a consequence, all of the challenged restraints—which collectively restrict both education-related and non-education-related benefits—were held unlawful. Defendants' arguments ignore this critical fact.

Indeed, if Defendants were right, the court could not have stopped the analysis at Step Three. If the restraints on non-education-related benefits were actually separate—and if the court had found them procompetitive (Step Two) with no less restrictive alternative (Step Three)—then it would have had to proceed to Step Four to conduct the balancing test. ER103–106; *Cty. of Toulomne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("Because plaintiffs have failed to

5

meet their burden of advancing viable less restrictive alternatives, we reach the balancing stage"); *Bhan v. NME Hosps. Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1990) (describing the "[f]inal[]" step where "the court must weigh the harms and benefits to determine if the behavior is reasonable on balance."). The court here acknowledged this and specifically declined to do it, explaining that balancing was unnecessary because "Plaintiffs have shown a less restrictive alternative to the challenged rules." ER103. This can mean only one thing: the court found *all* the challenged rules—holistically—to be unlawful, including to the extent that they restrict the award of non-education-related benefits. In fact, this has to be the case, as the challenged rules work together to impose the restraints.

This is no surprise, given the record. As the court found, while the NCAA purports to hew to a strict definition of amateurism, since *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir. 2015), it simultaneously allows certain athletes to receive "thousands or tens of thousands of dollars in [] compensation, related or unrelated to education," over and above the cost of attendance—without any adverse impact on consumer demand. ER50; *see also* ER85–86. These benefits

6

include athletic participation awards that may be paid in cash equivalents with a value of more than $5,600 a year, payments of up to $50,000 for premiums for loss-of-value insurance against the loss of anticipated professional earnings, unlimited food, guaranteed medical care after graduation, and payments of up to $4,000 to allow family members to travel to certain games. ER22–23, ER27–28, ER77, ER453–54, ER666, ER1232, ER1286. The court found that these benefits—all of which are unrelated to education—did not "affect[] [the athletes'] status as amateurs" from the perspective of the NCAA. ER28. Nor did these benefits negatively impact demand for college sports as distinct from professional sports. ER101–02. In recent years, "demand for college sports as a distinct product … continues apace," despite the exponential growth of the types and amounts of benefits provided above the cost of attendance. ER86–87. In the words of the district court, the existence of these benefits "belies Defendants' position that the challenged current restrictions … are necessary," *including* to the extent that the restrictions prevent extending these kinds of non-education-related benefits to all student-athletes. ER101. Indeed, the NCAA Board of Governors, in response to the recent legislative enactment by California,

7

unanimously reached the same conclusion when it instructed each Division to promulgate rules permitting athletes to receive compensation for the right to use their names, images, and likenesses.[2]

In short, the court found the entire interconnected set of challenged price-fixing restraints to be unlawful. Again, this was not surprising, as Defendants conceded (and Plaintiffs agreed) that the challenged NCAA rules must be evaluated as an interconnected whole. ECF No. 1128, Defs.' Closing Arg. at 29 (The NCAA's rulebook is an "interconnected set of rules, including the amateurism rules and academic eligibility requirements, which combined make up the collegiate model."); ECF No. 1014, Pls.' Opening Arg. at 12 ("The compensation-cap rules are overlapping and circular, and all collectively rise or fall based on Defendants' identical amateurism and integration justifications.").

---

[2] Report of the NCAA Board of Governors October 29, 2019 Meeting, https://ncaaorg.s3.amazonaws.com/committees/ncaa/exec_boardgov /Oct2019BOG_Report.pdf. Plaintiffs will address these developments in more detail in the supplemental brief, to be filed in accordance with this Court's request.

**II.** **Once it found all the challenged restraints unlawful, the court should have enjoined them, rather than ordering an alternative set of restraints that leave much of their competitive harm unremedied.**

Having found the challenged restraints unlawful, the court's task at the remedy stage was not to design a less restrictive system of market control and impose it; it was to restore competition by removing the entire set of challenged restraints, thus permitting competition—in this case among the conferences—to determine the best market outcome. *See United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (a "remedies decree in an antitrust case must seek to 'unfetter a market from anticompetitive conduct'") (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972)). Instead, the court below entered an injunction that perpetuates a significant portion of the anticompetitive harm from the unlawful restraints. As Plaintiffs' brief explains (at 80–92), this was an abuse of discretion.

Defendants' response misstates the legal standard. They complain that an injunction against all the unlawful rules would not be "virtually as effective as the challenged rules in preserving the distinction between professional and college sports." Reply/Resp. Br. 46. But this conflates the standard for an appropriate *remedy* with the standard

9

for a *less restrictive alternative*. The purpose of Step Three is to deter-
mine whether a restraint with anticompetitive effects is unreasonably
broad—that is, broader than necessary to serve its procompetitive justi-
fication. This is a fundamentally different inquiry than the question of
remedy. For example, a less restrictive alternative need not eliminate
all of the anticompetitive harm or restore competitive conditions,
whereas a proper injunction, after a restraint is held to be unlawful,
must do both. *See, e.g.*, *Ford*, 405 U.S. at 575. The analysis is different,
so a court should not simply import the less restrictive alternative as its
injunction. *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football
League*, 726 F.2d 1381, 1397–98 (9th Cir. 1984). Ordinarily, the injunc-
tion simply enjoins the challenged restraints. Areeda & Hovenkamp,
*Antitrust Law: An Analysis of Antitrust Principles & Their Application*
¶ 1913(b) (3d & 4th eds., 2017–2019) ("Areeda") ("Once a suitable less
restrictive alternative is found, the ordinary remedy is a declaration
that the challenged restriction is unreasonable.").

    Put another way, at the remedy stage, the court's role is not to
evaluate alternatives to the unlawful restraint and choose the best one
to serve a particular procompetitive justification. It is the *market*—not

10

the court—that should determine how best to preserve demand. *Los Angeles Mem'l Coliseum Comm'n*, 726 F.2d at 1397–98 (because "the market itself will deter unwise moves," "regulation … is best left to the marketplace."). Here, as Plaintiffs explained (Pls.' Br. 88–91), that market determination can be made through competition among the conferences. The alternative of permitting the court to formulate and impose an alternative combination of restraints is inconsistent with the very purpose of the antitrust laws—to protect free competition. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("The central purpose of the antitrust laws … is to preserve competition. It is competition—not the collusive fixing of prices at levels either high or low—that these statutes recognize as vital to the public interest.").[3]

Defendants themselves make a similar argument, but in the wrong part of their brief. In challenging the court's analysis at Step

---

[3] *See also id.* ("'The Sherman Act was … aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress …. But even were that premise open to question, the policy unequivocally laid down by the Act is competition.'") (quoting *N. Pac. Ry. v. United States*, 356 U.S. 1, 4 (1958)).

Three, Defendants complain that the court engaged in "judicial price administration" by comparing the effectiveness of potential alternatives. Opening Br. 65–68; *see also* Reply/Resp. Br. 53–54 ("improper price setting"). But, this is exactly what the court was *supposed* to do at Step Three, in deciding whether the restraints are more restrictive than necessary to serve the limited procompetitive justification. At the remedy stage, by contrast, the court must *not* formulate its own alternatives; it must instead clear away the unlawful restraints to restore competition so that the market can determine the most efficient and procompetitive outcome. The very source that Defendants cite as "the leading antitrust treatise" (Opening Br. 66) recommends that, ordinarily, "merely ending the restraint suffices [to restore competitive conditions], and the court need go no further." Areeda ¶ 325. In fact, the Areeda treatise cites two antitrust cases against the NCAA, *Board of Regents* and *Law*, to exemplify situations where "effective judicial intervention may consist of little more than an injunction against the anticompetitive agreement, thus permitting market forces to do their work." Areeda ¶ 1903.

12

### III. If the law required a remedy "as effective" at achieving the procompetitive justification, the record shows that a more complete remedy would meet that test here.

Even if Defendants were right about the court's role in crafting a remedy, the facts do not support their argument against a more traditional, more complete injunction here. Their core argument is that enjoining all of the unlawful compensation rules—thus leaving the market outcome to competition—would not be "virtually as effective" as the current restraints at maintaining the distinction between college and professional sports. Reply/Resp. Br. 61–67. The record squarely contradicts this argument.

To start, the district court found that "[m]uch of this difference [between college sports and professional sports] is based on the fact that student-athletes are students playing for their school." ER89; *see also* ER48–49 ("Defense lay witnesses also testified that consumer demand … is driven by consumers' perceptions that student-athletes are, in fact, students" playing for a particular school) (citing testimony). Even a casual observer of college alumni networks and student cheering sections knows this to be true. Because "student-athletes would remain students even if their compensation were not limited by the challenged

13

rules" (ER89)—and the rules requiring that athletes be students are not at issue in this suit—the core distinction between college and professional sports will remain intact with a more traditional remedy that simply enjoins the unlawful rules.

Nor does the record support Defendants' argument that the challenged NCAA-wide restraints are the only way to strike a demand-preserving balance in connection with payments untethered to education. Following the entry of a complete injunction against the unlawful restraints, the individual conferences can work this out themselves. Indeed, the record shows that the conferences have *already* been allowed to operate autonomously in many areas with respect to student-athlete compensation, and permitting them to do so has not damaged the distinction between college and professional sports or reduced demand. Pls.' Br. 24–26, 39–40, 70–71.

For example, since shortly after the trial record closed in *O'Bannon* (*i.e.*, since 2015), there has been a new structure of increased conference autonomy for the Power Five conferences that has allowed "legislative enactments … result[ing] in greater compensation for student-athletes." ER22–23. These changes include unlimited meals and

14

snacks regardless of cost, increased medical benefits, and loans to purchase loss-of-value insurance against potential professional earnings. *Id*. The conferences and individual schools also administer millions of dollars every year in the Student Assistance Fund ("SAF") and Academic Enhancement Fund, with no limit on the amount of money they provide to an individual athlete, and with essentially no restrictions on what the money is used for. ER28–30. More than 4,000 athletes received compensation in excess of their cost of attendance through the SAF in the 2015–16 season alone (ER1227), and SAF distributions have increased every year since. ER37. The evidence at trial also established that each conference already has its own rulemaking, compliance, and enforcement structures. ER658 (NCAA Constitution Art. 3.3.1.1); ER67–68. And, notably, following the *Board of Regents* decision eliminating the NCAA's output restriction over televising games, the conferences took over negotiating television broadcast agreements for their schools and successfully increased output and revenues dramatically. *See* ER1188–1203 (cataloguing conference broadcast agreements).

15

Despite this enhanced autonomy for the conferences, there has been no "race to the bottom," and demand for college sports is as robust as ever. And this positive demand outcome has been achieved even though there is already a "wide variation among conferences and their members in Division I" in the types and amounts of benefits provided, belying any claims that national uniformity is necessary. ER46; *see also* ER1220, ER1242–1243 (describing "five distinct compensation rule variations … within the overall compensation caps set by the challenged NCAA rules"). As Dr. Rascher explained, "[t]his diversity of responses … is strong economic evidence of how each school or conference is capable of taking its individualized consumer-demand preferences into account when making compensation offers." ER1221.

While Defendants point out that conferences "remain constrained by 'overarching NCAA limits'" (Reply/Resp. Br. 49 (quoting ER23)), every conference or school official witness who addressed this topic testified that he or she would take consumer demand into account when allowing new benefits. *See*, *e.g.*, ER624 (Pac-12 Commissioner confirmed he would take a long-term strategic view as to how to respond if court

16

strikes down current rules); *id.* at ER649 (Wake Forest President confirmed no university president or employee has indicated they would pay harmful amounts of compensation if allowed to do so); *accord* ER651–52 (America East Commissioner).  Even Defendants' economist, Dr. Elzinga, testified that he would expect that to be the case.  ER611–12.  Outgoing Big Ten Commissioner, Jim Delany, recently publicly echoed this sentiment that the major college conferences "may need more autonomy" from the NCAA's overarching limits, because "[y]ou can't have the smallest programs telling the larger programs what they can spend."[4]

The case for a more traditional antitrust remedy—simply enjoining the unlawful rules and restoring competition, which would naturally take place among the conferences to determine the correct market outcome for compensation rules—is thus stronger today than it has ever been.  Defendants have already made the "quantum leap" described in *O'Bannon.*  Pls.' Br. 3, 14, 31, 39.

---

[4] *Exiting Big Ten commish Jim Delany on his 30-year tenure and the future of college sports*, CBSSPORTS.COM, Jan. 2, 2020, https://www.cbssports.com/college-football/news/exiting-big-ten-commish-jim-delany-on-his-30-year-tenure-and-the-future-of-college-sports/.

Defendants have not cited any authority for the proposition that a district court, at the remedy stage, should use its injunctive power to evaluate and impose an alternative that it finds "virtually as effective" at achieving a procompetitive justification. But even if that were the law, overwhelming record evidence demonstrates that the more traditional remedy of enjoining the challenged NCAA rules—and thus allowing the conferences to compete among themselves with respect to compensation for the Plaintiff classes' athletic services—will be "virtually as effective" as the challenged rules in preserving demand for college sports as distinct from professional sports.

## CONCLUSION

Although the district court's Rule of Reason analysis was careful and correct—with ample support in the law and in the record—its injunction was too narrow, leaving un-redressed a significant portion of the anticompetitive harm caused by the restraints that Plaintiffs challenged and that the court held to be unlawful. Plaintiffs ask this Court to affirm the liability finding but vacate the injunction and remand this

case for entry of a more traditional remedy that enjoins all the challenged rules as an unlawful restraint of trade, thus permitting competition to determine the optimal procompetitive market outcome.

Dated:    February 12, 2020                Respectfully submitted,

HAGENS BERMAN SOBOL                        WINSTON & STRAWN LLP
SHAPIRO LLP

By *s/ Steve W. Berman*                    By *s/ Jeffrey L. Kessler*
Steve W. Berman                            Jeffrey L. Kessler
Craig R. Spiegel                           David G. Feher
Emilee N. Sisco                            David L. Greenspan
1918 Eighth Avenue, Suite 3300             200 Park Avenue
Seattle, WA 98101                          New York, NY 10166-4193
Telephone: (206) 623-7292                  Telephone: (212) 294-6700
*steveb@hbsslaw.com*                       *jkessler@winston.com*
*craigs@hbsslaw.com*                       *dfeher@winston.com*
*emilees@hbsslaw.com*                      *dgreenspan@winston.com*

                                           Linda T. Coberly
PEARSON, SIMON & WARSHAW,                   35 W. Wacker Drive
LLP                                        Chicago, IL 60601
                                           Telephone: (312) 558-5600
                                           *lcoberly@winston.com*
By *s/ Bruce L. Simon*
Bruce L. Simon                             Jeanifer E. Parsigian
Benjamin E. Shiftan                        101 California Street
350 Sansome Street, Suite 680              San Francisco, CA 94111
San Francisco, CA 94104                    Telephone: (415) 591-1000
Telephone:  (415) 433-9000                 *jparsigian@winston.com*
*bsimon@pswlaw.com*
*bshiftan@pswlaw.com*                      *Class Counsel for the Consolidated
                                           Action Plaintiffs*
*Class Counsel for the Consolidated
Action Plaintiffs*

20

PRITZKER LEVINE LLP


By *s/ Elizabeth C. Pritzker*
    Elizabeth C. Pritzker
    Jonathan K. Levine
    Bethany L. Caracuzzo
    180 Grand Avenue, Suite 1390
    Oakland, CA 94612
    Telephone: (415) 692-0772

*Additional Class Counsel*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**    19-15566, 19-15662

    I am the attorney or self-represented party.

    **This brief contains** 3,472 **words,** excluding the items exempted by Fed. R.

App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

    I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[x] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Jeffrey L. Kessler*                **Date** February 12, 2020
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: February 12, 2020

WINSTON & STRAWN LLP

*s/ Jeffrey L. Kessler*
Jeffrey L. Kessler

*Counsel for the Consolidated Action Plaintiffs*